Edward Gartenberg (State Bar No. 102693)
Kristin Sciarra (State Bar No. 236247)
GARTENBERG GELFAND WASSON & SELDEN LLP
801 South Figueroa Street, Suite 2170
Los Angeles, California 90017
Telephone: (213) 542-2100
Facsimile: (213) 542-2101
Email:      egartenberg@ggwslaw.com
            ksciarra@ggwslaw.com

Attorneys for Defendant and Movant
MYXER, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARISTA RECORDS, LLC, a Delaware limited liability company; *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>MYXER INC., f/k/a mVISIBLE TECHNOLOGIES, INC. *et al.*,<br><br>Defendants. | Case No.: CV 08-03935 GAF(JCx)<br><br>**JOINT STIPULATION OF COUNSEL IN CONNECTION WITH DEFENDANT MYXER'S MOTION FOR AN *IN CAMERA* REVIEW OF DOCUMENTS IDENTIFIED IN VERIZON'S PRIVILEGE LOG**<br><br>Date:  April 27, 2010<br>Time: 9:30 a.m.<br>Judge: Hon. Jacqueline Chooljian<br>Courtroom: 20 – 3rd Floor of Spring Street Courthouse<br>Trial Date: None Currently Set |

Pursuant to Local Rule 37, Defendant Myxer, Inc. ("Myxer") and non-party Cellco Partnership d/b/a Verizon Wireless ("Verizon") hereby submit the following Joint Stipulation in connection with Myxer's Notice of Motion and Motion for an *In Camera* Review of Document Identified in Verizon's Privilege Log.

# TABLE OF CONTENTS

I.      Myxer's Introductory Statement .................................................................. 2

II.     Verizon's Introductory Statement ............................................................... 3

III.    Myxer's Argument: An *In Camera* Review Is Appropriate ........................... 5

    A.   There Are Only Three Privilege Log Entries At Issue ......................... 5

    B.   The Content of the Documents Withheld is Relevant to the Case ..................... 6

    C.   Work Product Protection Applied to a Third Party is Narrow ..................... 7

    D.   The Privilege Extends Only to Communications with Counsel and Not to the Information Communicated .................................................. 8

IV.    Verizon's Argument: ................................................................................ 8

    A.   Myxer Has Not Satisfied The Standard For Requesting *In Camera* Inspection Of The Ruth Email ........................................................ 9

    B.   The Standard For Work Product Is Met ............................................ 10

        1.   The Ruth Email Was Prepared At The Direction of Counsel ................ 10

        2.   The Ruth Email Was Prepared Because of Anticipated Litigation ........ 10

    C.   Myxer Does Not Argue That The Work Product Doctrine May Be Overcome ........................................................................ 13

    D.   Verizon is Entitled to Fees Under Fed. R. Civ. P. 37 ........................ 13

V.     Myxer's Conclusion .............................................................................. 14

VI.    Verizon's Conclusion ............................................................................ 14

JOINT STIPULATION FILED IN CONNECTION WITH DEFENDANT MYXER, INC.'S MOTION TO FOR AN
*IN CAMERA* REVIEW OF VERIZON'S ALLEGEDLY PRIVILEGED DOCUMENT

### I.      Myxer's Introductory Statement

The Federal Rules allow parties to "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense."  Fed.R.Civ.P. 26(b)(1).  The discovery sought by Defendant Myxer, Inc. ("Defendant" or Myxer") from Verizon Wireless Telecom ("Verizon") is of uncontested relevance to the matters at issue in this case.  Defendant has requested and received documents from Verizon to support its affirmative defenses, and specifically the defense of misuse of copyright.  This information could provide a complete defense to Myxer in this case.

After extensive meet and confer efforts first regarding the document production and later regarding the privilege log, Verizon and Defendant only have a very narrow dispute remaining.  Declaration of Kristin Sciarra ("Sciarra Decl.") ¶ 3. There are three entries in Verizon's privilege log, entry numbers 21, 22 and 23, that Defendant would like the Court to review *in camera* to determine whether or not these items are properly designated as attorney-client privileged communication or attorney work product.  <u>Id</u>.  These documents were not produced to Myxer as part of Verizon's document production; however, they were identified and itemized on Verizon's privilege log.  Sciarra Decl. ¶¶ 4, 12, 13, Exhibit ("Ex.") F. *As to the privilege log entries at issue none of the email recipients are attorneys and none of the email drafters are attorneys.*  Sciarra Decl. ¶ 4, Ex. F (entries 21, 22, and 23).

During meet and confer efforts counsel for Verizon showed counsel for Myxer the email for which it based its privilege claims in privilege log entry numbers 21, 22 and 23.  Sciarra Decl. ¶ 5.  Prior to allowing Defendant's counsel review the documents at issue in this motion, however, Verizon's counsel insisted that any content of the emails not be addressed in briefs filed with the Court.  Sciarra Decl. ¶¶ 6, 7, Ex. A.  So that Myxer could properly evaluate the issue to determine if a motion would be necessary, Myxer's counsel agreed to Verizon's counsels' terms. Sciarra Decl. ¶ 8.  Thus, based on Verizon's demand, Defendant cannot explain in this pleading the reason it believes the information at issue is not protected by the

GARTENBERG
GELFAND
WASSON &
SELDEN LLP

-2-                                                                                    23407

JOINT STIPULATION FILED IN CONNECTION WITH DEFENDANT MYXER, INC.'S MOTION TO FOR AN *IN CAMERA* REVIEW OF VERIZON'S ALLEGEDLY PRIVILEGED DOCUMENT

1   attorney-client privilege or the work-product doctrine.  Doing so would require a

2   discussion of the content.  Sciarra Decl. ¶ 8, Ex. A.

3          Further, Verizon's counsel indicated that it was not going to show Myxer's

4   counsel all of the documents that related to entries 21, 22 and 23 because Verizon's

5   claim for privilege was only based upon the one email that they did show Myxer's

6   counsel.  Sciarra Decl. ¶ 5.  Based upon a review of the documents at issue, Myxer's

7   counsel disagrees that the documents identified in privilege log entries 21, 22 and 23

8   are protected by the attorney-client or work product privileges because they do not

9   satisfy the requisite legal standards to establish either privilege.  Sciarra Decl. ¶ 8.

10  Accordingly, Myxer respectfully requests that the Court conduct an *in camera*

11  inspection of the documents at issue, and if the Court agrees with Myxer that the

12  documents are not privileged, order that such documents be promptly produced.

13  **II.    Verizon's Introductory Statement**

14         Myxer's motion seeks *in camera* review of a single email chain, initially

15  prepared by Verizon employee Ed Ruth, with replies by Tom Constable, Daniel

16  Flagler, and Matthew Schwartz.[1] (Declaration of Jeffrey Darnell ("Darnell Decl.")

17  Ex. A at VZW 0222 -- 0225.)  Admittedly, none of these individuals are lawyers, yet

18  the basis for Verizon's assertion of the work product doctrine remains

19  straightforward.  The first email in the chain contains a draft report of an

20  investigation that Ruth prepared for Brian Ashby, Assistant General Counsel for

21  Verizon.[2] (*See* Darnell Ex. A at VZW 0222, 0223 & 0225; Ashby Decl. ¶¶ 1, 3 &

22  4.)  In that initial email, Ruth requested that Constable, Flagler, and Schwartz review

23  _____
[1] For work product purposes, each link of the email chain (*i.e.*, documents 21, 22,
24  and 23 on Verizon's privilege log) should be treated identically because Constable,
    Flagler, and Schwartz' suggestions and comments to Ruth's investigatory report
25  were part of the investigation conducted by Ruth, and initiated by Ashby, because of
    anticipated litigation.  Accordingly, the entire email chain will be referred to herein
26  as the "Ruth Email."
    [2] To avoid any potential argument of waiver, Ashby's declaration describes his
27  mental impressions and legal analysis in general terms.  However, should the Court
    decide to review the Ruth Email *in camera*, Verizon hereby requests that it be
28  granted leave to supplement Ashby's declaration with additional facts, to be
    considered by the Court *in camera*.

Gartenberg
Gelfand
Wasson &
Selden llp

his draft report, and add any additional helpful information to it, before Ruth sent it

to counsel.  (Darnel Ex. A at VZW 0222, 0223 & 0225.)  In turn, Ruth's

investigatory report discloses in its very first words that he drafted the report at the

instruction of Ashby:  "Brian, Per our discussion last week, I've done a little

investigating and have found . . . ."  (Darnell Decl. Ex. A at VZW 0222, 0223 &

0225, *see also* Ashby Decl. ¶ 3.)  Moreover, the report also reveals that the

investigation was conducted because Verizon suspected or anticipated that it might

get dragged into litigation involving the very same claims that are currently before

the Court.  (*See, e.g.,* Ashby Decl. ¶ 2.)  Ruth's report notes, "I'm concerned at this

point that our messaging business may get pulled into litigation . . . ."  (Darnell

Decl. Ex. A at VZW 0222, 0223 and 0225.)  The Ruth Email is thus classic work

product: an investigation by a non-attorney, conducted at an attorney's express

request, and prepared because of anticipated litigation.  Accordingly, Myxer's

motion has absolutely no basis and must be denied.

     Worse, each of the foregoing facts was known to Myxer at the time it brought

this motion because Verizon went to the extraordinary length of allowing Myxer's

counsel to review the initial email from Ruth during the Local Rule 37 meet-and-

confer process (subject to an agreement that such a disclosure would not amount to a

waiver), as Myxer's counsel admits.  (Sciarra Decl. ¶¶ 5-8.)  Because Myxer's

counsel had all the necessary information to determine that the Ruth Email was

clearly work product, the instant motion against Verizon – ***who is not even a party

to this action*** – can be nothing more than outright harassment.  Accordingly,

Verizon respectfully requests that Myxer be sanctioned in the amount of $3,862.50,

which will only partially reimburse Verizon for the attorney fees it has incurred in

defending this meritless motion.

JOINT STIPULATION FILED IN CONNECTION WITH DEFENDANT MYXER, INC.'S MOTION TO FOR AN
*IN CAMERA* REVIEW OF VERIZON'S ALLEGEDLY PRIVILEGED DOCUMENT

III.  **Myxer's Argument: An *In Camera* Review Is Appropriate**

Based on the facts involved, an *in camera* review should be allowed.  There is a reasonable belief that an *in camera* review of the materials will reveal evidence to establish that the attorney-client privilege or work product privilege do not apply.  See In re: Grand Jury Investigation v. The Corporation, 974 F. 2d 1068, 1071 (9th Cir. 1992).

- None of the privilege log entries disputed identity counsel as a recipient or as an author in the email chains.  Sciarra Decl. ¶ 4, Ex. F.
- Counsel for Myxer has reviewed the one email that Verizon claims is its entire basis for the documents withheld in privilege log entries 21, 22, and 23.  Sciarra Decl. ¶ 5.  Myxer's counsel does not believe the document it reviewed is privileged.  Sciarra Decl. ¶ 8.  Based on this, Myxer's counsel does not believe the other corresponding documents, which counsel has not seen, are privileged.  Sciarra Decl. ¶ 8.

A. **There Are Only Three Privilege Log Entries At Issue**

When evaluating whether an *in camera* review is appropriate, courts consider the amount of material they have been asked to review.  See id. at 1073.

The quest for documents began months ago.  Here, counsel for Defendant has been able to reach an agreement with Verizon's counsel on nearly everything.  See Sciarra Decl. ¶¶ 3, 5, 7, Myxer has been very diligent and has been consistently following-up with Verizon (and the other parties that were served with subpoenas) to complete its document production.  Sciarra Decl. ¶ 7.

After Judge Feess' January 21, 2010 Order, Verizon made its first production of documents on February 8, 2010.  Sciarra Decl. ¶ 11, Ex. C.  On February 10 and February 11, Myxer's counsel followed up with Verizon's counsel identifying numerous redactions throughout Verizon's production.  Sciarra Decl. ¶¶ 12, 13, Exs. D, and E.  Then on February 18, 2010, Verizon's counsel provided a privilege log

for the numerous redactions.  Sciarra Decl. ¶ 14, Ex. F.  On February 23, 2010, Myxer's counsel sent an email and a Rule 37 letter to Verizon's counsel.  Sciarra Decl. ¶¶ 16, 17, Exs. G, and H.  As detailed in this letter, Verizon's privilege log entry numbers 6, 7, 10, 12, 13, 15, 17, 21, 22, and 23 did not contain reference to an attorney, however, Verizon asserted attorney-client privilege and attorney work product for each of those entries.  Sciarra Decl. ¶ 17, Ex. H.  Then on February 24, 2010, Verizon produced more documents and provided a supplemental privilege log in which log entry number 36 also did not contain reference to an attorney.  Sciarra Decl. ¶ 18, Ex. I.  On March 3, 2010, Verizon made several changes to its privilege log and provided non-privileged documents to Myxer.  Sciarra Decl. ¶ 19, Ex. J.

On February 26, 2010 (by telephone), and again on March 9, 2010 (in person), counsel for Verizon and counsel for Myxer met and conferred extensively and were successfully able to resolve the majority of the disputes over the privilege log.  Sciarra Decl. ¶ 20.  The only remaining issue relates to privilege log entries 21, 22 and 23.

### B.  <u>The Content of the Documents Withheld is Relevant to the Case</u>

The only documents that Verizon produced were those that referred or related to Myxer.  Moreover, during meet and confer efforts, both counsel agreed that the documents corresponding to privilege log entries 21, 22 and 23, are relevant to this case.  Sciarra Decl. ¶ 21.

The Court has also noted that the documents sought bear on the merits of this case.  The Court has previously held, "it appears that precluding Myxer from conducting discovery regarding these defenses may cause Myxer to suffer substantial prejudice."  Sciarra Decl. ¶ 22, Ex. B.

\\\

JOINT STIPULATION FILED IN CONNECTION WITH DEFENDANT MYXER, INC.'S MOTION TO FOR AN
*IN CAMERA* REVIEW OF VERIZON'S ALLEGEDLY PRIVILEGED DOCUMENT

1             **C. <u>Work Product Protection Applied to a Third Party is Narrow</u>**

2        Work product protection is designed to protect the work product of an

3  adversary, not a third party who is not contemplated or anticipated to be a party to

4  the litigation.  <u>Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co.</u>, 117

5  F.R.D. 292, 298 (D.D.C. 1987) (court refused to extend work product protection to

6  audit letters prepared by an attorney where Magistrate Judge's *in camera*

7  examination revealed that they were not prepared to assist the company in present or

8  reasonably anticipated litigation); <u>Jordan v. United States Dep't of Justice</u>, 591 F.2d

9  753, 775 (D.C. Cir. 1978) (en banc) (noting that the "narrow" reach of the work

10  product protection is "modest" in that it is aimed towards protecting legal

11  representation within the framework of the adversary system by removing counsel's

12  fears that his thoughts and information will be invaded by his adversary."); <u>Marten</u>

13  <u>v. Yellow Freight Sys.</u>, 1998 U.S. Dist. LEXIS 268, 1998 WL 13244, at *10 (D.

14  Kan. Jan. 7, 1998) ("The court looks to the primary motivating purpose behind the

15  creation of the document to determine whether it constitutes work product.

16  Materials assembled in the ordinary course of business or for other non-litigation

17  purposes are not protected by the work product doctrine . . . the threat of litigation

18  must be 'real and imminent.'"); <u>United States v. El Paso Co.</u>, 682 F.2d 530, 543-44

19  (5th Cir. 1982), cert. denied, 466 U.S. 944 (1984) (documents that were ultimately

20  written "with an eye on" a party's "business needs" do not "contemplate litigation in

21  the sense required to bring it within the work product doctrine."); <u>De Beers LV</u>

22  <u>Trademark Ltd. v. Debeers Diamond Syndicate Inc.</u>, 2006 U.S. Dist. LEXIS 6091

23  (S.D.N.Y. Feb. 15, 2006) (documents prepared by a consulting firm were more

24  indicative of strategic business decisions that should be taken were not prepared in

25  anticipation of litigation but with a business purpose in mind.)

26        The test in the Central District is whether the "primary" purpose of the

27  document was to assist in pending or prospective litigation.  <u>Griffith v. Davis</u> (C.D.

28  Cal. 1995) 161 F.R.D 687, 698-99 (Magistrate Judge Wistrich) (refusing to apply

GARTENBERG
GELFAND
WASSON &
SELDEN LLP

-7-                23407

JOINT STIPULATION FILED IN CONNECTION WITH DEFENDANT MYXER, INC.'S MOTION TO FOR AN
*IN CAMERA* REVIEW OF VERIZON'S ALLEGEDLY PRIVILEGED DOCUMENT

1   work product privilege to administrative investigation that would have been

2   generated whether or not litigation was pending).

3        Based on a review of the documents presented by Verizon, Myxer does not

4   believe the documents referenced in privilege log entries 21, 22, and 23 are covered

5   by the work product or attorney-client privilege.  At this point, because Myxer's

6   counsel cannot reveal the content of the email at issue based their agreement with

7   Verizon's counsel, a further analysis cannot be set forth in these papers.  Sciarra

8   Decl. ¶ 6, 7, 8, Ex. A.

9        **D. The Privilege Extends Only to Communications with Counsel and
10       Not to the Information Communicated**

11       The work product privilege does not make facts privileged.  Only

12  communications with counsel are privileged, relevant facts cannot become

13  privileged if they become incorporated into a communication with an attorney.  See

14  Upjohn Co. v. United States (1981) 449 U.S. 383, 395-396.  Here, we do not have

15  an actual communication to an attorney.  Therefore, the email communications

16  presumptively should not be privileged.  Sciarra Decl. ¶ 4, Ex. F.

17       Moreover, even if a portion of the email communication could be determined

18  to be privileged, the remaining email communications are not privileged and they

19  should be produced to Myxer in discovery.

20  **IV.   Verizon's Argument:**

21       The work product doctrine plainly protects the Ruth Email.  As demonstrated

22  below, Myxer's bare allegations are insufficient to meet even the minimum showing

23  necessary for an *in camera* review of these documents.  Further, Verizon has

24  supplied the Court (and Myxer) with ample evidence indicating that the Ruth Email

25  was prepared at the direction of counsel and in anticipation of litigation (indeed, in

26  anticipation that Verizon might face claims exactly like the ones currently before the

27  Court).  Accordingly, Myxer's motion should be denied.

28  \\\

GARTENBERG
GELFAND
WASSON &
SELDEN LLP

JOINT STIPULATION FILED IN CONNECTION WITH DEFENDANT MYXER, INC.'S MOTION TO FOR AN
*IN CAMERA* REVIEW OF VERIZON'S ALLEGEDLY PRIVILEGED DOCUMENT

A.   **Myxer Has Not Satisfied The Standard For Requesting *In Camera* Inspection Of The Ruth Email**

As Myxer's own cited authority makes clear, an *in camera* review "is an intrusion which must be justified," and the Court may order such a review only upon a proper showing. *In re Grand Jury Investigation v. The Corp.*, 974 F.2d 1068, 1074 (9th Cir. 1992). Before an *in camera* review may take place, "the party opposing the [assertion] of the privilege," must "show a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged." *Id.* at 1075. Only if such a showing can be made, does the Court proceed to the second step, which is to exercise its discretion as to whether an *in camera* review is appropriate. *See id.* at 1073-75. Among the factors that the Court is to consider, is whether the review is likely to produce evidence that would defeat the asserted protection. *See id.* at 1073-74. Here, Myxer's challenge fails both prongs.

Stripped of its excess verbiage, Myxer's argument boils down to a single, unconvincing point: Myxer argues that an *in camera* review is appropriate because no attorney was included on the privilege log entries for the documents in question. This showing is insufficient. It is well established that an agent acting on behalf of an attorney may create attorney work product materials. *See, e.g., United States v. Nobles*, 422 U.S. 225, 238-39, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975) (noting that "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial," and that "the [work product] doctrine [therefore] protect[s] material prepared by agents for the attorney as well as those prepared by the attorney himself."); *Lewis v. Wells Fargo & Co.*, 2010 WL 890183, *6 (N.D. Cal. Mar. 12, 2010) ("Thus, the doctrine may be applied to documents created by non-attorneys so long as they are prepared by or for another party or its representative and they are created in anticipation of litigation.") (quotations omitted); *see also* Fed. R. Civ. P. 26(b)(3) ("Ordinarily, a party may not

discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, *or agent*).") (emphasis added).  As the foregoing authorities demonstrate, so long as the document in question was prepared at counsel's direction and because of anticipated litigation, it remains protected by the work product doctrine, even if it was not prepared by the attorney himself.

### B.   <u>The Standard For Work Product Is Met</u>

No *in camera* review is necessary because the Ruth Email is so obviously work product.  It satisfies both elements of the doctrine:  it was prepared at the instruction of counsel, and it was prepared in anticipation of litigation.

### 1.   The Ruth Email Was Prepared At The Direction of Counsel

Tellingly, Myxer does not dispute that the Ruth Email was prepared at the direction of counsel.  Nor can it.  In or around March 2009, Ashby directed Ruth to investigate certain aspects of Myxer's services.  (Ashby Decl. ¶ 3.)  On its face, the Ruth Email makes it clear that it was prepared for its intended audience of "Brian A" – that is, Brian Ashby, in house counsel.  (Darnell Decl. Ex. A at VZW 0222, 0223 & 0225.)  Moreover, Ruth's investigatory report begins, "Brian, Per our discussion last week, I've done a little investigating and have found . . . ."  (*Id.*) There can be no dispute that the first element of the work product doctrine is satisfied.

### 2.   The Ruth Email Was Prepared Because of Anticipated Litigation

Myxer agrees that a document prepared in anticipation of litigation may be subject to work product protections, but it misunderstands the relevant standard. Specifically, Myxer states that "[t]he test in the Central District is whether the 'primary' purpose of the document was to assist in pending or prospective litigation."  (Joint Stipulation, *supra* at Section III.C (citing *Griffith v. Davis*, 161

GARTENBERG
GELFAND
WASSON &
SELDEN LLP

-10-                                                          23407
JOINT STIPULATION FILED IN CONNECTION WITH DEFENDANT MYXER, INC.'S MOTION TO FOR AN
*IN CAMERA* REVIEW OF VERIZON'S ALLEGEDLY PRIVILEGED DOCUMENT

1    F.R.D 687, 698-99 (C.D. Cal. 1995)).)  Not so.  The Ninth Circuit has since adopted

2    the more liberal "because of" standard.  *In re Grand Jury Investigation (Mark*

3    *Torf/Torf Envt'l Mgmt.)*, 375 F.3d 900, 907 (9th Cir. 2004); *Lewis*, 2010 WL

4    890183 at *6 ("The Ninth Circuit has adopted the 'because of' standard for

5    determining whether a document was prepared 'in anticipation of litigation.'"); *Visa*

6    *U.S.A., Inc. v. First Data Corp.*, 2004 WL 1878209, *4 (N.D. Cal. Aug. 23, 2004)

7    ("[T]he Court notes that the 'because of' standard is more protective than the

8    'primary purpose' standard . . . .").

9         Accordingly, Verizon need only show that the Ruth Email, "in light of the

10   nature of the document and the factual situation in the particular case . . . can be

11   fairly said to have been prepared or obtained because of the prospect of litigation."

12   375 F.3d at 907.  Put another way, Verizon need not demonstrate that litigation was

13   the exclusive purpose for the creation of the documents at issue.  *See id.* at 907-08;

14   *see also id.* at 908 ("The 'because of' standard does not consider whether litigation

15   was a primary or secondary motive behind the creation of a document.").  Instead,

16   Verizon need only establish that the documents were prepared "because of" the

17   anticipation of litigation.

18        As set forth in the declaration of Brian Ashby, before March 2009, Verzion

19   was aware of the allegation that Myxer was violating copyright laws. (Ashby Decl.

20   ¶ 2.)  Accordingly, Ashby requested that Ruth investigate certain aspects of Myxer's

21   business.  (*Id.* at ¶ 3. )  Ashby made this request because he suspected that Verizon

22   might be named as a defendant in a subsequent copyright suit.  (*Id.* at ¶ 2.)  Indeed,

23   the Ruth Email itself specifically notes that Verizon was "concerned at this point

24   that our messaging business may get pulled into litigation . . . ." (Darnell Decl. Ex.

25   A at VZW 0222, 0223 & 0225.)

26        In addition, Ashby feared potential claims from Myxer as well – a fear that

27   has been borne out in the instant action.  As noted in this Court's January 21, 2010

GARTENBERG
GELFAND
WASSON &
SELDEN LLP

28

1  Order, "Myxer argues that Plaintiffs have engaged in anticompetitive behavior

2  giving rise to defenses of copyright misuse and unclean hands.  Specifically, Myxer

3  alleges that Plaintiffs communicated with the Telecommunications Carriers[,

4  including Verizon,] regarding Mxyer's business, which may have caused the

5  carriers, in light of declining revenues, to halt business with Mxyer."  (Sciarra Decl,

6  Ex. B at 4.)  Although this argument has no factual basis whatsoever, it is obvious

7  that it could be used offensively against Verizon, even though Myxer characterizes

8  this argument as a "defense."

9        Moreover, Verizon and Myxer are presently adverse in a pending matter

10  before the Federal Communications Commission ("FCC").  In or about September

11  30, 2009, Myxer filed with the FCC its "Comments" in response to two pending

12  FCC matters: *Notice of Inquiry, Fostering Innovation and Investment in the Wireless*

13  *Communications Market*, GN Docket No. 09-157, FCC 09-66 (rel. Aug. 27, 2009)

14  as well as *A National Broadband Plan For Our Future*, GN Docket No. 09-51, FCC

15  09-31 (rel. April 8, 2009).  (*See generally* Darnell Ex. B at 1.)  Therein, Myxer

16  alleged that "actions taken by the likes of AT&T and Verizon Wireless have

17  disrupted Myxer's business, implicating the Commission's call blocking policies,

18  net-neutrality policies, and the First Amendment rights of consumers and Myxer."

19  (*Id.* at 2-3.)  Subsequently, Myxer accuses Verizon of causing a 42% drop in

20  Myxer's customer traffic.  (*See id.* at 21.)  Like the "defense" articulated above, this

21  claim has no merit, but it might still flower into an offensive action against Verizon.

22        In sum, it is beyond question that Ruth's investigatory report was prepared

23  because of anticipated litigation – and that the anticipated litigation may yet

24  materialize.  The work product doctrine accordingly shields the Ruth Email from

25  disclosure.

26  \\\

27  \\\

28  \\\

GARTENBERG
GELFAND
WASSON &
SELDEN LLP

JOINT STIPULATION FILED IN CONNECTION WITH DEFENDANT MYXER, INC.'S MOTION TO FOR AN
*IN CAMERA* REVIEW OF VERIZON'S ALLEGEDLY PRIVILEGED DOCUMENT

**C.    Myxer Does Not Argue That The Work Product Doctrine May Be Overcome**

Finally, there is no exception or waiver that would allow the work product doctrine to be overcome.  Myxer has not articulated any argument that it has a substantial need for the documents at issue.  Nor has Mxyer articulated any argument that work product privilege has been waived.  As such, the Ruth Email remains protected.

**D.    Verizon is Entitled to Fees Under Fed. R. Civ. P. 37**

Rule 37(a)(5)(B) provides that when a motion to compel is denied, the Court "***must***, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(B) (emphasis added).  Although the rule provides a safe harbor for motions that are "substantially justified," Myxer cannot avail itself of that safe harbor here.  First, Verizon went to the extraordinary length of making the Ruth Email available for review by Myxer's counsel (subject to an agreement that such a disclosure would not be a waiver).  Accordingly, Myxer was well aware that the Ruth Email summarized an investigation expressly requested by Brian Ashby, counsel for Verizon ("Brian, Per our discussion last week, I've done a little investigating and have found . . . .").  (Darnell Decl. Ex. A at VZW 0222, 0223 & 0225; Sciarra Decl. ¶¶ 5-8.)  Myxer was also well aware that the Ruth Email was drafted because of anticipated litigation ("I'm concerned at this point that our messaging business may get pulled into litigation . . . .").  (Darnell Decl. Ex. A at VZW 0222, 0223 & 0225.)  As a  result, Myxer's motion cannot be "substantially justified," and Verizon's fees should therefore be awarded.

Verizon has incurred no less than $3,862.50 in fees and costs as a result of Myxer's baseless motion.  This sum includes time spent by just one attorney (although other attorneys have worked on this opposition), including time spent in

JOINT STIPULATION FILED IN CONNECTION WITH DEFENDANT MYXER, INC.'S MOTION TO FOR AN *IN CAMERA* REVIEW OF VERIZON'S ALLEGEDLY PRIVILEGED DOCUMENT

1   reviewing Verizon's motion (.6 hours), researching the legal issues raised and the

2   authorities cited (3.5 hours), and preparing this opposition (6.2 hours).  (Darnell

3   Decl ¶ 5.)

4   **V.    Myxer's Conclusion**

5       Myxer has established that an *in camera* review is appropriate and could

6   reveal non-privileged information.

7       Based upon a review of the documents at issue, Myxer's counsel disagrees

8   that the documents identified in privilege log entries 21, 22 and 23 are protected by

9   the attorney-client or work product privileges because they do not satisfy the

10  requisite legal standards to establish either privilege.  Accordingly, Myxer

11  respectfully requests that the Court conduct an *in camera* inspection of the

12  documents at issue, and if the Court agrees with Myxer that the documents are not

13  privileged, order that such documents be promptly produced.

14  **VI.   Verizon's Conclusion**

15      Myxer's motion is an invitation to waste judicial resources through the

16  needless *in camera* review of documents that are obviously protected by the work

17  product doctrine.  The Court should decline.  As demonstrated above, the Ruth

18  Email is part of a factual investigation carried out by Verizon employees at the

19  behest of in-house counsel for Verizon and in anticipation of litigation – including

20  the very claims at issue in the case at bar.  These undisputed facts unassailably

21  establish that the work product doctrine applies to the Ruth Email, and therefore,

22  that Myxer's motion should be denied.  Furthermore, each of the foregoing facts

23  was known to Myxer at the time this motion was filed, so Myxer cannot argue that

24  its motion was "substantially justified" within the meaning of Federal Rule of Civil

25  Procedure 37.  Accordingly, Verizon respectfully requests that Myxer be ordered to

26

27

28

GARTENBERG
GELFAND
WASSON &
SELDEN LLP

JOINT STIPULATION FILED IN CONNECTION WITH DEFENDANT MYXER, INC.'S MOTION TO FOR AN
*IN CAMERA* REVIEW OF VERIZON'S ALLEGEDLY PRIVILEGED DOCUMENT

1   pay Verizon the amount of $3,862.50, which will only partially reimburse Verizon

2   for the attorney's fees it has incurred in defending this meritless motion.

3

4   Dated: March 25, 2010      GARTENBERG GELFAND WASSON &
                               SELDEN LLP
5
                                      By: /s/ Edward Gartenberg____
6                                         Edward Gartenberg
                                          Kristin Sciarra
7                                         Attorneys for Defendant MYXER INC.

8   Dated: March 25, 2010      SCHEPER KIM & OVERLAND, LLP

9
                                      By: /s/ Alexander H. Cote____
10                                        Alexander H. Cote
                                          Jeffrey Darnell
11                                        Attorneys for Non-Party CELLCO
                                          PARTNERSHIP D/B/A VERIZON WIRELESS
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION FILED IN CONNECTION WITH DEFENDANT MYXER, INC.'S MOTION TO FOR AN
*IN CAMERA* REVIEW OF VERIZON'S ALLEGEDLY PRIVILEGED DOCUMENT

# DECLARATION OF KRISTIN SCIARRA

I, Kristin Sciarra, declare and state:

1.      I am a member of the State Bar of California and I am admitted to practice before this Court.  I am an attorney with the law firm of Gartenberg Gelfand Wasson & Selden, LLP and I am co-counsel of record for Defendant Myxer, Inc. ("Defendant" or "Myxer") in this case.

2.      I make this declaration in support of Defendant Myxer, Inc.'s Notice of Motion and For an *In Camera* Review if Documents Identified in Verizon's Privilege Log ("Motion").  This Motion is brought to have the Court review documents *in camera* that were identified in non-party Verizon Wireless Telecom's ("Verizon") privilege log.  I have personal knowledge of the matters stated herein, except as stated otherwise, and I could and would testify competently to them if called as a witness.

## The Instant Motion

3.      After meet and confer efforts first regarding the document production and later regarding the privilege log, Verizon and Defendant only have a very narrow dispute remaining.  There are three entries in Verizon's privilege log, entry numbers 21, 22 and 23, that Defendant would like the Court to review *in camera* to determine whether or not these items are properly designated as attorney-client privileged communication or attorney work product.

4.      The documents identified in privilege log entries 21, 22 and 23, were not produced to Myxer as part of Verizon's document production, however, they were identified and itemized on Verizon's privilege log.  In privilege log entries 21, 22, and 23, *none of the email recipients are attorneys and none of the email drafters are attorneys.*

5.      During meet and confer efforts counsel for Verizon showed counsel for Myxer various emails in connection with privilege log entries 6, 7, 10, 12, 13, 15, and 17.  There is no dispute regarding the information withheld by Verizon and

1   identified in privilege log entries 6, 7, 10, 12, 13, and 15.  Verizon's counsel also

2   showed Myxer's counsel the one email for which it based its privilege claims in

3   privilege log entry numbers 21, 22 and 23.  Thus, counsel for Myxer did not review

4   all of the emails that are being withheld pursuant to privilege log entries 21, 22 and

5   23.

6         6.     Prior to allowing Defendant's counsel review the documents at issue in

7   this motion, however, Verizon's counsel conditioned the disclosure on an

8   agreement to not reveal the content of the emails in briefs filed with the Court.

9         7.     Attached hereto as **Exhibit "A"** is a true and correct copy of

10  Alexander Cote's (counsel for Verizon) March 9, 2010 email to Kristin Sciarra

11  providing in part:

12

13        We are conditioning our disclosure of the documents on Myxer's

14        agreement that it will not sue the information for any purpose.  The

15        word "use" has already been employed it the protective order in this

16        case, so the parties should already know what it means. (See Section

17        2.2.)  We adopt the same meaning of "use" here.

18

19        However, where as Section 2.2 of the protective order permits "use" in

20        this litigation, we are conditioning our disclosure on Myxer's

21        agreement not to sue the information we disclose in any way, **whether**

22        **in litigation or otherwise**.  This would include (for example and

23        without limitation) disclosing the contents of the privileged

24        communications in any filings before the Court.  (Emphasis in

25        original.)

26

27        8.     So that Myxer could properly evaluate the issue to determine if a

28  motion would be necessary.  Myxer's counsel (myself and Edward Gartenberg)

Gartenberg
Gelfand
Wasson &
Selden llp

-2-                                                   23447

DECLARATION OF KRISTIN SCIARRA FILED IN SUPPORT OF MYXER'S MOTION FOR AN *IN CAMERA*
REVIEW OF DOCUMENTS

1  agreed to Verizon's counsels' terms.  Thus, based on Verizon's demand, Defendant

2  cannot explain in this Declaration or in underlying Motion the reason counsel

3  believes the information at issue is not protected by the attorney-client privilege or

4  the work-product doctrine.  Doing so would require a discussion of the content.

5  **Meet and Confer Efforts**

6      9.     The quest for documents began months ago and Myxer has been

7  diligent in pursuing the documents from Verizon and other third party

8  telecommunication carriers.

9      10.    Attached hereto as **Exhibit "B"** is a true and correct copy of Judge

10 Feees' January 21, 2010 Order Re: Motion for Leave to Enforce Subpoenas.

11     11.    After the Court's Order, Verizon made its first production of

12 documents on February 8, 2010.  Attached hereto as **Exhibit "C"** is a true and

13 correct copy of Jeffrey Darnell's (counsel for Verizon) February 8, 2010 email to

14 Kristin Sciarra in which documents from Verizon were received.

15     12.    On February 10, 2010, Myxer's counsel followed up with Verizon's

16 counsel identifying numerous redactions throughout Verizon's production.

17 Attached hereto as **Exhibit "D"** is a true and correct copy of Kristin Sciarra's

18 February 10, 2010 email to Jeffrey Darnell identifying 20 redactions in Verizon's

19 production of documents and requesting that Verizon provide a privilege log as to

20 these redactions.

21     13.    Attached hereto as **Exhibit "E"** is a true and correct copy of Kristin

22 Sciarra's February 11, 2010 email to Jeffrey Darnell again requesting a privilege

23 log from Verizon.

24     14.    On February 18, 2010, Verizon's counsel, Jeffrey Darnell provided a

25 privilege log for the numerous redactions.  Attached hereto as **Exhibit "F"** is a true

26 and correct copy of the email sent by Jeffrey Darnell to Kristin Sciarra attaching

27 Verizon's privilege log.

28

GARTENBERG
GELFAND
WASSON &
SELDEN LLP

DECLARATION OF KRISTIN SCIARRA FILED IN SUPPORT OF MYXER'S MOTION FOR AN *IN CAMERA*
REVIEW OF DOCUMENTS

15.   **Exhibit "F"** includes privilege log entries 21, 22 and 23 which are the privilege log entries disputed in the instant Motion.

16.   On February 23, 2010, Myxer's counsel, Kristin Sciarra, sent an email to Jeffrey Darnell and Alexander Cote, counsel for Verizon, notifying them that a number of the entries did not appear to be protected by the privileges asserted and then requesting authority for the privileges asserted.  On that date, Alexander Cote requested a "meet-and-confer letter that complies with Local Rule 37."  Attached hereto as **Exhibit "G"** is a true and correct copy of the February 23, 2010, email exchange between Kristin Sciarra and Alexander Cote.

17.   Also on February 23, 2010, as per Alexander Cote's request, Kristin Sciarra sent a Rule 37 letter to Verizon's counsel.  As detailed in this letter, Verizon's privilege log entry numbers 6, 7, 10, 12, 13, 15, 17, 21, 22, and 23 did not contain reference to an attorney, however, Verizon asserted attorney-client privilege and attorney work product for each of those entries.  Attached hereto as **Exhibit "H"** is a true and correct copy of Kristin Sciarra's letter to Verizon's counsel in compliance with Rule 37.

18.   Then on February 24, 2010, Verizon produced more documents and provided a supplemental privilege log in which log entry number 36 also did not contain reference to an attorney.  Attached hereto as **Exhibit "I"** is a true and correct copy of the email sent by Verizon's counsel making an additional production of documents and providing a supplemental privilege log.

19.   On March 3, 2010, Verizon made several changes to its privilege log and provided non-privileged documents to Myxer.  Attached hereto as **Exhibit "J"** is a true and correct copy of the email received by Kristin Sciarra from Verizon's counsel regarding the privilege log.

20.   On February 26, 2010 (by telephone), and again on March 9, 2010 (in person), counsel for Verizon and counsel for Myxer met and conferred extensively

DECLARATION OF KRISTIN SCIARRA FILED IN SUPPORT OF MYXER'S MOTION FOR AN *IN CAMERA* REVIEW OF DOCUMENTS

and were successfully able to resolve the majority of the disputes over the privilege log. The only remaining issue relates to privilege log entries 21, 22 and 23.

21.     On March 9, 2010, counsel for Verizon and counsel for Myxer both agreed that the content of the emails withheld was relevant to the underlying litigation.

22.     The Court has also noted that the documents sought bear on the merits of this case. The Court has previously held, "it appears that precluding Myxer from conducting discovery regarding these defenses may cause Myxer to suffer substantial prejudice." Judge Feess Order Re: Motion for Leave to Enforce Subpoenas, **Exhibit "B**."

23.     I declare under penalty of perjury under the laws of the State of California that he foregoing is true and correct.

Executed this 23rd day of March 2010, at Los Angeles, California.

*Kristin Sciarra*

KRISTIN SCIARRA

DECLARATION OF KRISTIN SCIARRA FILED IN SUPPORT OF MYXER'S MOTION FOR AN *IN CAMERA*
REVIEW OF DOCUMENTS

# EXHIBIT "A"

**Kristin Sciarra**

| | |
|---|---|
| **From:** | Alexander Cote [acote@scheperkim.com] |
| **Sent:** | Tuesday, March 09, 2010 9:31 AM |
| **To:** | Kristin Sciarra; Jeffrey Darnell |
| **Cc:** | Edward Gartenberg |
| **Subject:** | RE: Arista v. Myxer; Meet and confer |

Kristin,

   We are conditioning our disclosure of the documents on Myxer's agreement that it will not use the information for any purpose. The word "use" has already been employed in the protective order in this case, so the parties should already know what it means. (See Section 2.2.) We adopt the same meaning of "use" here.

   However, where as Section 2.2 of the protective order permits "use" in this litigation, we are conditioning our disclosure on Myxer's agreement not to use the information we disclose in any way, **whether in the litigation or otherwise**. This would include (for example and without limitation) disclosing the contents of the privileged communications in any filings before the Court.

   Please let me know if this is still unclear.

   Thanks,


Alexander H. Cote
Scheper Kim & Overland LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
T (213) 613-4660 ● F (213) 613-4656
acote@scheperkim.com ● Vcard: link


**From:** Kristin Sciarra [mailto:ksciarra@ggwslaw.com]
**Sent:** Monday, March 08, 2010 6:46 PM
**To:** Alexander Cote; Jeffrey Darnell
**Cc:** Edward Gartenberg
**Subject:** RE: Arista v. Myxer; Meet and confer

Alex,

Thank you for your email and offer to meet tomorrow.  We are set for 4:00 p.m.

We agree that by showing us the unredacted copies of the documents, Verizon is not waiving the privileges that you have asserted.  I am unclear on what you mean by Myxer will not make use of the information or documents.

Kristin


**From:** Alexander Cote [mailto:acote@scheperkim.com]
**Sent:** Monday, March 08, 2010 6:13 PM

3/16/2010

**To:** Kristin Sciarra; Jeffrey Darnell
**Cc:** Edward Gartenberg
**Subject:** RE: Arista v. Myxer; Meet and confer

Kristin and Ed,

   We will be there at four.

   As we discussed on the phone, in an effort to further meet and confer on Myxer's threatened motion to compel, we plan to show you unredacted copies of the documents identified in your February 23, 2010 letter, notwithstanding that they contain privileged communications. In exchange, we again ask that you agree on behalf of Myxer that this is not a waiver of any privilege or protection, that Myxer will not argue that it is a waiver, and that Myxer will not make use of the information or documents we share with you in our meeting tomorrow.

   If you agree that this is acceptable, please send me a confirming email.

Thanks,

Alexander H. Cote
Scheper Kim & Overland LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
T (213) 613-4660 • F (213) 613-4656
acote@scheperkim.com • Vcard: link

---

**From:** Kristin Sciarra [mailto:ksciarra@ggwslaw.com]
**Sent:** Monday, March 08, 2010 5:29 PM
**To:** Alexander Cote; Jeffrey Darnell
**Cc:** Edward Gartenberg
**Subject:** Arista v. Myxer; Meet and confer

Hi Alex and Jeff,

Alex, just left you a voicemail.  We can do tomorrow at 4:00 p.m.

Thank you,
Kristin

Kristin Sciarra Martin
Attorney at Law
Gartenberg Gelfand Wasson & Selden LLP
801 S. Figueroa Street, Suite 2170
Los Angeles, California 90017
Direct Dial: (213) 542-2110
Main: (213) 542-2100
Fax: (213) 542-2101
Email: ksciarra@ggwslaw.com

3/16/2010

# EXHIBIT "B"

LINK: 464

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF (VBKx) | Date | January 21, 2010 |
|---|---|---|---|
| Title | Arista Records LLC et al v. Myxer Inc. et al | | |

| Present: The Honorable | **GARY ALLEN FEESS** | |
|---|---|---|
| Renee Fisher | None | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| None | | None |

**Proceedings:**      **(In Chambers)**

<u>**ORDER RE: MOTION FOR LEAVE TO ENFORCE SUBPOENAS**</u>

**I.
INTRODUCTION**

Defendant Myxer, Inc. ("Myxer") seeks leave to enforce four non-party subpoenas. The non-parties are four telecommunication carriers that allegedly possess facts pertinent to Myxer's affirmative defenses. Myxer served three of the subpoenas on October 29, 2009, and the fourth subpoena on November 15, 2009. Myxer contends that the need to serve the subpoenas at issue did not develop until Myxer discovered certain facts at depositions conducted on various dates in October 2009.

In its Scheduling and Case Management Order, the Court set November 16, 2009 as the discovery cut-off date. Because the non-parties either objected to or failed to respond to the subpoenas, Myxer was unable to complete discovery by the scheduled date. Thus, Myxer now moves for leave to enforce the subpoenas on AT&T Corp. ("AT&T"), T-Mobile USA, Inc. ("T-Mobile"), Sprint Spectrum, L.P., and Verizon Wireless Telecom, Inc. ("Verizon"). (Mem. at 7.) If leave is granted, Myxer will be permitted to file the appropriate motions before the Magistrate Judge to enforce the subpoenas.

The Court finds that Myxer has exercised diligence in seeking relief from the Court's scheduling order. The Court notes that, based on when the depositions giving rise to Myxer's need occurred, Myxer's ability to complete necessary discovery in accordance with the Court's scheduling order likely proved extremely difficult. The Court concludes that Myxer may seek

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF (VBKx) | Date | January 21, 2010 |
|---|---|---|---|

| Title | Arista Records LLC et al v. Myxer Inc. et al |
|---|---|

leave to enforce the subpoenas at issue.  Accordingly, Myxer's motion is **GRANTED**.  The Court's ruling is limited to the circumstances related to the present motion and not as permission to seek any other discovery.

**II.**
**BACKGROUND**

Myxer provides technology that simplifies the process of managing and delivering content, such as ringtones, to mobile devices.  (Mem. at 3.)  Myxer's business requires users to be able to download content onto their mobile phones.  (Id. at 4.)  Therefore, telecommunication carriers serve an important role in the functionality of Myxer's business.  (Id.)

During the course of discovery, it became apparent that Plaintiffs had engaged in discussions with various telecommunication carriers (the "Telecommunication Carriers") regarding Myxer and Myxer's business.  Specifically, Myxer discovered such information from the depositions of three individuals: (1) Universal Music Group employee David Ring conducted on October 1, 2009; (2) Warner Music Group employee Paul Rehrig[1] conducted on October 8, 2009; and (3) Sony Music Entertainment employee Chris Frankenberg[2] held on October 14, 2009.  (Sciarra Decl., Exs. A, B, C.)

Subsequently, subpoenas were served on non-parties AT&T, T-Mobile, Sprint Nextel Corporation, and Verizon on October 29, 2009.  (Gartenberg Decl. ¶¶ 5-10, Exs. A, B, C, D, E.)  Sprint Spectrum L.P. was served on November 15, 2009.  (Id.)  Each of these parties either objected to or failed to respond to the issued subpoenas.  (Id. ¶¶ 11-15.)  Sprint Spectrum, L.P. has not yet responded to the subpoena.  (Id. ¶ 15.)

The Court' Scheduling and Case Management Order set November 16, 2009 as the discovery cut-off date.  (Catalano Decl., Ex. 1 at 14.)  The Court's Scheduling and Case Management Order clearly states that "[a]ll discovery shall be completed by the discovery cutoff

---

[1] Rehrig testified that his business development contact at AT&T "was deeply concerned about the effect that Myxer was having on AT&T's ring tone business.  And he felt . . . that there was a direct correlation between the—decline in the ringtone revenues that we were experiencing on the service and the rise of an popularity of Myxer."  (Sciarra Decl., Ex. A [Rehrig Depo. at 227-28].)

[2] Frankenberg stated that he had conversations with Verizon regarding "the presence and prevalence of services like Myxer.  Clearly growing pattern of usage as seen by just looking at the press releases going out saying, you know X million downloads a day or X million users added a day, and seeing that number tick up quite frequently while also seeing our content revenues decline."  (Sciarra Decl., Ex. C [Frankenberg Depo. at 26-27].)

LINK: 464

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF (VBKx) | Date | January 21, 2010 |
|---|---|---|---|
| Title | Arista Records LLC et al v. Myxer Inc. et al | | |

. . . **THIS IS <u>NOT</u> THE DATE BY WHICH DISCOVERY REQUESTS MUST BE SERVED; IT IS THE DATE BY WHICH ALL DISCOVERY IS TO BE COMPLETED."** (<u>Id.</u> at 2.)  Because Myxer was unable to enforce the subpoenas by the discovery cut-off date, Myxer is forced to seek leave from the Court's scheduling order.

**III.
DISCUSSION**

**A. Legal Standard**

Under Rule 16(b) of the Federal Rules of Civil Procedure, a scheduling order may be modified "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).  Rule 16(b)'s "good cause" standard "primarily considers the diligence of the party seeking the amendment." <u>Johnson v. Mammoth Recreations, Inc.</u>, 975 F.2d 604, 609 (9th Cir. 1992).  A district court may modify the pretrial schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension." <u>Id.</u> (quotation omitted).  If the party seeking the modification is not diligent, the motion to modify should not be granted. <u>Zivkovic v. S. California Edison Co.</u>, 302 F.3d 1080, 1087 (9th Cir. 2002).

**B. Application**

**1. Copyright Misuse and Unclean Hands**

Myxer contends that the information sought in the subpoenas relates to two separate defenses: copyright misuse and unclean hands.  Myxer suggests that either of the defenses could provide a complete defense in the action.

"A successful copyright misuse defense bars a culpable plaintiff from prevailing on an action for infringement of the misused copyright." <u>Lasercomb Am., Inc. v. Job Reynolds</u>, 911 F.2d 970, 972 (4th Cir. 1990).[3]  The essential issue is "whether the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright." <u>Id.</u> at 978.  "Misuse often exists where the patent or copyright holder has engaged in some form of anticompetitive behavior." <u>Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.</u>, 342 F.3d 191, 204 (3d Cir.

---

[3] The Supreme Court recognized a defense for patent misuse in <u>Morton Salt Co. v. G.S. Suppiger</u>, 314 U.S. 488 (1942).  In <u>Lasercomb</u>, the Fourth Circuit extended the rationale behind <u>Morton Salt</u> to copyright misuse. 911 F.2d at 977.  The Ninth Circuit explicitly adopted the rule from <u>Lasercomb</u> in <u>Practice Mgmt. Info. Corp. v. Am. Med. Ass'n</u>, 121 F.3d 516, 520 (9th Cir. 1997).

LINK: 464

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF (VBKx) | Date | January 21, 2010 |
|---|---|---|---|
| Title | Arista Records LLC et al v. Myxer Inc. et al | | |

2003).

"To prevail on an unclean hands defense, a defendant in a copyright infringement action must demonstrate that: (1) the plaintiff's conduct is inequitable; and (2) the conduct relates to the subject matter of its claims." Shloss v. Sweeney, 515 F. Supp. 2d 1068, 1082 (N.D. Cal. 2007) (citing Brother Records, Inc. v. Jardine, 318 F.3d 900, 909 (9th Cir. 2003).

Myxer argues that Plaintiffs have engaged in anticompetitive behavior giving rise to defenses of copyright misuse and unclean hands. Specifically, Myxer alleges that Plaintiffs communicated with the Telecommunication Carriers regarding Myxer's business, which may have caused the carriers, in light of declining revenues, to halt business with Myxer. The Court notes that the merits of these defenses bear little on the question of diligence. However, it appears that precluding Myxer from conducting discovery regarding these defenses may cause Myxer to suffer substantial prejudice. Therefore, the Court will proceed to address Myxer's diligence with this consideration in mind.

### 2. DILIGENCE

On three separate days in October 2009, Myxer conducted the depositions of three of Plaintiffs' employees, the last of which took place on October 14, 2009. (Sciarra Decl., Exs., A, B, C.) Each of the individuals were questioned regarding their respective communications with the Telecommunication Carriers, and all of them indicated that Plaintiffs had engaged in discussions with the carriers about Myxer. Myxer contends that only after the testimony was taken in these depositions did it become aware of the need for the subpoenas at issue. (Gartenberg Decl. ¶ 4.)

Plaintiffs argue that the need for the subpoenas was apparent to Myxer much earlier. Plaintiffs support this argument by indicating that Myxer made document requests in April 2009 seeking, among other things, communications between Plaintiffs and the same non-party carriers Myxer is attempting to subpoena.[4] (See, e.g., Catalano Decl., Ex. 2 at 12.) However, Myxer contends that Plaintiffs have refused to produce the requested documents, necessitating further discovery and the present subpoenas. The Court finds that the evidence indicates Myxer's ongoing efforts to conduct discovery in connection with the Telecommunication Carriers, and

---

[4] In addition, four months later, Myxer served Plaintiffs with a series of deposition notices pursuant to Federal Rule of Civil Procedure 30(b)(6), which included categories of testimony regarding any and all discussions, communications, and contacts of any kind between Plaintiffs and the telecommunication carriers. (See, e.g., Catalano Decl., Ex. 3.)

LINK: 464

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF (VBKx) | Date | January 21, 2010 |
|---|---|---|---|
| Title | Arista Records LLC et al v. Myxer Inc. et al | | |

resistance to that discovery on the part of Plaintiffs.

Under the Federal Rules of Civil Procedure, the party issuing a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. FED. R. CIV. P. 45(c)(1). The Court is required to quash or modify a subpoena that fails to allow a reasonable time to comply. FED. R. CIV. P. 45(c)(3). In addition, the Court's scheduling order indicates that "[a]ny motion challenging the adequacy of responses to discovery must be filed timely, served and calendared sufficiently in advance of the discovery cutoff date to permit the responses to be obtained before that date, if the motion is granted." (Catalano Decl., Ex. 1 at 2.)

Here, three of the subpoenas were served on October 29, 2009, with a November 12, 2009 return date; the fourth was served on November 15, 2009, with a November 16, 2009 return date. (Garternberg Decl. ¶ 5.) The Court finds that the three subpoenas served on October 29, 2009 provided the non-parties with a reasonable time to respond.[5] However, the amount of time provided in the fourth subpoena is clearly inadequate. Moreover, the fact that all four subpoenas were served so close to the discovery cutoff date did not afford Myxer with sufficient time to bring a properly noticed motion to compel, if necessary, before the cutoff date, which the Court's scheduling order mandates. Nevertheless, the Court finds that Myxer served its subpoenas before the cutoff date, and that the the need for the subpoenas arose near the discovery cutoff date. Accordingly, the Court concludes that Myxer pursued its discovery with diligence.

Plaintiffs also contend that, after meeting and conferring with Plaintiffs on December 3, 2009, Myxer waited until December 30, 2009, before filing the present motion. However, the prior version of Local Rule 7-3 required the conference to occur at least twenty (20) days prior to the filing of the motion. Therefore, the evidence is not contrary to a finding of diligence.

Finally, Myxer's counsel has indicated that meet and confer efforts with counsel for AT&T, Verizon, T-Mobile, and Sprint Spectrum, L.P. have indicated that many, if not all, of the issues in connection with the subpoenas will be resolved. (Supp. Sciarra Decl. ¶ 3.) A swift conclusion to discovery, with as little inconvenience to the non-parties as possible, is desirable.

**IV.
CONCLUSION**

---

[5] "Service of subpoenas at least 10 days before the deposition or production is customary, but not mandatory." See William W. Schwarzer et al., California Practice Guide: Federal Civil Procedure Before Trial § 11:2277 (2009).

**LINK: 464**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-3935 GAF (VBKx) | Date | January 21, 2010 |
|---|---|---|---|

| Title | Arista Records LLC et al v. Myxer Inc. et al |
|---|---|

    For the foregoing reasons, Myxer's motion for leave from the Court's Scheduling and Case Management Order is **GRANTED**. Myxer shall contact the Chambers of Judge Chooljian no later than Friday, January 22, 2010, to arrange a schedule for the filing and hearing of the motion. Nothing in this order should be taken as any indication as to the Court's view as to the merits of the motion. That is a matter that is entirely within the province of Judge Chooljian.

**IT IS SO ORDERED.**

# EXHIBIT "C"

**Kristin Sciarra**

| | |
|---|---|
| **From:** | Kristin Sciarra |
| **Sent:** | Monday, February 08, 2010 4:11 PM |
| **To:** | 'Jeffrey Darnell' |
| **Cc:** | Alexander Cote; Edward Gartenberg |
| **Subject:** | RE: Myxer/Verizon Production |

Thank you Jeff, I received the email.


Kristin Sciarra Martin
Attorney at Law
Gartenberg Gelfand Wasson & Selden LLP
801 S. Figueroa Street, Suite 2170
Los Angeles, California 90017
Direct Dial: (213) 542-2110
Main: (213) 542-2100
Fax: (213) 542-2101
Email: ksciarra@ggwslaw.com


**From:** Jeffrey Darnell [mailto:jdarnell@scheperkim.com]
**Sent:** Monday, February 08, 2010 4:00 PM
**To:** Kristin Sciarra
**Cc:** Alexander Cote
**Subject:** Myxer/Verizon Production



Kristin,


Verizon's production is attached.


Best Regards,


Jeff



<<Ltr re Verizon Production.PDF>>
<<VERIZON AEO DOCS - 2-8-10.pdf>> <<VERIZON CONFIDENTIAL DOCS 2-8-10.PDF>>
Jeffrey R. Darnell
Scheper Kim & Overland LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
T (213) 613-4693 ● F (213) 613-4656



3/12/2010

# EXHIBIT "D"

## Kristin Sciarra

| | |
|---|---|
| **From:** | Kristin Sciarra |
| **Sent:** | Wednesday, February 10, 2010 9:59 AM |
| **To:** | 'Jeffrey Darnell' |
| **Cc:** | Alexander Cote; 'Ranahan, Erin R.'; Edward Gartenberg |
| **Subject:** | RE: Myxer/Verizon Production |

Hi Jeff,

Thank you for sending over Verizon's document production. We note that there are redactions on the following pages VZW 32, 33, 66, 81, 83, 104, 105, 106, 107, 108, 109, 112, 113, 114, 116, 117, 118, 121, 122, 123. Please provide us with a privilege log as to these redactions.

Thank you,
Kristin

Kristin Sciarra Martin
Attorney at Law
Gartenberg Gelfand Wasson & Selden LLP
801 S. Figueroa Street, Suite 2170
Los Angeles, California 90017
Direct Dial: (213) 542-2110
Main: (213) 542-2100
Fax: (213) 542-2101
Email: ksciarra@ggwslaw.com

---

**From:** Jeffrey Darnell [mailto:jdarnell@scheperkim.com]
**Sent:** Monday, February 08, 2010 4:00 PM
**To:** Kristin Sciarra
**Cc:** Alexander Cote
**Subject:** Myxer/Verizon Production

Kristin,

Verizon's production is attached.

Best Regards,

Jeff

<<Ltr re Verizon Production.PDF>>
<<VERIZON AEO DOCS - 2-8-10.pdf>> <<VERIZON CONFIDENTIAL DOCS 2-8-10.PDF>>
Jeffrey R. Darnell

3/12/2010

# EXHIBIT "E"

## Kristin Sciarra

| | |
|---|---|
| **From:** | Kristin Sciarra |
| **Sent:** | Thursday, February 11, 2010 6:42 PM |
| **To:** | 'Jeffrey Darnell' |
| **Cc:** | Alexander Cote; 'Ranahan, Erin R.'; Edward Gartenberg |
| **Subject:** | FW: Myxer/Verizon Production |

Hi Jeff,

I have not yet received a response to my email of yesterday.  Can you please let me know when Verizon will be able to provide the privilege log?

Thank you,
Kristin

Kristin Sciarra Martin
Attorney at Law
Gartenberg Gelfand Wasson & Selden LLP
801 S. Figueroa Street, Suite 2170
Los Angeles, California 90017
Direct Dial: (213) 542-2110
Main: (213) 542-2100
Fax: (213) 542-2101
Email: ksciarra@ggwslaw.com

**From:** Kristin Sciarra
**Sent:** Wednesday, February 10, 2010 9:59 AM
**To:** 'Jeffrey Darnell'
**Cc:** Alexander Cote; 'Ranahan, Erin R.'; Edward Gartenberg
**Subject:** RE: Myxer/Verizon Production

Hi Jeff,

Thank you for sending over Verizon's document production.  We note that there are redactions on the following pages VZW 32, 33, 66, 81, 83, 104, 105, 106, 107, 108, 109, 112, 113, 114, 116, 117, 118, 121, 122, 123.  Please provide us with a privilege log as to these redactions.

Thank you,
Kristin

Kristin Sciarra Martin
Attorney at Law
Gartenberg Gelfand Wasson & Selden LLP
801 S. Figueroa Street, Suite 2170
Los Angeles, California 90017
Direct Dial: (213) 542-2110
Main: (213) 542-2100
Fax: (213) 542-2101

3/12/2010

Email: ksciarra@ggwslaw.com

---

**From:** Jeffrey Darnell [mailto:jdarnell@scheperkim.com]
**Sent:** Monday, February 08, 2010 4:00 PM
**To:** Kristin Sciarra
**Cc:** Alexander Cote
**Subject:** Myxer/Verizon Production


Kristin,

Verizon's production is attached.

Best Regards,

Jeff


<<Ltr re Verizon Production.PDF>>
<<VERIZON AEO DOCS - 2-8-10.pdf>> <<VERIZON CONFIDENTIAL DOCS 2-8-10.PDF>>
Jeffrey R. Darnell
Scheper Kim & Overland LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
T (213) 613-4693 ● F (213) 613-4656
jdarnell@scheperkim.com ● Vcard: link

# EXHIBIT "F"

**Kristin Sciarra**

| | |
|---|---|
| **From:** | Jeffrey Darnell [jdarnell@scheperkim.com] |
| **Sent:** | Thursday, February 18, 2010 12:21 PM |
| **To:** | Kristin Sciarra |
| **Cc:** | Alexander Cote |
| **Subject:** | Verizon Privilege Log |
| **Attachments:** | Myxer Priv Log.pdf |

Kristin,

Please find attached Verizon's privilege log.

Thanks.

<<Myxer Priv Log.pdf>>

**Jeffrey R. Darnell**
Scheper Kim & Overland LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
T (213) 613-4693 ● F (213) 613-4656
jdarnell@scheperkim.com ● Vcard: link

**PRIVILEGE LOG TO DOCUMENTS PRODUCED BY VERIZON WIRELESS TELECOM, INC. ("VERIZON") TO MYXER, INC. ("MYXER") IN RESPONSE TO SUBPOENA ISSUED 10/28/09**

| No. | Bates | Date | Author(s) | Recipient(s) | Document/ Subject Matter | Privilege Asserted |
|-----|-------|------|-----------|--------------|--------------------------|--------------------|
| 1. | VZW 0001 | 1/25/10 | Tom Constabile | Thomas Mahr, Esq.; Ed McGah; Alexander Cote, Esq.; Brian Ashby, Esq.; Ed Ruth; Matthew Schwartz | E-mail attorney-client communication re litigation | Attorney-client communication; attorney work-product |
| 2. | VZW 0032-VZW 0033 | 2/26/00 | Brian Ashby, Esq.; Jeffrey Nelson | Brian Ashby, Esq.; Ed Ruth; Dana Willis; Jeffrey Nelson; Daniel Flagler | Chain e-mail attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |
| 3. | VZW 0058 | 3/4/09 | Dana Willis | Brian Ashby, Esq.; Jonathan Salkoff; Daniel Flagler | E-mail attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |
| 4. | VZW 0066 | 3/5/09 | Dana Willis | Brian Ashby, Esq.; Jonathan Salkoff | E-mail attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |
| 5. | VZW 0081 (upper portion) | 2/26/09 | Daniel Flagler | Brian Ashby, Esq.; Ed Ruth; Jeffrey Nelson | E-mail attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |
| 6. | VZW 0081 (lower portion) & VZW 0083 | 2/25/09 | Jonathan Salkoff | Daniel Flagler | E-mail comment on attorney-client communication | Attorney-client privileged communication; attorney work product |
| 7. | VZW 0084 | 2/23/09 | Jeffrey Nelson | Ed Ruth; Debra Lewis | E-mail comment on attorney-client communication | Attorney-client privileged communication; attorney work product |
| 8. | VZW 0103 & VZW 0104 | 2/26/00 | Brian Ashby, Esq.; Jeffrey Nelson | Brian Ashby, Esq.; Ed Ruth; Dana Willis; Jeffrey Nelson; Daniel Flagler | Chain e-mail attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |

### PRIVILEGE LOG TO DOCUMENTS PRODUCED BY VERIZON WIRELESS TELECOM, INC. ("VERIZON") TO MYXER, INC. ("MYXER") IN RESPONSE TO SUBPOENA ISSUED 10/28/09

| No. | Bates | Date | Author(s) | Recipient(s) | Document/ Subject Matter | Privilege Asserted |
|-----|-------|------|-----------|--------------|--------------------------|--------------------|
| 9. | VZW 0105 | 2/26/09 | Daniel Flagler; Jeffrey Nelson; Ed Ruth | Brian Ashby, Esq.; Ed Ruth; Daniel Flagler; Dana Willis | Chain e-mail attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |
| 10. | VZW 0106, VZW 0107 & VZW 0108 (upper portion) | 2/25/09 | Jonathan Salkoff | Daniel Flagler | Comment on attorney-client communication | Attorney-client privileged communication; attorney work product |
| 11. | VZW 0108 (lower portion) | 2/23/09 | Ed Ruth | Brian Ashby, Esq.; Jeffrey Nelson; Debra Lewis; Daniel Flagler | E-mail attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |
| 12. | VZW 0109 | 2/23/09 | Jeffrey Nelson | Debra Lewis; Ed Ruth | Comment on attorney-client communication | Attorney-client privileged communication; attorney work product |
| 13. | VZW 0112 (upper portion) | 7/14/08 | Lawrence Douglas | Matthew Schwartz; Tom Constabile | Comment on attorney-client communication | Attorney-client privileged communication; attorney work product |
| 14. | VZW 0112 (lower portion) - VZW 0114 | 6/20/08 | Brian Ashby, Esq.; Lawrence Douglas | Brian Ashby, Esq.; Lawrence Douglas; Matthew Schwartz; Tom Constabile | Chain e-mail attorney-client communication | Attorney-client privileged communication; attorney work product |
| 15. | VZW 0116 | 7/14/08 | Lawrence Douglas | Matthew Schwartz; Tom Constabile | Comment on attorney-client communication | Attorney-client privileged communication; attorney work product |
| 16. | VZW 0117 & VZW 0118 | 6/20/08 | Brian Ashby, Esq.; Lawrence Douglas | Lawrence Douglas; Brian Ashby, Esq. | Chain e-mail attorney-client communication | Attorney-client privileged communication; attorney work product |

PRIVILEGE LOG TO DOCUMENTS PRODUCED BY VERIZON WIRELESS
TELECOM, INC. ("VERIZON") TO MYXER, INC. ("MYXER") IN RESPONSE TO
SUBPOENA ISSUED 10/28/09

| No. | Bates | Date | Author(s) | Recipient(s) | Document/ Subject Matter | Privilege Asserted |
|---|---|---|---|---|---|---|
| 17. | VZW 0121 (upper portion) | 7/14/08 | Lawrence Douglas | Matthew Schwartz; Tom Constabile | Comment on attorney-client communication | Attorney-client privileged communication; attorney work product |
| 18. | VZW 0121 (lower portion) - VZW 0123 | 6/23/08 | Brian Ashby, Esq.; Lawrence Douglas | Lawrence Douglas; Brian Ashby, Esq. | E-mail attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |
| 19. | N/A | 1/25/10 | Alexander Cote, Esq.; Thomas Mahr, Esq. | Thomas Mahr, Esq.; Jeffrey Darnell, Esq.; Diann Kim, Esq.; Brian Ashby, Esq. | Chain e-mail attorney-client communication re Myxer subpoena | Attorney-client privileged communication; attorney work product |
| 20. | N/A | 1/11/10 | Thomas Mahr, Esq.; Alexander Cote, Esq. | Brian Ashby, Esq.; Dana Willis; Jeffrey Darnell, Esq.; Bill Wallace, Esq.; Thomas Mahr, Esq.; Edward McGah; Jody Citizen; Rynae Benson; Diann Kim, Esq. | Chain e-mail attorney-client communication re Myxer subpoena | Attorney-client privileged communication; attorney work product |
| 21. | N/A | 3/2/09 | Ed Ruth; Tom Constabile | Daniel Flagler; Matthew Schwartz; Tom Constabile; Ed Ruth | Chain e-mail re attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |
| 22. | N/A | 3/2/09 | Ed Ruth; Daniel Flagler; Matthew Schwartz | Daniel Flagler; Matthew Schwartz; Tom Constabile; Ed Ruth | Chain e-mail re attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |
| 23. | N/A | 3/2/09 | Ed Ruth; Matthew Schwartz | Daniel Flagler; Matthew Schwartz; Tom Constabile; Ed Ruth | Chain e-mail re attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |

**PRIVILEGE LOG TO DOCUMENTS PRODUCED BY VERIZON WIRELESS TELECOM, INC. ("VERIZON") TO MYXER, INC. ("MYXER") IN RESPONSE TO SUBPOENA ISSUED 10/28/09**

| No. | Bates | Date | Author(s) | Recipient(s) | Document/ Subject Matter | Privilege Asserted |
|-----|-------|------|-----------|--------------|--------------------------|--------------------|
| 24. | N/A | 11/6/09 | Diann Kim, Esq.; Rynae Benson | Jeffrey Darnell, Esq.; Alexander Cote, Esq.; Rynae Benson; Brian Ashby, Esq.; Thomas Mahr, Esq. | Chain e-mail attorney-client communication re Myxer subpoena | Attorney-client privileged communication; attorney work product |
| 25. | N/A | 10/19/09 | Bill Wallace, Esq.; Brian Ashby, Esq. | Brian Ashby, Esq.; Bill Wallace, Esq. | Chain e-mail attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |
| 26. | N/A | 11/9/09 | Diann Kim, Esq.; Rynae Benson; Thomas Mahr, Esq.; Brian Ashby, Esq. | Jeffrey Darnell, Esq.; Alexander Cote, Esq.; Rynae Benson; Brian Ashby, Esq.; Thomas Mahr, Esq. | Chain e-mail attorney-client communication re Myxer subpoena | Attorney-client privileged communication; attorney work product |
| 27. | N/A | 3/5/09 | Brian Ashby, Esq.; Ed Ruth; Matthew Schwartz | Brian Ashby, Esq.; Ed Ruth; Matthew Schwartz | Chain e-mail attorney-client communication re Myxer | Attorney-client privileged communication; attorney work product |

# EXHIBIT "G"

## Kristin Sciarra

| | |
|---|---|
| **From:** | Alexander Cote [acote@scheperkim.com] |
| **Sent:** | Tuesday, February 23, 2010 5:13 PM |
| **To:** | Kristin Sciarra; Jeffrey Darnell |
| **Cc:** | Edward Gartenberg; Ranahan, Erin R. |
| **Subject:** | RE: Arista v. Myxer, et. al.; Verizon Privilege Log |

Kristen,
I am out of the office presently. However, we cannot respond to your concerns about the privilege log without knowing which specific log entries you are concerned about. Accordingly, please send us a meet-and-confer letter that complies with Local Rule 37 in this respect. Also, please note that under that rule, it is *your* burden to provide authority in support of your position. To the extent you believe the Court has already ruled on similar issues, please send us the relevant Court's orders.
Thanks,

**From:** Kristin Sciarra [mailto:ksciarra@ggwslaw.com]
**Sent:** Tue 2/23/2010 4:37 PM
**To:** Jeffrey Darnell; Alexander Cote
**Cc:** Edward Gartenberg; Ranahan, Erin R.
**Subject:** Arista v. Myxer, et. al.; Verizon Privilege Log

Dear Jeff and Alex,

We have had a chance to review Verizon's privilege log.  There are a series of communications that have been marked privileged and do not have an attorney as part of the communication.  Please provide us with authority that protects those specific entries, as we are considering whether to proceed with a motion before Magistrate Judge Chooljian for an *in camera* review of those documents to determine if the "dominant purpose" is to relay legal advice.

Please note that on another issue in this case before Magistrate Judge Chooljian, the Court found that an email communication was not protected by the attorney-client privilege because the dominant purpose of that email was not to solicit or obtian legal advice.  Moreover, the Court noted that the privilege does not extend to communications between the client or his attorney and a third party.
I would appreciate a response quickly.  Please call me if you have any questions.

Sincerely,
Kristin

Kristin Sciarra Martin
Attorney at Law
Gartenberg Gelfand Wasson & Selden LLP
801 S. Figueroa Street, Suite 2170
Los Angeles, California 90017
Direct Dial: (213) 542-2110
Main: (213) 542-2100
Fax: (213) 542-2101
Email: ksciarra@ggwslaw.com

3/16/2010

**From:** Jeffrey Darnell [mailto:jdarnell@scheperkim.com]
**Sent:** Thursday, February 18, 2010 12:21 PM
**To:** Kristin Sciarra
**Cc:** Alexander Cote
**Subject:** Verizon Privilege Log


Kristin,

Please find attached Verizon's privilege log.

Thanks.


<<Myxer Priv Log.pdf>>

Jeffrey R. Darnell
Scheper Kim & Overland LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
T (213) 613-4693 ● F (213) 613-4656
jdarnell@scheperkim.com ● Vcard: link

# EXHIBIT "H"



GARTENBERG GELFAND
WASSON & SELDEN LLP

Please reply to:
Los Angeles office
Direct Tel: 213-542-2110
ksciarra@ggwslaw.com

February 23, 2010

**VIA EMAIL**

Alexander H. Cote
Jeffrey Darnell
Scheper Kim & Overland LLP
601 West Fifth Street, 12th Floor
Los Angeles, California 90071-2025

Re:   *Arista Records LLC, et. al., v. Myxer Inc. et. al.*

Dear Mr. Cote and Mr. Darnell:

Please accept this letter as a meet and confer effort by Defendant Myxer, Inc. ("Myxer") pursuant to Federal Rule of Civil Procedure 37 and the local rules for the United States District Court, Central District of California.

This meet and confer effort relates to the privilege log provided by Verizon Wireless Telecom Inc. ("Verizon") on Thursday, February 18, 2010. As I explained in my email sent earlier today, there are a series of communications that Verizon has marked privileged and which do not identify an attorney as part of the communication. Specifically, based on Verizon's privilege log, entry numbers 6, 7, 10, 12, 13, 15, 17, 21, 22, and 23, do not contain reference to an attorney, however, Verizon has asserted attorney-client privilege and attorney work product to each of those entries. Unless Verizon can provide us with an acceptable reason for this, Myxer will have no choice but to seek an *in camera* review of those documents.

The District Court may conduct *in camera* inspections of alleged confidential communications to determine whether attorney-client privilege applies. See Clarke v. American Commerce National Bank, 974 F. 2d 127, 129 (9th Cir. 1991). The Court has ordered *in camera* inspections in this case. (Order issued by the Honorable Judge Jacqueline Chooljian, dated November 30, 2009; Case 2:08-cv-03935-GAF-JC; Document 421.) I have enclosed a copy of this Order dated November 30, 2009, for your review.

In this case, the Court has also previously ruled on whether certain documents were protected by the attorney-client privilege. In ruling on this similar issue, the Court set forth the law on this topic as follows:

The purpose of the attorney-client privilege is to encourage "full and frank communication between attorneys and their clients and thereby promote broader

Los Angeles
801 S. Figueroa Street | Suite 2170
Los Angeles, CA 90017

T  213.342.2100
F  213.342.2101

Orange County
3010 Old Ranch Pkwy | Suite 340
Seal Beach, California 90740

T  562.430.7060
F  562.795.8984

San Francisco
220 Montgomery St | 15th Floor
San Francisco, California 94104

T  415.788.6230
F  415.788.7999

www.ggwslaw.com

A Limited Liability Partnership
including Professional
Corporations          23030

GARTENBERG GELFAND WASSON & SELDEN LLP
A Limited Liability Partnership including Professional Corporations

Alexander H. Cote
Jeffrey Darnell
February 23, 2010
Page 2

public interests in the observance of law and the administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).

Wigmore on Evidence describes the several elements of the privilege this way: (1) When legal advice of any kind is sought (2) from a professional legal advisor in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived. United States v. Martin, 278 F. 3d 988, 999 (9th Cir. 2002) (citing 8 Wigmore, Evidence § 2292, at 554 (Mc Naughton rev. 1961)); see also United States v. Plache, 913 F. 2d 1375, 1379 n. 1 (9th Cir. 1990).

"[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." Upjohn Co., 449 U.S. at 390. However, the fact that a person is a lawyer does not make all communications with that person privileged. Martin, 278 F.3d at 999 (citation omitted). An entity cannot insulate documents from discovery simply by sending a "cc" to counsel. United States Postal Service v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 163-64 (E.D.N.Y. 1994) (attorney-client privilege would apply to documents copied to attorney if documents contain communications intend to be confidential and dominant purpose of communications was to obtain legal advice); see also Clavo v. Zarrabian, 2003 WL 24272641 *2 (C.D. Cal. 2003) (insufficient evidence presented to demonstrate that documents exchanged between company employees which were merely copied to counsel were privileged; mere transmittal of documents to lawyers is insufficient to bring documents under umbrella of attorney-client privilege), reconsideration granted in non-pertinent part, 2004 WL 3708920 (C.D. Cal. 2004).

Correspondence which reveals the motive of the client in seeking representation, litigation strategy, or the specific nature of services provided, such as researching particular areas of law, fall within the privilege. Clarke v. American Commerce National Bank, 974 F. 2d 127, 129 (9th Cir. 1992) (citations omitted). Communications between a lawyer and a client which enable the lawyer to perform a legal function are also privileged. United States v. Chen, 99 F.3d 1495, 1501 (9th Cir. 1996), cert. denied, 520 U.S. 1167 (1997) Legal advice regarding the client's business affairs are encompassed within the attorney-client privilege. Id. Accordingly, the attorney-client privilege applies to communications between lawyers and their clients when the lawyers act in a counseling and planning role, as well as when lawyers represent their clients in litigation. Id.

GARTENBERG GELFAND WASSON & SELDEN LLP
a Limited Liability Partnership including Professional Corporations

Alexander H. Cote
Jeffrey Darnell
February 23, 2010
Page 3

The burden to establish all the elements of the privilege is on the party asserting the privilege. United States v. Munoz, 233 F.3d 1117, 1128 (9th Cir. 2000). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." Weil v. Investment/Indicators, Research and Management, Inc., 647 F.2d 18, 24 (9th Cir. 1981). Nonetheless, "hard cases should be resolved in favor of the privilege, not in favor of disclosure . . . '[A]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is letter better than non privilege at all.'"). United States v. Mett, 178 F. 3d 1058, 1065 (9th Cir. 1999) (quoting Upjohn Co., 449 U.S. at 393).

(Order issued by the Honorable Judge Jacqueline Chooljian, dated July 29, 2009; Case 2:08-cv-03935-GAF-JC; Document 174.)

I have enclosed a complete copy of the Order dated July 29, 2009, for your further review. In short, unless Verizon can establish that the dominant purpose of the subject communications was to solicit or obtain legal advice or to give information to a lawyer to enable him to give sound and informed advice, we do not believe the subject communications are protected and these communications must be provided to Myxer.

Additionally, the attorney-client privilege does not apply to communications with third parties. United States Postal Service v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 161 (E.D.N.Y. 1994)); see also United States v. Chevron Texaco Corp., 241 F. Supp. 2d 1065, 1070 (N.D. Cal. 2002) (privilege generally does not extend to communications between the client or his attorney and a third party).

Based on the privilege log provided by Verizon, it does not appear that the items referenced above are protected by either the attorney-client privilege or the attorney work product doctrine.

Myxer would like to resolve these issues without burdening the Court with motion practice if possible. If we cannot, we will need to proceed with a motion to compel and preparation of a joint stipulation very soon. I am available to meet in person at my office this week if necessary.

Thank you.

Sincerely,

Kristin Sciarra

Kristin Sciarra

Enclosures
cc:    Erin Ranahan
       Edward Gartenberg

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF(JCx) | | Date | November 30, 2009 |
|---|---|---|---|---|
| Title | Arista Records LLC, et al. v. Myxer, Inc., et al. | | | |

Present: The Honorable   Jacqueline Chooljian, United States Magistrate Judge

| Kimberly I. Carter | | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| none | none |

**Proceedings:**      **ORDER RE PRIVILEGE ISSUES**

1.      Defendant's request that the court conduct an *in camera* review of the allegedly privileged "David Ring" documents to assess whether plaintiffs have properly invoked the attorney-client privilege/attorney work product doctrine relative to such documents and whether such documents should be produced is granted.[1]  Plaintiffs are ordered to produce for *in camera* review, UMG privilege log entry nos. 17, 23, 25, 29, 30 and 33 within five (5) days.[2]  To the extent redacted versions of such documents have been produced, plaintiffs are directed concurrently to supply the court with both the redacted and unredacted versions as well as an accompanying declaration specifying what versions have/have not been produced to defendant.  Plaintiffs are also granted leave concurrently to submit additional declarations relative to their assertion of privilege regarding such documents, which, to the extent not apparent from the materials submitted to date, address the purpose(s) of the communications in issue, the capacity/capacities in which the individuals who are parties to the communications were then acting, and with whom the documents were shared.  See In re Grand Jury Investigation v. The Corporation, 974 F.2d 1068, 1071 (9th Cir. 1992).

---

[1]In connection with the issue addressed in Order No. 1 herein, the parties submitted and the court has considered the following documents:  (1) Defendant Myxer Inc.'s Memorandum Re Issues to Be Addressed at October 30, 2009 Discovery Hearing (Docket No. 344); (2) Declaration of Rebecca Lawlor Calkins with exhibits (Docket No. 348); (3) Plaintiffs' Response to Defendant Myxer Inc.'s Memorandum Re Issues to Be Addressed at October 30, 2009 Discovery Hearing and supporting declaration of Karen R. Thorland with an exhibit (Docket No. 338).

[2]Although defendant's request also seeks an unredacted version of UMG log entry no. 24, plaintiffs represent that they produced an unredacted version of such document on October 23, 2009, rendering defendant's request moot as to such document.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-3935 GAF(JCx) | Date | November 30, 2009 |
|---|---|---|---|
| Title | Arista Records LLC, et al. v. Myxer, Inc., et al. | | |

    2.     Defendant's request relative to the allegedly privileged RIAA documents is denied.[3] Based upon the court's review of all of the documents submitted by the parties in connection with this issue, including the privilege logs and amended privilege logs in issue (Calkins Exs. G, H), the declarations of counsel and the multiple declarations of representatives of plaintiffs, the court concludes that plaintiffs have made a prima facie showing that the documents in issue are privileged.[4]  The court further finds that defendant has failed to provide an adequate factual showing to justify an *in camera* review with respect to such documents.  See In re Grand Jury Investigation, 974 F.2d at 1074-75.

    IT IS SO ORDERED.

Initials of Deputy Clerk: KC

---

    [3]In connection with the issue addressed in Order No. 2 herein, the parties submitted and the court has considered the following documents:  (1) Defendant Myxer Inc.'s Memorandum Re Issues to Be Addressed at August 21, 2009 Discovery Hearing and supporting declaration of Rebecca Lawlor Calkins with exhibits ("Calkins Ex.") (Docket No. 190); (2) Plaintiffs' Response to Defendant Myxer Inc.'s Memorandum Re Issues to Be Addressed at August 21, 2009 Discovery Hearing, supporting declarations of Jeffrey D. Goldman, Alasdair J. McMullan, Michael Ostroff, Silda Palerm and Wade Leak (Docket No. 192); (3) Plaintiffs' Memorandum Re Issues to Be Addressed at September 4, 2009 Discovery Hearing, supporting declarations of Donald Miller, Alasdair McMullan and Dong Jang and supporting exhibits (Docket No. 200); (4) Defendant Myxer Inc.'s Memorandum Re Issues to Be Addressed at September 4, 2009 Discovery Hearing and supporting declaration of Rebecca Lawlor Calkins (Docket No. 201); and (5) Defendant Myxer Inc.'s Response to Plaintiffs' Memorandum Re Issues to Be Addressed at September 4, 2009 Discovery Hearing and supporting declaration of Rebecca Lawlor Calkins (Docket No. 203).

    [4]The documents in issue are described in the EMI privilege log in entry nos. 2 and 37 and in the Sony privilege log in entry nos. 22-24, 29, 54, 72, 74a, 74b, and 76.  (Calkins II Exs. G, H).  The court further notes that defendant's request is moot as to the documents which appear on the privilege log of the EMI plaintiffs as such plaintiffs are no longer parties to this action.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF(JCx) | | Date | July 29, 2009 |
|---|---|---|---|---|

| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. |
|---|---|

Present: The Honorable   Jacqueline Chooljian, United States Magistrate Judge

| Kimberly I. Carter | None | None |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendants: |
|---|---|
| none present | none present |

**Proceedings:**       **(IN CHAMBERS) (UNDER SEAL)**

**ORDER PRIVILEGE ISSUE**

## I.    Background

On June 16, 2008, plaintiffs, multiple record companies, filed a copyright infringement action against Myxer Inc., f/k/a/ mVisible Technologies, Inc., an entity which maintains various advertising-supported websites on which users may download user-uploaded or user-generated cellular phone ringtones, videos and wallpaper free of charge.  Plaintiffs allege that much of the content on defendant's websites is infringing because defendant permits users to upload plaintiffs' copyrighted works without plaintiffs' authorization, thereby allowing users to search through and download the content to their phones or computers.

Pending before this court is the parties' dispute regarding whether or not a March 14 email string (the "March email"), which has been submitted to the court under seal[1] for review, is privileged.[2]  The

---

[1]Although the parties have referred to an "*in camera*" review, such term is a misnomer in the present case because defendant already produced the March email to plaintiffs and all parties (or at least all counsel) are privy to its contents.  In any event, prior to reviewing the March email, this court ascertained on the record that defendant's counsel had no objection to the court's review of the document.  See Clarke v. American Commerce National Bank, 974 F.2d 127, 129 (9th Cir. 1991) (district court may conduct *in camera* inspection of alleged confidential communications to determine whether attorney-client privilege applies) (citations omitted).  See also infra note 14.

[2]The parties have submitted the following documents in connection with this issue: (1) Plaintiffs' Memorandum Re Issues to Be Addressed at July 10, 2009 Discovery Hearing ("Plaintiffs' Memo"), filed on July 7, 2009; (2) a document with the same title as Plaintiffs' Memo which contains Exhibit A (the "March email") and Exhibit B (a Declaration of Jonathan E. Cole (the "Cole Declaration" or "Cole Decl.")), filed under seal on July 7, 2009; (3) a Declaration of Donald A. Miller ("Miller Declaration" or "Miller Decl.") with exhibits ("Miller Ex."), filed on July 7, 2009; (4) Defendant's Response to Plaintiffs' Memo ("Defendant's July 9 Response"), filed on July 9, 2009; (5) a Declaration of Rebecca Lawlor Calkins (the "Calkins Declaration" or "Calkins Decl.") with exhibits ("Calkin Ex."),

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF(JCx) | | Date | July 29, 2009 |
|---|---|---|---|---|

| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. |
|---|---|

March email consists of two emails: (1) an email from Jonathan Cole (NWA) to Scott Kinnear and Myk Willis, and copied to David W. Kantaros, Ron Harris and Jonathan Cole (NWA), regarding "Viacom-YouTube" (the "Cole email"); and (2) an email from Myk Willis to Jonathan Cole (NWA) and Scott Kinnear, copied to David Kantaros and Ron Harris, regarding "Viacom-YouTube" (the "Willis email"). Jonathan Cole is an attorney and a Director and Founder of New World Angels, Inc. ("NWA"), one of defendant's investors. (Cole Decl. ¶¶ 1, 2; Miller Ex. 4). At the time of the March e-mail, Cole was also a member of defendant's Board of Directors. (Cole Decl. ¶ 2). Myk Willis, Scott Kinnear and Ron Harris are, or were at the time of the March email, on defendant's Board of Directors. (Cole Decl. ¶ 2). David Kantaros is, or was at the time of the March email, an attorney at Foley & Lardner LLP, retained by defendant.[3]  (Cole Decl. ¶ 4).

Defendant produced the March email to plaintiffs in discovery in this action. (Miller Decl. ¶ 2). On May 22, 2009, plaintiff used the March email at the deposition of Ron Harris. (Miller Decl. ¶ 2). On the record at the deposition, defendant's counsel noted that she had discovered during the break that Kantaros was copied on the email and that, subject to a conversation with Cole to determine whether Cole was seeking advice with respect to the March email or not, she wanted to put on the record that the document was "potentially privileged." (Goldman Ex. 1). Six business days after the Harris deposition – on June 2, 2009 – defendant's counsel sent plaintiffs' counsel a letter, asserting that the March e-mail was privileged and had been produced unintentionally, attaching a privilege log pertaining to the March

---

filed on July 9, 2009; (6) Documents lodged under seal by plaintiffs on July 13, 2009 ("Lodged Documents); (7) Defendant's Response to Plaintiff's Memo ("Defendant's July 17 Response"), filed on July 17, 2009; (8) Plaintiffs' Reply ("Plaintiffs' Reply") filed under seal on July 22, 2009; (9) a Supplemental Declaration of Jeffrey D. Goldman ("Goldman Declaration" or "Goldman Decl.") with exhibits ("Goldman Ex."), filed under seal on July 22, 2009; (10) a Declaration of Valent Manssourian ("Manssourian Declaration" or "Manssourian Decl."), filed on July 22, 2009; and (11) Evidentiary Objections to the Cole Declaration ("Objections"), filed under seal on July 22, 2009. Except to the extent expressly referenced herein, the court has not relied upon the Cole Declaration. To the extent plaintiffs object to the court's consideration of the matters expressly referenced and relied upon herein, their objections are overruled on the merits. To the extent certain of Cole's statements are somewhat conclusory, the court considers such fact in assessing the weight to be afforded to such assertions. To the extent plaintiffs object to matters in the Cole Declaration which are not expressly referenced and relied upon herein, the objections are moot and are overruled as such.

[3]Cole refers to Kantaro as "corporate" and "company" counsel and attests that (i) the purpose of the Cole email was to "keep corporate counsel involved in analyzing and monitoring developments in the legal landscape related to the [Digital Millenium Copyright Act]'" and (ii) the Cole email was directed to Kantaros so that "management could consult with company counsel on the topics reported to the Board. . . ." (Cole Decl. ¶¶ 7, 8). Although Cole more broadly attests to the purpose of the entire March email (*i.e.*, both the Cole email and the Willis email), this court does not consider Cole's assertions regarding the purpose of the Willis email because such statements lack foundation.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-3935 GAF(JCx) | | Date | July 29, 2009 |
|---|---|---|---|---|
| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. | | | |

email, and requesting that the March email be returned within five (5) business days in accordance with the Stipulated Protective Order.[4]  (Miller Ex. 1).

Defendant essentially asserts that the March email is privileged because it is a communication between defendant's agents, Cole, Willis, Kinnear, and Harris, and defendant's outside corporate counsel, Kantaros, regarding legal issues and was generated for the purpose of seeking legal advice from Kantaros.[5]

Plaintiffs contend that defendant has failed to meet its burden to demonstrate that the March email is privileged.  More specifically, plaintiffs argue: (1) defendant has failed to establish that Cole was acting *solely* in his capacity as one of defendant's Directors when he sent/received the March email; (2) the court should not credit the Cole Declaration based upon the judicial estoppel doctrine; (3) to the extent Cole was acting on behalf of defendant's investor NWA, defendant has failed to establish that the March email is privileged based upon the joint defense/common interest doctrine; (4) defendant has failed to establish that the March email was for the "dominant" purpose of seeking legal advice; (5) defendant has waived any privilege relating to Kantaros because there is no evidence that the production of the March email was inadvertent, defendant has produced many other communications with Cole and Kantaros, and defendant did not timely seek to retrieve such other communications; (6) defendant has implicitly waived the privilege by asserting as affirmative defenses the "safe harbor" of the Digital Millenium Copyright Act and "innocent infringement"; and (7) even if the March email is privileged, the crime fraud exception applies.

As discussed below, this court finds that the March email is not privileged because defendant has failed to meet its burden to demonstrate that the dominant purpose thereof was to solicit or obtain legal advice or to give information to a lawyer to enable him to give sound and informed advice.  Although not essential to the court's ruling, the court also addresses some of the parties' other legal contentions regarding the March email.

## II.    General Attorney-Client Privilege Law

The purpose of the attorney-client privilege is to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice."  Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).

Wigmore on Evidence describes the several elements of the privilege this way: (1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's

---

[4]This court discusses the substance of pertinent provisions of the Stipulated Protective Order in its assessment of plaintiffs' waiver arguments, *infra*.

[5]Defendant does not assert that the March email is privileged based upon Cole's status as an attorney.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-3935 GAF(JCx) | Date | July 29, 2009 |
|---|---|---|---|
| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. | | |

instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived.  United States v. Martin, 278 F.3d 988, 999 (9th Cir. 2002) (citing 8 Wigmore, Evidence § 2292, at 554 (McNaughton rev.1961)); see also United States v. Plache, 913 F.2d 1375, 1379 n.1 (9th Cir.1990).

"[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." Upjohn Co., 449 U.S. at 390.  However, the fact that a person is a lawyer does not make all communications with that person privileged.  Martin, 278 F.3d at 999 (citation omitted).  An entity cannot insulate documents from discovery simply by sending a "cc" to counsel.  United States Postal Service v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 163-64 (E.D.N.Y. 1994) (attorney-client privilege would apply to documents copied to attorney if documents contain communications intended to be confidential and dominant purpose of communications was to obtain legal advice); see also Clavo v. Zarrabian, 2003 WL 24272641 *2 (C.D. Cal. 2003) (insufficient evidence presented to demonstrate that documents exchanged between company employees which were merely copied to counsel were privileged; mere transmittal of documents to lawyer insufficient to bring documents under umbrella of attorney-client privilege), reconsideration granted in non-pertinent part, 2004 WL 3708920 (C.D. Cal. 2004).

Correspondence which reveals the motive of the client in seeking representation, litigation strategy, or the specific nature of services provided, such as researching particular areas of law, fall within the privilege.  Clarke v. American Commerce National Bank, 974 F.2d 127, 129 (9th Cir. 1992) (citations omitted).  Communications between a lawyer and a client which enable the lawyer to perform a legal function are also privileged.  United States v. Chen, 99 F.3d 1495, 1501 (9th Cir. 1996), cert. denied, 520 U.S. 1167 (1997)  Legal advice regarding the client's business affairs are encompassed within the attorney-client privilege.  Id.  Accordingly, the attorney-client privilege applies to communications between lawyers and their clients when the lawyers act in a counseling and planning role, as well as when lawyers represent their clients in litigation.  Id.

The burden to establish all the elements of the privilege is on the party asserting the privilege. United States v. Munoz, 233 F.3d 1117, 1128 (9th Cir. 2000).  "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed."  Weil v. Investment/Indicators, Research and Management, Inc., 647 F.2d 18, 24 (9th Cir. 1981).  Nonetheless, "hard cases should be resolved in favor of the privilege, not in favor of disclosure . . . '[A]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.' ").  United States v. Mett, 178 F.3d 1058, 1065 (9th Cir.1999) (quoting Upjohn Co., 449 U.S. at 393).

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF(JCx) | Date | July 29, 2009 |

| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. |

**III.    Discussion**

   **A.    Defendant Has Not Met Its Burden to Demonstrate That the Dominant Purpose of the March Email Was to Solicit or Obtain Legal Advice or to Give Information to a Lawyer to Enable Him to Give Sound and Informed Advice**

   Plaintiffs contend that a party asserting that a communication is privileged must demonstrate that the "dominant" or "primary" purpose of the communication is to obtain legal advice. (Plaintiffs' Memo at 4). Although defense counsel suggested at the hearing on this matter, that the purpose of the communication may be broader, *i.e.*, that it may encompass the provision of information to a lawyer to enable the lawyer to give sound and informed advice, defendant has not disputed that such purpose must be the dominant purpose. Although the Ninth Circuit does not appear to have addressed the issue, other circuits and other district courts in the Ninth Circuit have adopted the "dominant purpose" test in assessing whether a communication is privileged. See, e.g., County of Erie, 473 F.3d 413, 420 & n.7 (2d Cir. 2007) (applying "predominant purpose" test) (citing, *inter alia*, 24 Charles Alan Wright & Kenneth W. Graham, Federal Practice and Procedure § 5490 (1986) (observing that while this issue is "seldom discussed by the courts and writers," the majority rule is the "dominant purpose doctrine")); Mora v. Baroni, 2008 WL 2509143 *7 (E.D. Cal. June 23, 2008); United States v. ChevronTexaco Corp., 241 F. Supp. 2d 1065 (N.D. Cal. Sept. 12, 2002).[6]  Accordingly, this court employs the dominant purpose test in assessing whether the March email is privileged.

---

   [6]Although not cited or argued by the parties, this court notes that at least two federal district courts in the Ninth Circuit have instead adopted a broader test which examines whether the assertedly privileged document was created "because of" a legal purpose. See In re CV Therapeutics Inc., Securities Litigation, 2006 WL 1699536 *3-4 (N.D. Cal. June 16, 2006), as clarified on reconsideration, 2006 WL 2585038 (N.D. Cal. Aug. 30, 2006); Visa USA Inc. v. First Data Corp., 2004 WL 1878209 *4, 7 (N.D. Cal. Aug. 23, 2004). Such courts have employed the "because of" test based upon the Ninth Circuit's use of a similar test in the context of assessing whether a document was prepared in anticipation of litigation for purposes of the work product doctrine. See In re Grand Jury Subpoena, 357 F.3d 900, 908 (9th Cir. 2004) (The "because of" standard does not consider whether litigation was a primary or secondary motive behind the creation of a document. Rather, it considers the totality of the circumstances and affords protection when it can fairly be said that the "document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation.") (citation omitted); see also In re CV Therapeutics Inc., Securities Litigation, 2006 WL 1699536 *3-4 (N.D. Cal. June 16, 2006) (considering totality of circumstances in assessing whether document was generated because of legal purpose, including the context of the communication, the content of the communication, the facts surrounding the creation of the document, the nature of the document, the breadth of the recipient list, and whether the communication explicitly sought advice and comment).

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-3935 GAF(JCx) | Date | July 29, 2009 |
|---|---|---|---|

| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. |
|---|---|

Based upon a review of the contents of the March email, as well as Cole's assertions regarding the same, the court is not persuaded that the *dominant* purpose of the March Email was to solicit or obtain legal advice from Kantaros or to give Kantaros information to enable him to give sound and informed advice to defendant/defendant's Board.

First, the fact that Kantaros is only copied on the March email and is not a direct recipient thereof, necessarily means he was not the primary recipient of the email and suggests, notwithstanding Cole's attestations regarding "[t]he purpose" of the email, that soliciting advice from Kantaros, and/or keeping Kantaros informed so that he could at some future point appropriately advise the Board, was not the dominant purpose of the email.

Second, the subject matter of the March email does not persuade the court that its dominant purpose was soliciting advice from Kantaros, and/or keeping Kantaros informed so that he could at some future point appropriately advise the Board. Cole's email essentially: (i) suggests that someone monitor the Viacom-YouTube lawsuit and attaches a link to the complaint in that action; (ii) inquires about what technical measures could be taken to filter content to enable them to argue around a willfulness allegation; (iii) inquires about efforts to change the law; and (iv) summarizes the substance of a Wall Street Journal article which described a practice by YouTube designed to take advantage of the [Digital Millenium Copyright Act] safe harbor. Willis' responsive email (i) advises of the non-existence of a practical filtering solution; (ii) describes the program in use by defendant and essentially discusses a cost benefit analysis relative to the utilization of a filtering program and the prevention of piracy; (iii) describes their current plan of action regarding the same; (iv) expresses skepticism about a legislative solution but notes that clear [presumably legislative] guidance regarding an aspect of the [DMCA] safe harbor would be nice; and (v) affirms that they will be watching the Viacom-YouTube case. The March email thus encompasses legal issues, technical and operational issues, and a discussion of potential lobbying/the lack of lobbying to change the law. This court finds that Cole's primary purpose in sending the Cole email was to share information with and to obtain information from *Willis and Kinnear not Kantaros* regarding the foregoing matters. This court further finds that Willis' primary purpose in sending the Willis email was to share information with Cole, not Kantaros.

In light of the foregoing, this court concludes that the March email is not privileged because defendant has failed to meet its burden to demonstrate that the dominant purpose thereof was to solicit or obtain legal advice or to give information to a lawyer to enable him to give sound and informed advice.

### B.   Whether Defendant Has Met Its Burden to Establish that Cole's Participation in the March Email Did Not Otherwise Render It Non-Privileged

The parties also dispute whether Cole was acting as a representative of defendant when he sent/received the March email. Plaintiffs point out that the privilege does not apply to communications with third parties. (Plaintiffs' Memo at 2) (citing United States Postal Service v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 161 (E.D.N.Y. 1994)); see also United States v. Chevron Texaco Corp., 241 F. Supp. 2d 1065, 1070 (N.D. Cal. 2002) (privilege generally does not extend to communications between the client or his attorney and a third party).

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 08-3935 GAF(JCx) | Date | July 29, 2009 |
|---|---|---|---|
| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. | | |

Plaintiffs contend that because Cole was both an investor and a member of defendant's Board of Directors at the time in issue, defendant bears the burden, which defendant has not met, of demonstrating that Cole was acting *solely* in his capacity as a Board Member when the Cole email was sent. (Plaintiff's Memo at 2 & n.8) (citing Brookshire Bros. Holding, Inc. v. Total Containment, Inc., 2006 WL 845731 *2 (W.D. La. Mar. 30, 2006)).[7]  Defendant primarily asserts that the privilege applies because Cole was acting as a Board Member when he sent/received the March email.  Defendant further contends that even if Cole was acting on behalf of investor NWA, the March email would still be privileged because Cole, as an investor, shared a common interest with defendant.  Plaintiffs respond that the "common interest" privilege does not apply on the facts presented here.

First, the court notes that the law is not entirely clear that defendant bears the burden to demonstrate that Cole was acting *solely* as a Board member when he sent/received the March email.

Second, however, assuming defendant does bear such a burden, defendant has not met this burden.  Although the evidence in the record persuades the court that Cole was acting, at least in part in his capacity as a Director when he sent/received the March email, Cole does not attest, and there is no basis in the record to find, that Cole was acting *solely* in his capacity as a Director.  As the evidence in the record is at best ambiguous on the matter, the court resolves the matter against defendant – the party that bears the burden of proof.[8]

---

[7]In Brookshire, a diversity case in which Louisiana law controlled, the court concluded that insufficient evidence had been presented to demonstrate that an email requesting the attendance of an individual who served as both an entity's General Counsel and Chief Administrative Officer was privileged where the evidence presented did not establish that the email was sent for the purpose of obtaining legal advice from him.  The only "evidence" presented in that case was (i) an assertion in the entity's opposition memorandum that the individual had been asked to attend a meeting in his capacity as the entity's lawyer and to address any legal issue that might arise – an assertion which the court recognized did not constitute evidence; and (ii) an affidavit from the individual attesting merely that he had received an email asking him to attend the meeting.

[8]Plaintiffs also contend that the court should not credit or rely upon Cole's attestation that the March email, which was sent to/from Cole at his NWA email address, constituted internal board communications because NWA, in a pleading filed in federal court in Florida, resisted compliance with plaintiffs' subpoena based upon an assertion that NWA was a non-party, and was at least partially successful.  Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.  New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (citation and quotation marks omitted).  This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.  Id. (citation and quotation marks omitted); see also Hamilton v. State Farm Fire & Casualty Co., 270 F.3d 778, 782 (9th Cir. 2001) (citations omitted) (judicial estoppel is equitable doctrine that precludes party from gaining advantage by asserting one position and then later seeking an advantage by taking clearly

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF(JCx) | Date | July 29, 2009 |
|---|---|---|---|

| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. |
|---|---|

      Third, the court finds that even if Cole was acting as both a Director and investor when he sent/received the March email, his participation in the communication would not render the email non-privileged, assuming it was otherwise privileged, based upon the common interest privilege. Participants in a joint or common defense or individuals with a community of interests may communicate among themselves and with the separate attorneys on matters of common legal interest, for the purpose of preparing a joint strategy, and the attorney-client privilege will protect those communications to the same extent as it would communications between each client and his own attorney. <u>Nidec Corp. v. Victor Co. of Japan</u>, 249 F.R.D. 575, 578 (N.D. Cal. 2007). The joint defense privilege protects not only the confidentiality of communications passing from a party to his or her attorney but also from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. <u>United States v. Austin</u>, 416 F.3d 1016, 1021 (9th Cir. 2005). The privilege applies irrespective of whether or not litigation has begun or is contemplated. <u>Continental Oil v. United States</u>, 330 F.2d 347, 350 (9th Cir. 1964).[9] Here, the court is satisfied that if the primary purpose of the March email had been to obtain legal advice (or to give information to a lawyer to enable him to give sound and informed advice), then Cole had a common interest with defendant relative to the matters discussed in the March email.

---

inconsistent position). Here, the facts do not support plaintiffs' contention that judicial estoppel should cause this court to discredit or reject consideration of Cole's declaration. The litigation in Florida involved a motion to compel NWA to produce documents pursuant to a subpoena duces tecum directed to NWA in the instant litigation. In its opposition to plaintiffs' motion to compel, NWA argued, among other things, that (i) plaintiffs should be required to obtain subpoenaed documents in the possession of both NWA and defendant from defendant to avoid burdening NWA, a non-party investor in defendant; (ii) NWA should not be ordered to produce other documents because to do so would unduly burden NWA, a non-party; and (iii) plaintiffs should be required to pay the costs of NWA's production of documents at least in part because of NWA's status as a non-party. (Miller Ex. 3). The Florida District Court ultimately held that plaintiffs must first pursue avenues of compulsion with defendant before shifting their aim to nonparty NWA, and that because NWA is a nonparty, plaintiffs would, at least initially, bear NWA's costs of producing documents responsive to plaintiffs' subpoena which were not also in the possession of defendant. (Miller Ex. 4). Assuming, for purposes of analysis, that Cole and NWA are the same party, Cole's declaration in the instant matter is not inconsistent with the position taken by NWA in the Florida litigation. The fact that Cole was on defendant's Board of Directors between December 26, 2006 and July 1, 2008 – a period which appears to predate the Florida litigation – and that Cole currently continues to "act as an observer" with defendant's Board of Directors is not inconsistent with the fact that the entity NWA is not a party to this action – the position espoused by NWA in the Florida litigation. (Cole Decl. ¶ 2; Miller Ex. 3).

    [9]Although <u>In re Teleglobe Communications Corp.</u>, 493 F.3d 345, 364-65 (3d Cir. 2007), upon which plaintiffs rely, suggests that the common interest privilege protects only communications shared between attorneys, the Ninth Circuit does not appear to have adopted that restriction. <u>See Austin</u>, 416 F.3d at 1021.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF(JCx) | Date | July 29, 2009 |
| --- | --- | --- | --- |

| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. |
| --- | --- |

**C.      Whether, Assuming the March Email Is Privileged, Defendant Has Expressly
         Waived the Privilege**

       **1.      Applicable Law**

Although as general matter, "[a] party is not entitled to discovery of information protected by the attorney-client privilege[,]" Navajo Nation v. Confederated Tribes & Bands of the Yakima Indian Nation, 331 F.3d 1041, 1046 (9th Cir. 2003) (citation omitted), the privilege is not absolute. Gomez v. Vernon, 255 F.3d 1118, 1131 (9th Cir.), cert. denied, 534 U.S. 1066 (2001). It may be waived "either implicitly, by placing privileged matters in controversy, or explicitly, by turning over privileged documents." Id.

An express waiver occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public. Bittaker v. Woodford, 331 F.3d 715, 719 (9th Cir.), cert. denied, 540 U.S. 1013 (2003). "Inadvertence" of disclosure does not as a matter of law prevent the occurrence of waiver. Weil, 647 F.2d at 24. Disclosures that effect an express waiver are typically within the full control of the party holding the privilege; courts have no role in encouraging or forcing the disclosure-they merely recognize the waiver after it has occurred. Bittaker, 331 F.3d at 719 & n.4 ("express" waiver need not be effectuated by words or accompanied by litigant's subjective intent; rather, privilege may be waived by client's, and in some cases the attorney's, actions, even if the disclosure that gave rise to the waiver was inadvertent) (citations omitted).[10]

       **2.      The Stipulated Protective Order**

On December 17, 2009, the District Judge issued a Stipulated Protective Order, paragraph 5 of which pertains to the "Unintentional Disclosure of Privileged Information." (Calkins Ex. A). It provides in pertinent part:

---

[10]Recently enacted Rule 502 of the Federal Rules of Evidence provides that a disclosure of a privileged document does not operate as a waiver of the privilege if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B). Fed. R. Evid. 502(b). Such rule further recognizes that a federal court may order that the privilege is not waived by disclosure connected with the litigation pending before it and that the parties' agreement on the effect of a disclosure in a federal proceeding is binding upon them. Fed. R. Evid. 502(d), 502(e). Rule 502 applies in all proceedings commenced after the date of its enactment [September 19, 2008] and, insofar as is just and practicable, in all proceedings pending on such date of enactment. See Fed. R. Evid. 502 Effective and Applicability Provisions. As the instant action commenced prior to September 19, 2008, the Stipulated Protective Order addresses the unintentional production of privileged documents, and neither party has invoked Rule 502(b), this court will not apply such rule here.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF(JCx) | Date | July 29, 2009 |
|----------|---------------------|------|----------------|

| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. |
|-------|---------|

> If . . . a party unintentionally discloses DOCUMENTS that are privileged. . . ,
> the party shall, within seven (7) business days upon discovery of the
> disclosure, so advise the RECEIVING PARTY or parties in writing, request
> the DOCUMENTS be returned, and attach a privilege log with an entry
> pertaining to the DOCUMENTS that are privileged. . . *If that request is made
> and the privilege log provided, no party to this action shall thereafter assert
> on this basis that the disclosure waived any privilege. . . .* [¶] To the extent
> that any such inadvertently produced material has been used, included,
> referenced or summarized in a pleading, deposition or other proceeding,
> nothing in this Order shall require a RECEIVING PARTY to purge, redact or
> excise any such information that has been used in good faith before a request
> for the return of the unintentionally produced material.

(Stipulated Protective Order ¶¶ 5.1-5.3; Calkins Ex. A) (emphasis added).[11]

### 3.    Discussion

The cases referenced above regarding express waivers and the inadvertent production of
privileged documents suggest that defendant has waived any privilege as to the March email by
voluntarily producing it. However, given the provisions of the Stipulated Protective Order, further
analysis is required.

As noted above, the Stipulated Protective Order forecloses a receiving party from asserting that
the producing party has waived the privilege by producing a document if, within seven (7) business days

---

[11]The parties also refer the court to Rule 26(b)(5)(B) of the Federal Rules of Civil Procedure
which provides:

> If information produced in discovery is subject to a claim of privilege or of protection as trial-
> preparation material, the party making the claim may notify any party that received the
> information of the claim and the basis for it. After being notified, a party must promptly return,
> sequester, or destroy the specified information and any copies it has; must not use or disclose the
> information until the claim is resolved; must take reasonable steps to retrieve the information if
> the party disclosed it before being notified; and may promptly present the information to the
> court under seal for a determination of the claim. The producing party must preserve the
> information until the claim is resolved.

To the extent defendant contends that plaintiffs have violated the Rule 26(b)(5) relative to the
submission of the March email to this court in connection with the instant matter, the court finds no
violation. Nor is it clear to the court that plaintiffs violated Rule 26(b)(5) by submitting the March email
to the District Judge in connection with plaintiffs' motion for leave to file a first amended complaint as
defendant, in such motion, sought a determination that the March email was not privileged.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-3935 GAF(JCx) | Date | July 29, 2009 |
|---|---|---|---|
| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. | | |

of discovering that it has unintentionally produced a privileged document, the producing party so advises the receiving party in writing, requests the return of the document and provides a privilege log.

The court agrees with defense counsel's contention that defense counsel's request to opposing counsel under paragraph 5 of the Stipulated Protective Order need not be accompanied by evidence which establishes that a document in issue has been unintentionally produced. However, as noted above, in the present proceeding, it is defendant's burden to demonstrate that it has not waived the privilege. Accordingly here, it *is* defendant's burden to demonstrate, with competent evidence, that the provision of the Stipulated Protective Order which would foreclose plaintiffs from asserting that defendant waived the privilege as to the March email by producing it, was properly triggered. Defendant has not done so. Although the record contains defense counsel's representations (to the court and/or to plaintiffs' counsel in correspondence), the record contains no *evidence* that the March email was produced unintentionally, or assuming the production was unintentional, the date on which defendant discovered this fact.[12] Absent evidence of the latter, the court cannot determine whether defendant's request to plaintiffs' counsel was made within seven (7) business days thereafter as required to invoke the protections afforded to defendant under paragraph 5 of the Stipulated Protective Order.[13]

### D.   Whether, Assuming the March Email Is Privileged, Defendant Implicitly Waived the Privilege

#### 1.   Applicable Law

Privileged communications do not become discoverable simply because they are related to issues raised in the litigation. United States v. Amlani, 169 F.3d 1189, 1195-96 (9th Cir. 1999) (citation and quotation marks omitted). However, where a party raises a claim which in fairness requires disclosure of the protected communication, the attorney-client privilege may be implicitly waived. Chevron Corp. v. Pennzoil Corp., 974 F.2d 1156, 1162 (9th Cir. 1992) (citing United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir.), cert. denied, 502 U.S. 813 (1991)).

---

[12]Although defense counsel represented on the record at the May 22, 2009 Harris deposition that she had discovered during a break that the March email had been sent to Kantaros, there is no *evidence* of when the defense discovered that it had inadvertently produced the assertedly privileged document.

[13]In light of the court's determination that the production of the March email waives any privilege relative to such email, the court need not address plaintiffs' contention that defendant expressly waived the privilege as to the March email by producing numerous other emails involving Cole and Kantaros or defendant's responses thereto. To the extent plaintiffs argue that defendant has expressly waived the privilege as to *all* communications involving Cole and Kantaros by virtue of producing the March email and numerous other emails to which Kantaros is a party, the court does not so find. (Plaintiffs' Memo at 6-7). Voluntary disclosure of a privileged attorney/client communication constitutes a waiver of the attorney/client privilege as to all communications on the same subject matter. Weil, 647 F.2d at 24. Accordingly, the scope of the waiver does not, or at least does not necessarily turn on the identity of those participating in the communication.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-3935 GAF(JCx) | Date | July 29, 2009 |
|---|---|---|---|

| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. |
|---|---|

The Ninth Circuit employs a three-pronged test to determine whether an implicit waiver has been effected. Amlani, 169 F.3d at 1195-96; United States v. Gray, 2007 WL 1848030 *4 (N.D. Cal. 2007). An implicit waiver is effected where (1) a party raises an affirmative defense; (2) that puts in issue communications otherwise privileged; and (3) upholding the privilege would deny the opposing party access to vital facts. Gray, 2007 WL 1848030 at *4 (citing Amlani,169 F.3d at 1995).

This waiver principle is applicable when a defendant who is accused of violating the law asserts that he thought his actions were legal because it places in issue his knowledge of the law and the basis for his understanding of what the law required. Bilzerian, 26 F.2d at 1292. His communications with counsel regarding the legality of his actions would be directly relevant in determining the extent of his knowledge and, as a result, his intent. Bilzerian, 26 F.2d at 1292. Accordingly, the assertion of an affirmative defense containing a subjective good faith element operates as an implicit waiver of the privilege as to communications regarding the legality of the conduct in issue, irrespective of whether a defendant actually raises a reliance on advice of counsel defense. See Bilzerian, 926 F.2d at 1294 (although mere denial of allegation would not waive privilege, assertion of good faith would be inextricably intertwined with defendant's state of mind, and would waive the privilege to determine basis for such belief).

## 2.   Discussion

Plaintiffs assert that defendant has impliedly waived the attorney-client privilege by asserting as affirmative defenses, the DMCA "safe harbor," (17 U.S.C. § 512) and "innocent infringement" (17 U.S.C. § 504(c)(2)). (Plaintiffs' Memo at 8-9).

Plaintiffs assert, and defendant does not contest, that a defendant who seeks to invoke the DMCA safe harbor must prove, among other things: (i) it does not have actual knowledge that the material or an activity using the material on its system or network is infringing; (ii) it is not aware of facts or circumstances from which infringing activity is apparent; (iii) it does not receive a financial benefit directly attributable to the infringing activity in a case; and (iv) it has exercised its reserved right to police its system to its fullest extent and has not turned a blind eye to detectable acts of infringement for the same of profit which give rise to vicarious liability. (Plaintiffs' Memo at 8-9).

Plaintiffs also assert, and defendant does not contest, that a defendant who raises an "innocent infringement" defense – a defense which provides the basis for a discretionary reduction in statutory damages – must demonstrate that it was not aware and had no reason to believe that its acts constituted an infringement of copyright. (Plaintiffs' Memo at 9).

It is not entirely clear whether plaintiffs argue that the assertion of the foregoing defenses implicitly waive the attorney-client privilege as to just the March email or as to all otherwise privileged communications which bear upon whether the defendant knows that infringing material is on the defendant's websites. In any event, plaintiffs' argument, taken to its logical conclusion, would mean that in every copyright infringement action in which a defendant asserts the DMCA safe harbor or innocent infringement as a defense, the defendant has implicitly waived the privilege as to communications which bear upon whether the defendant knows that infringing material is on the

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-3935 GAF(JCx) | Date | July 29, 2009 |
|---|---|---|---|

| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. |
|---|---|

defendant's website. This court notes that while there is no shortage of cases in which defendants assert the DMCA safe harbor and innocent infringement as affirmative defenses, plaintiffs do not cite and this court has not located *any* case in which a court has held that the assertion of either a DMCA safe harbor affirmative defense or an innocent infringement defense results in an implicit waiver of the attorney-client privilege. This court declines to so find in this case.

###### E.      The Crime Fraud Exception

Plaintiffs argue that even if the March email is privileged, the crime fraud exception applies. Defendant disagrees.

The attorney-client privilege does not extend to communications made to a lawyer to further a criminal purpose. When a lawyer's advice is sought to further a crime or fraud, those communications are not privileged. United States v. Zolin, 491 U.S. 554, 563 (1989). The crime-fraud exception to the attorney-client privilege "assure[s] that the 'seal of secrecy' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." Id. (citations and internal quotation marks omitted).

A party seeking to vitiate the attorney-client privilege under the crime-fraud exception must satisfy a two-part test. In re Napster, Inc. Copyright Litigation, 479 F.3d 1078, 1090 (9th Cir. 2007). First, the party must show that "the client was engaged in a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme." Id. (citation and internal quotation marks omitted). Second, it must demonstrate that the attorney-client communications for which production is sought are "sufficiently related to" and were made "in furtherance of [the] intended, or present, continuing illegality." Id. (citation and internal quotation marks omitted). In a civil case, a party seeking disclosure (as opposed to an *in camera* review) of attorney-client communications under the crime-fraud exception must establish the existence of such exception by a preponderance of the evidence. Id. at 1094-95.[14]  A party does not establish the crime fraud exception by showing that an

---

[14]In Zolin, the Court considered whether a party seeking to establish that the crime-fraud exception applies must rely entirely on sources independent of the disputed attorney-client communications, or whether a district court may ever honor a request that it conduct *in camera* review of some of the communications to assist in the determination that the privilege has been vitiated. Zolin, 491 U.S. at 560-61.  It held that a district court could conduct an *in camera* review of the materials in issue if there was a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies. Id. at 572.  It further held that the threshold showing to obtain *in camera* review may be met using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged. As (i) plaintiffs lawfully obtained the March email, (ii) it has not been adjudicated to be privileged, (iii) defendant, prior to the court's review of the March email, affirmatively agreed that the court could review such document, and (iv) the court is otherwise permitted to consider the March email in assessing whether such email is privileged, no issue exists in the present case as to the propriety of the court's consideration of the March email in assessing whether the crime fraud exception applies.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-3935 GAF(JCx) | Date | July 29, 2009 |
|---|---|---|---|

| Title | Arista Records LLC, et al. v. Myxer Inc., f/k/a/ mVisible Technologies, Inc., et al. |
|---|---|

opponent structured a business transaction to limit its liability.  In re Napster, Inc. Copyright Litigation, 479 F.3d at 1097.

Here, the court is not persuaded that the crime fraud exception applies.

### IV.    Temporary Under Seal Nature of Instant Order

Absent further order of this court or the assigned District Judge, the Clerk is directed to file and maintain this order under seal for a period of seven (7) days.  The court finds good cause to file such order under seal for at least the limited seven-day period in light of the nature of its contents and the fact that it is based, at least in part on materials submitted under seal pursuant to a protective order.  The parties shall have five (5) days from the date of this order to submit any objections to the public filing of this order or any portion thereof.  Any such objections should state the legal reason therefor and be accompanied by a proposed redacted version of the order which, in the objecting parties' view, is appropriate for public filing.  If no objections are timely received, and absent further order of this court or the assigned District Judge, the court will direct the Clerk to file this order in the public record at the expiration of the seven-day period.

IT IS SO ORDERED.

|  |  |
|---|---|
| Initials of Deputy Clerk | kc |

# EXHIBIT "I"

# Kristin Sciarra

| | |
|---|---|
| **From:** | Jeffrey Darnell [jdarnell@scheperkim.com] |
| **Sent:** | Wednesday, February 24, 2010 10:43 AM |
| **To:** | Kristin Sciarra |
| **Cc:** | Alexander Cote |
| **Subject:** | Myxer/Supplemental Production |
| **Attachments:** | Myxer Privilege Log Supplemental Production.pdf; VZW-Myxer-Supp Prod (AEO-VZW0169-0202).pdf; VZW-Myxer-Supp Prod (Conf-VZW0203-0221).pdf |

Kristin,

Please find attached supplemental documents produced by Verizon in response to Myxer's subpoena. I attach a privilege log as well.

Thanks.

Jeff

<<Myxer Privilege Log Supplemental Production.pdf>>

<<VZW-Myxer-Supp Prod (AEO-VZW0169-0202).pdf>> <<VZW-Myxer-Supp Prod (Conf-VZW0203-0221).pdf>>

Jeffrey R. Darnell
Scheper Kim & Overland LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
T (213) 613-4693 ● F (213) 613-4656
jdarnell@scheperkim.com ● Vcard: link

# EXHIBIT "J"

**Kristin Sciarra**

| | |
|---|---|
| **From:** | Jeffrey Darnell [jdarnell@scheperkim.com] |
| **Sent:** | Wednesday, March 03, 2010 5:57 PM |
| **To:** | Kristin Sciarra; Alexander Cote |
| **Cc:** | Edward Gartenberg; Ranahan, Erin R. |
| **Subject:** | RE: Arista Records v. Myxer, et. al.; Rule 37 meet and confer letter |
| **Attachments:** | Amended AEO VZW0196.pdf; Amended AEO VZW0108.pdf |

Kristin,

Please find attached unredacted copies of VZW 108 and VZW 196.  Upon further review, we do not believe these documents should have been redacted.  Accordingly, pivilege log entries #11, #36, and the portion of #10 that refers to the upper portion of VZW 108 are no longer applicable.  Note that the upper portion of VZW 108 was already produced in other documents (e.g., VZW 083).

Thank you.

Jeff


Jeffrey R. Darnell
Scheper Kim & Overland LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
T (213) 613-4693 ● F (213) 613-4656
jdarnell@scheperkim.com ● Vcard: link


**From:** Kristin Sciarra [mailto:ksciarra@ggwslaw.com]
**Sent:** Wednesday, March 03, 2010 4:05 PM
**To:** Alexander Cote; Jeffrey Darnell
**Cc:** Edward Gartenberg; Ranahan, Erin R.
**Subject:** RE: Arista Records v. Myxer, et. al.; Rule 37 meet and confer letter

Alex,

We are still speaking with our client but we will let you know this week if we intend to move to compel.  When can we expect the amended privilege log correcting entry number 36?

Kristin


**From:** Alexander Cote [mailto:acote@scheperkim.com]

### DECLARATION OF JEFFREY DARNELL

I, Jeffrey Darnell, declare as follows:

1.      I am an associate at the law firm of Scheper Kim & Overland LLP.  I have personal knowledge of the facts set forth herein.  If called as a witness, I could and would competently testify to the matters stated herein.  I make this declaration on behalf of Verizon Wireless Telecom, Inc. ("Verizon").

2.      Attached hereto as Exhibit A are redacted copies of the emails from Ed Ruth that are the subject of Myxer, Inc.'s ("Myxer") Motion for an *In Camera* Review of Documents Identified in Verizon's Privilege Log.  Verizon has redacted the privileged portion of these emails, and reveals only those portions that establish that the work product protection applies.  Verizon has also produced the documents attached hereto as Exhibit A as Bates numbers VZW 0222 to VZW 0225.  These documents correspond to Verizon privilege log entries No. 21 (VZW 0222), No. 22 (VZW 0224 - 0225 ) and No. 23 (VZW 0223).

3.      During the meet and confer process for this motion, Alexander Cote and I met with counsel for Myxer, Edward Gartenberg and Kristin Sciarra, on March 9.  At this meeting, we allowed them to review an unredacted copy of the email from Ed Ruth that is at the bottom of VZW 0222, VZW 0223 and VZW 0225.  This email is the basis for the assertion of the work product protection here.  Mr. Cote and I observed Mr. Gartenberg and Ms. Sciarra review this email.

4.      As Myxer acknowledges, Mr. Gartenberg and Ms. Sciarra, were allowed to review the email from Ed Ruth under a strict agreement that counsel would not disclose or use its contents in any way.  A copy of this agreement is attached as Exhibit A to the Declaration of Kristin Sciarra, which is before the Court in connection with the instant motion.

5.      To date, Verizon has incurred thousands of dollars in fees and costs as a result of this motion.  Counting my time only, Verizon has incurred fees for time spent reviewing Myxer's motion (.6 hours), researching the legal issues raised and

1

1  the authorities cited (3.5 hours), and preparing this opposition (6.2 hours).  My firm

2  is compensated for my time at the rate of $375 per hour, which is the normal rate for

3  which my time is billed.  I believe this rate to be reasonable given my education,

4  background, and skill.  I graduated from the University of California, Davis with the

5  recognition of Order of the Coif.  I then served as a judicial clerk to the

6  Hon. Frederick Martone for the District of Arizona from 2002 to 2003.  In 2003, I

7  joined the law firm of Arnold & Porter LLP.  I practiced there until March 3, 2009,

8  at which time I joined the law firm of Scheper Kim & Overland LLP, where I

9  currently practice law.  Counting my time only, Verizon has incurred fees of no less

10  than $3,862.50, which consists of the 10.3 hours I have spent responding to Myxer's

11  motion times my hourly rate of $375.

12        6.     In addition, Verizon has incurred fees of $2,512.50 for the time of my

13  colleague, Mr. Cote.  Although Verizon has incurred these fees, Verzion does not

14  seek compensation for Mr. Cote's time in connection with this motion.

15        7.     Attached hereto as Exhibit B is a true and correct copy (exhibits

16  omitted) of "Comments" that Myxer filed with the Federal Communications

17  Commission ("FCC") in response to two pending FCC matters: *Notice of Inquiry,*

18  *Fostering Innovation and Investment in the Wireless Communications Market*, GN

19  Docket No. 09-157, FCC 09-66 (rel. Aug. 27, 2009) and *A National Broadband*

20  *Plan For Our Future*, GN Docket No. 09-51, FCC 09-31 (rel. April 8, 2009).

21

22       I declare under penalty of perjury under the laws of the United States of

23  America that the foregoing is true and correct.

24

25       Executed March 23, 2010, at Los Angeles, California.

26

27                           _____

28                           Jeffrey Darnell

# EXHIBIT "A"

**Schwartz, Matthew**

| | |
|---|---|
| **From:** | Constabile, Tom |
| **Sent:** | Monday, March 02, 2009 5:33 PM |
| **To:** | Ruth, Ed; 'daniel.g.flagler@one.verizon.com'; Schwartz, Matthew |
| **Subject:** | RE: Myxer |

Redacted

| | |
|---|---|
| **From:** | Ruth, Ed |
| **Sent:** | Monday, March 02, 2009 5:27 PM |
| **To:** | 'daniel.g.flagler@one.verizon.com'; Schwartz, Matthew; Constabile, Tom |
| **Subject:** | FW: Myxer |
| **Importance:** | High |

Going to send this to Brian A and Dave B later tonight - please let me know if you have any comments or upgrades.

Brian,

Per our discussion last week, I've done a little investigating and have found

I'm concerned at this point that our messaging business may get pulled into litigation -

Redacted

VZW  0222

**Schwartz, Matthew**

| | |
|---|---|
| From: | Schwartz, Matthew |
| Sent: | Monday, March 02, 2009 5:36 PM |
| To: | Ruth, Ed; 'daniel.g.flagler@one.verizon.com'; Constabile, Tom |
| Subject: | RE: Myxer |

Redacted

| | |
|---|---|
| From: | Ruth, Ed |
| Sent: | Monday, March 02, 2009 5:27 PM |
| To: | 'daniel.g.flagler@one.verizon.com'; Schwartz, Matthew; Constabile, Tom |
| Subject: | FW: Myxer |
| Importance: | High |

Going to send this to Brian A and Dave B later tonight - please let me know if you have any comments or upgrades.

Brian,

Per our discussion last week, I've done a little investigating and have found

I'm concerned at this point that our messaging business may get pulled into litigation -

Redacted

**VZW  0223**

**Schwartz, Matthew**

| | |
|---|---|
| **From:** | Schwartz, Matthew |
| **Sent:** | Monday, March 02, 2009 6:08 PM |
| **To:** | Ruth, Ed |
| **Subject:** | RE: Myxer |

Redacted

**From:** Ruth, Ed
**Sent:** Monday, March 02, 2009 6:03 PM
**To:** Schwartz, Matthew
**Subject:** RE: Myxer

Redacted

**From:** Ruth, Ed
**Sent:** Monday, March 02, 2009 5:54 PM
**To:** Schwartz, Matthew; 'Flagler, Daniel G (Dan)'; Constabile, Tom
**Subject:** RE: Myxer

Redacted

**From:** Schwartz, Matthew
**Sent:** Monday, March 02, 2009 5:40 PM
**To:** 'Flagler, Daniel G (Dan)'; Ruth, Ed; Constabile, Tom
**Subject:** RE: Myxer

Redacted

**From:** Flagler, Daniel G (Dan) [mailto:daniel.g.flagler@one.verizon.com]
**Sent:** Monday, March 02, 2009 5:39 PM
**To:** Ruth, Ed; Schwartz, Matthew; Constabile, Tom
**Subject:** RE: Myxer

Redacted

**From:** Ruth, Ed [mailto:Ed.Ruth@VerizonWireless.com]

VZW  0224

FW: Myxer                                                                 Page 2 of 2

**Sent:** Monday, March 02, 2009 5:26 PM
**To:** Flagler, Daniel G (Dan); Schwartz, Matthew B; Constabile, Thomas P
**Subject:** FW: Myxer
**Importance:** High

Going to send this to Brian A and Dave B later tonight - please let me know if you have any comments or upgrades.

Brian,

Per our discussion last week, I've done a little investigating and have found

I'm concerned at this point that our messaging business may get pulled into litigation -

Redacted

# EXHIBIT "B"

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| | ) | |
| Fostering Innovation and Investment in the | ) | GN Docket No. 09-157 |
| Wireless Communications Market | ) | |
| | ) | |
| A National Broadband Plan For Our Future | ) | GN Docket No. 09-51 |

**COMMENTS OF MYXER INC.**

Michael B. Hazzard
Jason A. Koslofsky
Arent Fox LLP
1050 Connecticut Ave, N.W.
Washington, DC  20036-5339
Tel: (202) 857-6029
Fax: (202) 261-0035
hazzard.michael@arentfox.com
koslofsky.jason@arentfox.com

*Counsel to Myxer Inc.*

Dated: September 30, 2009

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION AND SUMMARY ...................................................................1

II.     MOBILE COMMERCE AND TEXT MESSAGING ......................................4

        A.      Tremendous Growth In The Use Of Mobile Phones .............................4

        B.      Text Messaging And Short Codes ........................................................6

        C.      Issues Related To Short Codes ..........................................................11

III.    OVERVIEW OF MYXER ...............................................................................15

        A.      Myxer's Role In The Wireless Market ...............................................15

        B.      Myxer Faces Challenges Caused By A Closed Wireless System ........18

IV.     CONCLUSION .................................................................................................25

Myxer Inc. ("Myxer"), through counsel, files the following comments in response to the Commission's Notice of Inquiry, *Fostering Innovation and Investment in the Wireless Communications Market*, GN Docket No. 09-157, FCC 09-66 (rel. Aug. 27, 2009). As directed in the Notice of Inquiry, these comments are also being filed in *A National Broadband Plan For Our Future*, GN Docket No. 09-51, FCC 09-31 (rel. April 8, 2009). Myxer's comments primarily address Sections II.D and II.E in the Notice of Inquiry regarding mobile applications and services and business models and practices.

## I.      INTRODUCTION AND SUMMARY

Myxer applauds the Commission's stated commitment to fostering wireless innovation, because it will undoubtedly be critical to the growth of the wireless industry and the economy as a whole. Innovation benefits consumers by offering more choices and new technologies. Myxer welcomes the opportunity to further explain why open and accessible wireless markets are critical to the success of innovative and entrepreneurial businesses such as Myxer. The FCC has recently announced a continued focus on net neutrality, as well as an expansion of the principle to all platforms that access the Internet, including wireless networks.[1] Myxer commends the FCC for working towards expanded principles of net neutrality to wireless networks because it only benefits consumers when they can access innovative and competitive businesses through their mobile phones.

By providing mobile phone users downloadable entertainment content through its website and the mobile web through text messages, Myxer is part of the

---

[1]      *FCC Chairman Genachowski Outlines Actions to Preserve the Free and Open Internet*, Sept. 21, 2009, *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-293567A1.pdf.

"value chain" of the wireless market identified in the Notice of Inquiry. Myxer has one of the most popular websites for mobile content and has established itself as one of the most popular mobile content providers. Current mobile phones provide much more than simply the technology to communicate wirelessly. Mobile phones have become increasingly more sophisticated and can be customized with mobile content such as wallpapers, ringtones, games, and other applications. Companies that provide that mobile content have the opportunity to reach millions of mobile phone users, and those mobile phone users should be able to reach those companies. Thus, it is clear that the mobile phone is quickly becoming the web access device of choice, and it is critical that the same principles that have protected innovation and access to the products and services of consumer's choice on the wired Internet be transferred to the wireless world.

Innovation has been the key to Myxer's success and Myxer supports every effort to encourage and promote more innovation in the wireless markets. Part of Myxer's innovative approach is offering free mobile content that is supported by advertising revenue and using text messages to allow mobile phone users access to that mobile content. Myxer also offers premium content to consumers for a fee. Myxer's content offerings compete directly with those offered by the largest national mobile operators, such as AT&T and Verizon Wireless, which creates an incentive for the mobile operators to discriminate against third-party content providers, thereby limiting – and in some cases, foreclosing – the ability of consumers to access the content of their choosing. Indeed, as explained below, actions taken by the likes of AT&T and Verizon Wireless have disrupted Myxer's business, implicating the Commission's call blocking

policies, net-neutrality policies, and the First Amendment rights of consumers and Myxer.

Consumers should be able to reach Myxer (and other content providers) and access available content through their mobile phones as easily as they can over the traditional Internet. Today, however, that is not the case due to the mobile operators' control over the Short Message Service ("SMS") network and "short codes" used by Myxer and other content providers to deliver requested, lawful content to consumers. The consolidation of the wireless industry has placed considerable power into the hands of just a few wireless providers. Four carriers, Verizon Wireless, AT&T, Sprint-Nextel, and T-Mobile, control 90% of the wireless market, with Verizon and AT&T combined controlling 60% of the wireless market.[2]

Consumers of the nations' largest wireless carriers face considerable hurdles reaching innovative businesses because of the bottleneck control exercised by the wireless operators. With the growth of the mobile Internet and the use of text messages by mobile users, new opportunities for companies like Myxer to offer innovative products to the public have arisen. The wireless providers should not be able block a mobile phone user's ability to send text messages to a competing business or prevent a consumer from obtaining the content of their choosing. If that is allowed, despite the Commission's call-blocking rules and net-neutrality principles, mobile phone users will suffer and the competing businesses will be shut out of the wireless marketplace.

---

[2]     Office of Senator Herb Kohl, Press Release, *Kohl Examines Causes of Rising Text Message Pricing*, June 16, 2009,
http://kohl.senate.gov/newsroom/pressrelease.cfm?customel_dataPageID_1464=2870.

3

Innovation and success require open access to wireless networks whether through text messages or the mobile Internet.

## II.     MOBILE COMMERCE AND TEXT MESSAGING

### A.     Tremendous Growth In The Use Of Mobile Phones

Mobile phones have changed the world for billions of people.  Worldwide, there are approximately 4.1 billion mobile phone subscribers.  According to the Cellular Telecommunications & Internet Association (CTIA), at the end of 2008, 87% of the U.S. population owned a mobile phone – equivalent to approximately 270.3 million wireless subscribers.[3]  Mobile phones have become the sole communication devices in millions of households.  CTIA estimates approximately 20% of U.S. households are wireless-only.[4]  As the mobile market has developed, so has the functionality of mobile phones.

As of June 30, 2009, 65% of all U.S. subscribers use some form of mobile data services, according to Chetan Sharma Consulting.[5]  Mobile Internet usage has escalated as wireless networks have been upgraded.  As early as 2001, approximately 97% of mobile phones being sold in the U.S. had Wireless Access Protocol capabilities, which provided mobile subscribers basic access to the Internet.  Internet usage did not take-off at that time, however, due to minimal screen sizes, low data transfer rates and expensive or confusing data plans offered by carriers.  In contrast, today's 3G network

---

[3]     CTIA, *Wireless Quick Facts, available at* http://www.ctia.org/advocacy/research/index.cfm/AID/10323.

[4]     *Id.*

[5]     Chetan Sharma Consulting, *US Wireless Data Market Update - Q2 2009, available at* http://www.chetansharma.com/usmarketupdateq209.htm.

speeds can be as much as six times faster than their 2 and 2.5G predecessors and data plans have become cheaper and simpler.

According to recent data from comScore, the number of U.S. subscribers with 3G enabled devices grew 80% during 2008 to 64.2 million.[6] The market has responded enthusiastically as carriers have rolled out their enhanced networks and a new crop of 3G enabled devices. In addition, consumers are enjoying a more compelling experience because major publishers of content have enhanced their mobile web content and sites.

The problems with mobile Internet use were not limited to technological ones. Indeed, carriers have long maintained "blacklists" of websites that could not be accessed by their subscribers, or from which downloads will not be permitted, even when those subscribers were paying for "internet access" on their devices. As has been well-documented by Skype and others, wireless carriers have also deliberately disabled technical capabilities of the handsets that they sell in order to restrict how they may be used. Some other examples include preventing hyperlinks embedded in text messages from being followed by the end user even when the physical hardware supports such functionality, instances of disabling the use of Bluetooth on handsets to prevent "sideloading" of content over Bluetooth instead of the wireless network, and disabling the ability to save downloaded content for use as a ringtone or other products that compete with one sold by the wireless provider itself.

---

[6] comScore, Press Release, *Comscore Reports that the U.S. Catches Up with Western Europe in Adoption of 3G Mobile Devices*, *available at* http://www.comscore.com/Press_Events/Press_Releases/2008/09/US_Adoption_of_3G_ Mobile_Devices.

The mobile Internet can be accessed through a browser on a mobile phone to view webpages or check email. It is also the means by which a mobile phone user can download mobile content to the phone. Mobile phones are being used by consumers to perform electronic commercial transactions. For example, a mobile phone user can download ringtones and wallpapers over the mobile Internet through the phone's browser. The mobile phone will undoubtedly continue to be an increasingly indispensable part of the average consumer's day-to-day life. The consumer will only see these benefits if wireless networks are open and accessible to consumers and businesses. The future is bright, so long as it is fair.

At present, however, the market is not fair. Directly flouting the Commission's call blocking prohibitions and network-neutrality principles, the mobile network operators take the view that they can block SMS calls to Myxer's short code (and anyone else's, for that matter) for good reason, bad reason, or no reason at all. The Commission should do everything possible to ensure the opposite result by vigilantly enforcing its call blocking rules and by ensuring that principles of net neutrality extend to wireless networks, just like wired networks.

### B.     Text Messaging And Short Codes

Part of the tremendous growth in the use of mobile phones has been in the increasing use of text-messaging as a means of making calls on mobile phones. Although text messaging has a history dating back to the early 1990's, widespread use has only occurred recently.[7] The use of text messages has grown significantly and the number

---

[7]     Patricia Moloney Figliola, Congressional Research Service, *Text and Multimedia Messaging: Emerging Issues for Congress* (Mar. 23, 2009) *available at* http://assets.opencrs.com/rpts/RL34632_20090323.pdf. Attached hereto as Exhibit A.

6

being sent has nearly doubled every year since 2006. Approximately, 162 billion messages were sent over U.S. carrier networks during 2006, 363 billion mobile messages were sent during 2007, and an estimated 600 billion messages were sent during 2008.[8]

Text messages are referred to as Short Message Service or SMS, which is the standard used by mobile phones to send and receive the 160 character messages. The terms SMS and text message are used interchangeably. Text messages are sent on a wireless channel between the mobile phone and the mobile phone tower called the "control channel." A mobile phone is constantly communicating through the control channel with the mobile tower to determine which network the mobile phone is in and what towers it is using. This interaction occurs even when the mobile phone is not in use. The control channel is also used to send small packets of data back and forth between the mobile phone and tower to ensure the connection between the two are still operating. Text messaging takes advantage of the channel as well. The control channel is a different channel than what is used for wireless voice communications. Two other types of text messaging allow for messages beyond the plain text of an SMS. Enhanced Messaging Service (EMS) allows for formatted text, sound effects, and small pictures. MMS (Multimedia Messaging Service) allows animations, audio, and video files in addition to text to be sent. Thus, text messaging provides another means, besides voice, that two mobile users can communicate between their mobile phones to exchange messages, content, or even applications.

Text messaging has also become a significant marketing tool by which to reach millions of wireless users. The use of text messages as a marketing tool has been

---

[8]     Common Short Code Administration, *The Market for Common Short Codes*, *available at* http://www.usshortcodes.com/csc_about.html

further enhanced by the development of "common short codes," also known as CSCs, specifically for text messages.  Short codes are special telephone numbers that only work for text messages and are usually five or six digits long (instead of a typical telephone number of ten digits).  The short codes are most often used by a mobile phone user to communicate with a company or organization and obtain mobile content, participate in text-messaging voting, or sign-up for alerts about the company's product.

Short codes provide direct access to a company or organization's so-called application which provides the mobile content.  "Application providers" create the applications which use and process the short codes.  A company with content to distribute may partner with an application provider or develop its own application in order to run a promotion or other marketing plan through short code messaging.   Mobile phone users may be asked to send a certain text message to a short code obtained by the company and when the application receives the text message, it can process the message and interact with the mobile phone user by return text message to the mobile phone user.  For example, as explained in greater detail below, a mobile phone user may send a text with a ringtone's unique code to Myxer's short code (69937), upon which Myxer's application would process the short code message and send a text message back with the means of downloading that ringtone.  Myxer is both a content distributor as well as an application provider.  Some short codes are exclusive to a single wireless provider, and may be less than five digits, such as the text message voting system on American Idol that is exclusive to AT&T and relies on a four digit short code for each contestant.[9]

---

[9]     http://www.americanidol.com/mobile/; http://www.americanidol.com/faq/

Companies lease short codes from the Common Short Code Administration ("CSCA").[10]  The CSCA is part of the CTIA,[11] which is a nonprofit membership organization that represents all sectors of wireless communications and companies in the wireless industry.  The CSCA administers the short codes for wireless carriers and oversees the technical and operational aspects of short code use.

To lease a short code, the CSCA allows a company to search for and choose a specific vanity short code that may correspond to a five or six letter word (such as short code 69937, which is "MYXER" on the phone keypad), or companies can choose a random short code.  The vanity short codes are more expensive to lease than a randomly-assigned one.  Once a company has a short code and it has partnered with an application provider or developed its own application, it must then enter into contracts with wireless providers to recognize the short code so that the wireless providers will route short code text messages to the correct application provider.  In the case of non-exclusive short codes, an application provider who obtains a short code wants that short code to work across all wireless providers.  A short code is useless if a mobile phone user's wireless provider does not recognize the short code or send it to the application provider for processing.

Thus, in many cases, application providers enter into one contract with an "aggregator" instead of multiple contracts with various wireless companies.  The aggregator typically has connectivity already established with many of the wireless

---

[10]     Common Short Code Administration, *Functional Roles Involved in CSC Administration*, *available at* http://www.usshortcodes.com/aboutCSCA.html.

[11]     Cellular Telecommunications & Internet Association, *About Us*, *available at* http://www.ctia.org/aboutCTIA.

companies, so that the application provider can use its short code without entering into multiple contracts. Thus, a short code message from a mobile phone user often travels first to the wireless company who then sends the short code to an aggregator who then sends it to the application provider. The application then processes the message and sends the appropriate text message back to the mobile phone user. Because of the growth in the mobile web described above, text messages can include links that mobile phones can use to connect to the Internet and download mobile content.

Some famous examples of mobile marketing programs that used short code messaging include voting on the television show American Idol (text messaging "VOTE" to the short code assigned to the candidate the mobile user wants to win)[12] and Coke's "My Coke Rewards" promotion (text messaging the alphanumeric code underneath a soda cap to earn points which can be used to obtain rewards).[13] Beyond commercial mobile campaigns, short codes are becoming a popular method for politicians to reach supporters in political campaigns as well. Even the Obama Presidential Campaign used short codes as part of its announcement of the Vice-Presidential nominee (text messaging "VP" to short code 62262 (*i.e.,* "OBAMA") to receive a "first to know" text message announcing Obama's running mate).[14] This is a small fraction of the mobile marketing campaigns and other mobile programs that exist in the marketplace.

---

[12]    http://www.americanidol.com/mobile/

[13]    http://www.mycokerewards.com

[14]    http://my.barackobama.com/page/s/firsttoknow

### C.    Issues Related To Short Codes

Because short codes allow direct contact between a company and a mobile phone user, the industry has established best practices focused on consumer protection and privacy.   The Mobile Marketing Association ("MMA") is a global trade association that focuses on the growth of mobile marketing and its associated technologies.   Working with all major wireless providers, the MMA developed best practices for mobile marketing campaigns in order to safeguard consumers from unwanted text messages and other practices that might turn mobile phone users away from mobile marketing campaigns.   The MMA publishes "U.S. Consumer Best Practices"[15] and a "Global Code of Conduct"[16] designed to achieve those ends.   These industry guidelines are designed to benefit the consumer and are designed to be followed by wireless providers and application providers in developing mobile marketing campaigns.

Besides self-regulation by the wireless industry, the Commission has recognized that text messaging falls within its regulatory authority[17] and that authority has been affirmed by at least one federal circuit court.[18]   That federal court relied on the FCC's rules and regulations which equated text messages with voice calls for purposes of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227.   Thus, because text message were calls under the TCPA, per the FCC's interpretation, text messages cannot

---

[15]    MMA, *U.S. Consumer Best Practices*, *available at* http://www.mmaglobal.com/bestpractices.pdf.

[16]    MMA, *Global Code of Conduct*, *available at* http://www.mmaglobal.com/codeofconduct.pdf.

[17]    *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order*, 18 FCC Rcd. 14014, 14115 (July 3, 2003).

[18]    *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951-54 (9th Cir. 2009).

11

be sent unsolicited to recipients using an automatic telephone dialing system. Just as SMS messages are calls for purposes of the TCPA, they are calls for purposes of the Commission's rules prohibiting call blocking.

The considerable influence of the wireless providers and the ability to block a mobile campaign is also a potential problem for the successful utilization of short codes in mobile campaigns. A Petition filed in December 2007 still presently before the Commission urges the Commission to treat text messages as a Title II common carrier services subject to all Title II provisions including nondiscrimination, accessibility, and the § 208 complaint process.[19] Myxer urges the Commission to grant that Petition. Should the Commission not act on that Petition or in regard to the present Notice of Inquiry, companies like Verizon Wireless will continue to pretend that that the Commission's prohibition on call blocking does not apply to SMS calls and maintain a claim that it has the authority to censor or block any text messages they deem controversial or even competitive. Verizon has been caught blocking text messages at least twice, and in one case recanted after a public outcry, yet in the other has maintained an unassailable right to block text messages.

In September 2007, Verizon Wireless notified NARAL Pro-Choice America that it was rejecting NARAL's request to open Verizon's network for NARAL's pro-choice text messages.[20] Although NARAL would only send the text messages to

---

[19] *Petition of Public Knowledge et al. for Declaratory Ruling Stating that Text Messaging and Short Codes are Title II Services or are Title I Services Subject to Section 202 Nondiscrimination Rules*, WT Docket No. 08-7 (filed Dec. 11, 2007).

[20] Adam Liptak, *Verizon Blocks Messages of Abortion Rights Group*, N.Y. Times, Sept. 27, 2007, at A1, 2007 WLNR 18960271, *available at* http://www.nytimes.com/2007/09/27/us/27verizon.html. Westlaw version attached hereto as Exhibit B.

mobile phone users who requested that NARAL send the text messages, Verizon rejected

NARAL's request based on an undisclosed internal policy against "controversial or

unsavory" text messages.  However, Verizon quickly recanted when faced with

widespread criticism and, the next day, opened its network to NARAL's text messages.[21]

Even after recanting with regard to NARAL, Verizon maintained its right to choose what

messages it transmits, even in cases where consumers were seeking to access lawful

content of their choosing.[22]

   Verizon's self-asserted right to block text messages it deems

"controversial" starkly demonstrates the issues of net neutrality that can arise with text

messages.  Even if a Verizon subscriber wanted to receive the content of the user's

choosing, *i.e.* NARAL's text messages, and had expressly requested that NARAL send

the text messages, Verizon blocked that avenue of communication based on Verizon's

unilateral decision that it contained "controversial" content.  Such content-based

discrimination unlawfully impinges on the First Amendment rights of consumers and

organizations.  Verizon's unilateral classification of the content and subsequent blocking

could logically lead Verizon to block other content on less controversial subjects than

abortion based on Verizon's perceived harm of the content.  Given the wireless

provider's control over its network, conceivably, a wireless provider could block text

messages related to a competitor's mobile marketing campaign.

---

[21]  Adam Liptak, *Verizon Reverses Itself on Abortion Messages*, N.Y. Times,
Sept. 28, 2007, at A20, 2007 WLNR 18998680, *available at*
http://www.nytimes.com/2007/09/28/business/28verizon.html.  Westlaw version attached
hereto as Exhibit C.

[22]  *Id.*

In fact, Verizon and several other wireless providers did just that when they blocked the text messages of a company called Rebtel Networks in late 2007.[23] Rebtel allowed mobile phone users to text the company an international telephone number and Rebtel would then text back a local number that after being dialed, would then connect the mobile phone user to the international telephone number previously sent by text message. By using the local telephone number, the mobile phone user avoided the wireless provider's much higher rates that would apply by dialing the international number directly. T-Mobile, Alltel, and Verizon all blocked Rebtel's text messaging, cutting off the ability of Rebtel to send the local telephone number. In response to calls that the wireless providers should not block text messages, Verizon unequivocally stated that it can block calls to a competitor's short codes,[24] even in the face of the Commission's call blocking rules, which appply equally to SMS calls as they do to other types of calls.

Text message blocking obviously restricts a mobile phone user from obtaining the legal content of the user's choosing. Innovative businesses will face impossible hurdles if a wireless provider can simply cut off a competitor. Expanding net neutrality to include wireless networks and text messaging would prevent a mobile phone user from ever facing these types of situation again.

---

[23]     Bruce Meyerson, *Not on Our Network, You Don't*, BusinessWeek, Dec. 13, 2007, *available at* http://www.businessweek.com/magazine/content/07_52/b4064034911363.htm. Attached hereto as Exhibit D.

[24]     *Id.*

## III.   OVERVIEW OF MYXER

### A.   Myxer's Role In The Wireless Market

Myxer was founded in 2005 and is based in Deerfield Beach, Florida.  Part of the "value chain" of the wireless market, Myxer is both a mobile content retailer and a mobile content distribution platform.  Myxer presents a full spectrum of mobile entertainment content, such as ringtones, wallpapers, and mobile games, much of which is free, to virtually every mobile operating system, including iPhone and Android, with the goal of democratizing the tools of production for mobile entertainment – making it possible for everyone – no matter how small they are – to participate in the mobile economy.

Myxer provides online products for all content providers, including artists, record labels, film and television studios, to prepare, promote, and monetize their content in the mobile market.  Accordingly, the Myxer platform was designed so that all content-owners could deliver their content to mobile devices quickly and easily.  Myxer's platform is especially attractive to smaller content-owners who typically do not have the technical ability or marketing resources to create their own portals or secure placement on the content "decks" of mobile carriers.  Thus, Myxer has considerable success attracting independent artists who were previously shut out of the ringtone and wallpaper market because they were not big enough to sell ringtones and wallpapers on their own. Now with Myxer, over 100,000 bands have found a way to reach their fans and the enormous Myxer audience.

Myxer reaches much of its audience through its website at www.myxer.com.  Myxer's website, which is accessible both by traditional personal computers as well as from mobile phones, has increasingly been visited by its young

15

audience more often from a mobile device than from a traditional computer. In the time between the start of 2008 to the second quarter of 2009, Myxer's audience has shifted from one that used the mobile phone only 25% of the time to access its website to one in which fully three-quarters of visits are made from mobile devices.

Myxer's business also depends heavily on the use of short codes and the short code system in order to distribute mobile content. In the terms of the description of short codes above, Myxer is both a company with mobile content to distribute as well as the application provider to distribute that mobile content. Myxer allows a mobile phone user to visit the Myxer website and browse a wide selection of ringtones and wallpapers, among other mobile content. Once the mobile phone user chooses a ringtone, for example, they can choose an option from the website to send the ringtone to their phone at which point their phone will receive a text message that allows the user to begin downloading the ringtone. Alternatively, Myxer allows users to download or purchase a content provider's products directly from the user's mobile phone. Every product in the Myxer catalog is assigned a unique ID number, which makes it available for download or purchase directly from any compatible mobile phone. Thus, a musician's fan simply send a text message to the Myxer short code (69937, *i.e.*, "MYXER") that contains the product ID number of the musician's ringtone, and the item will be delivered to the user's mobile phone via a text message that allows the user to begin downloading the ringtone.

Additionally, Myxer works closely with advertisers to deliver highly efficient interactive advertising campaigns that leverage both Myxer's audience and technology to deliver integrated campaigns spanning an audience of millions across the web, mobile web, and SMS calls. These products span multiple medias including web,

16

mobile web, and SMS text messaging, thus providing a vast array of unique campaign opportunities.  Advertisers can brand the Myxer website and their own website and utilize the Myxer technology to promote text-to-win contests, text-to-vote, mobile coupons, and text message alerts.

Unlike some mobile content providers, Myxer does not charge a subscription fee for downloading mobile content, and most of the mobile content offered by Myxer is free to download.  Myxer's free content is supported by advertising revenue. If the mobile content does have a cost associated to download, the mobile user is charged on their mobile phone bill by their wireless provider.  Myxer must pay the wireless provider a portion of the revenue generated when a user purchases mobile content that is charged on user's mobile phone bill.

Because much of the content Myxer offers is free, Myxer.com has become one of the most popular destinations for entertainment content on the mobile Internet with a consumer audience of approximately 26 million total users, over 6 million of which are active each month.  Myxer delivers 60 million downloads and 18 million text messages monthly, and serves hundreds of millions of page views across the web and mobile web. According to Hitwise, as of May 2009, Myxer had among the highest market share of U.S. mobile web page visits.

Myxer's business has been built on consumer trust and the ability to offer free mobile content without hidden subscription fees or other charges.  Thus, Myxer complies with all best practices identified by the CSCA and CTIA for mobile marketing

campaigns.[25]  Myxer communicates all pricing information to the mobile user and offers

clear options for help and to opt-out of any service.  Further, Myxer is in compliance with

all applicable laws and regulations.  For example, Myxer is in compliance with the

Digital Millennium Copyright Act of 1998 (the "DMCA").  The Company is a strong

proponent of protecting the rights of copyright holders and strictly follows the DMCA.

The Company's PROTECT program even makes it possible for copyright holders to

remove items from the Myxer catalog via an expedited DMCA "takedown" without any

human intervention.

> Myxer has created a thriving business based on technological innovations

in the wireless marketplace that allow it to reach a large audience of mobile phone users.

As a content provider and distribution platform, Myxer's success, and the success of

businesses like Myxer, requires that wireless networks are open and accessible so that

mobile phone users can send Myxer's content to their phones through the mobile Internet

or short code text messages.

### B.    Myxer Faces Challenges Caused By A Closed Wireless System

> Despite Myxer's compliance with industry codes of conduct, Myxer faces

significant challenges without net neutrality principles applied explicitly to wireless

networks and text messages.  When every part of the short code system is working

properly, Myxer is able to send mobile content to any mobile phone user that requests a

download.  A mobile phone user with any wireless provider can send a text message to

Myxer's short code and in return Myxer can send them a text message back with

download instructions.  As described above, the mobile phone user's text message to

---

[25]      CSCA, Best Practices, *available at*
http://www.usshortcodes.com/csc_best_practices.html.

Myxer's short code goes first to the wireless provider who sends it to an aggregator who then sends it to Myxer. When everything works correctly, Myxer's innovative mobile marketing campaigns can reach a vast audience and the audience can reach Myxer.

Unfortunately, Myxer has faced service disruptions because the short code system does not always work as it should. Mobile phone users have had their SMS calls to Myxer blocked when they have attempted to obtain Myxer's mobile content through Myxer's short code. This blocking is caused when either of the parties in the chain between Myxer and the mobile phone user, the wireless provider and the aggregator, have refused to transmit the text message to Myxer. In other words, either the wireless provider or the aggregator has blocked Myxer's text messages. When Myxer has investigated these blocking episodes, both the wireless provider and the aggregator have claimed not to be blocking any short code text messages or have pointed to the other party as responsible for blocking. Alternatively, the aggregator will admit to blocking text messages to Myxer, but does not face the kind of scrutiny the wireless provider might face if they were found to be blocking text messages.

Various inconsistent justifications have been given for blocking Myxer's short codes, including claims of violations of content standards and "potential copyright infringement," but doesn't provide any greater detail and never have. In essence, the wireless provider has appointed itself an arbitrary administrator of the nation's copyright laws. And, the aggregator is ultimately beholden to the wireless providers to which it is connected, rather than to consumers or the application providers who must rely on the aggregator to facilitate short code text message exchange. Thus, application providers

like Myxer are at the mercy of wireless providers and aggregators who can at either step block the text messages intended for the application providers.

More specifically, Myxer has experienced situations where AT&T, the second largest wireless provider in the United States, either inadvertently or through subtle pressure, convinced Myxer's aggregator to block Myxer's text messages. In the past, AT&T has apparently expressed some concern to aggregators about Myxer's undefined and unsubstantiated "potential copyright infringement" without further explanation. Although AT&T may not have explicitly directed the aggregator block Myxer, the aggregator is ultimately dependant on the wireless carrier for its business, and, thus, may act on the perceived or implicit pressures of the wireless provider. The upshot is that this type of tactic enables AT&T to eliminate, or at least materially disadvantage, a competitor by merely pointing to unverified accusations, and it gets the result it seeks without direct responsibility.

Ironically, AT&T recently has claimed that Google is unlawfully blocking in violation of the Commission's rules and net neutrality principles[26] -- the same practice AT&T maintains that it may, at its sole discretion, employ against Myxer and others. Just as Google should not be able to block calls from AT&T's consumers or made to certain telephone numbers, AT&T should not be able to block SMS calls from its consumers to Myxer. As noted, the Commission has found that SMS messages are calls

---

[26]    *See* AT&T *Ex parte* in *Google Voice; Establishing Just and Reasonable Rates for Local Exchange Carriers*, WC Docket No. 07-135; *Broadband Industry Practices*, 07-52 (filed Sept. 25, 2009).

under the Act, and this determination has been affirmed.[27]  AT&T should follow the Commission's rules and acknowledge that it cannot block SMS calls, just as AT&T wants Google to stop blocking calls from AT&T's subscribers.

Furthermore, Myxer has also faced issues with Verizon Wireless, the nation's largest wireless provider, whereby Verizon blocked access to Myxer's short code messages.  Millions of Verizon customers lost access to Myxer's content.  And, obviously losing access to the millions of customers of the nation's largest wireless carrier had a dramatic impact on Myxer's business.  Verizon eventually agreed to stop blocking Myxer's short code messages, so long as Myxer severely limited the content that was available to Verizon customers.  Verizon effectively forced Myxer to reduce its catalogue of free items from approximately 400,000 pieces of content to approximately 25,000 pieces of content.  The limitations were based on arbitrary censorship rules that were even harsher than what is allowed on network television.  Even since Verizon stopped blocking SMS calls to the Myxer short code, Myxer has not been able to make up its lost business.   Prior to the content restrictions forced on Myxer by Verizon Wireless, Myxer typically had approximately 40,000 new users per day.  Since Verizon Wireless' content censorship took effect, the number of new users per day has dropped to about 23,000.  By restricting the free flow of content, Verizon was able to have a significant negative impact to a business competitor and also is restricting users from having access to products and services of their choice.

---

[27]   *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order*, 18 FCC Rcd. 14014, 14115 (July 3, 2003); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951-54 (9th Cir. 2009).

Text message blocking and censorship are serious threats to the wireless market and to innovation by companies like Myxer. Wireless providers, like Verizon, incorrectly and unlawfully assert a right to censor lawful content sought by consumers and to block SMS calls at will.[28] By blocking Myxer's short code text messages and restricting the consumer's unfettered access to the content of its choosing, a wireless provider could conceivably block access to a competitor's product in favor of their own. Indeed, the wireless providers generally have their own mobile content marketplaces that compete with Myxer's website for ringtones, wallpapers, and applications.[29] Consumers face reduced choice, because the wireless providers typically do not offer as much free content as Myxer offers or offer content at higher prices than Myxer. Additionally, the wireless providers stand to benefit financially from direct sales of content because they don't share any revenue with third-party content providers like Myxer.

If a wireless provider blocks Myxer's short code text messages, or has the aggregator block Myxer's messages, the wireless provider has eliminated a competitor's opportunity to reach the wireless provider's subscribers, and has foreclosed consumers from accessing content of their choosing. This is especially troublesome where Myxer may offer free content to mobile phone users like ringtones that the wireless providers do not offer. This kind of anticompetitive behavior stifles innovation in the wireless market and removes a free option of the consumer to obtain mobile content.

---

[28]     Exhibit C, Adam Liptak, *Verizon Reverses Itself on Abortion Messages*, N.Y. Times, Sept. 28, 2007, at A20, 2007 WLNR 18998680, *available at* http://www.nytimes.com/2007/09/28/business/28verizon.html.

[29]     Verizon Media Store (http://mediastore.verizonwireless.com/onlineContentStore/index.html); AT&T Ringtones & More (http://www.wireless.att.com/cell-phone-service/ringtones_media/index.jsp).

Finally, content providers like Myxer are also beholden to the wireless providers for billing and must often share revenue at the wireless provider's demand. Wireless providers enforce an "all or nothing" billing rule on companies like Myxer.  In other words, if Myxer elects to use the wireless providers' billing system to bill Myxer users for the purchase of premium entertainment content, the wireless providers require that 100% of Myxer's billings to its customers be transacted through the wireless providers' billing system and Myxer is prohibited from using any other method to bill its customers (*i.e.*, internet credit card billing).  These practices also restrict a consumer's ability to buy mobile content online through a credit card purchase and then send that content to their mobile phone.  Instead, consumers must be billed for the mobile content on the wireless provider's bill and are denied any choice in the matter.  Under this all or nothing regime, if the billing is through the wireless provider's bill, the wireless provider typically charges a significant tariff of up to 30-40% or even higher on all mobile internet commerce, even though the cost of putting a line item on a bill does not vary with the size of the purchase.  If the billing were over the Internet, the wireless provider would not share in the sale of the content and this substantial savings could be passed along to the consumer.

By way of example, when a mobile phone user purchases a song from iTunes, they pay $.99 directly to iTunes over the internet, even if that song is eventually sent to the user's iPhone on the AT&T network.  However, if a mobile phone user purchases a $.99 ringtone from Myxer, the wireless provider would get 30-40% of the $.99 just for putting the $.99 fee on the mobile phone user's wireless bill.  This is just another example of the power that the wireless providers have based on market share.  By

23

charging a significant tariff for all mobile internet commerce billed through the wireless
operators billing system, wireless providers have found a way to profit even where a
competitor makes the sale. This power should shift to consumers. The consumers
ultimately pay the bills, and they should be able to choose whether they receive charges
on their wireless bill or by some other means.

   The FCC recently announced its intention to expand the principle of net
neutrality to all platforms that access the Internet, including wireless networks.[30]  Myxer
applauds this effort because open wireless networks are essential to consumers' ability to
reach Myxer's mobile content. As the many examples above demonstrate, Myxer's
success as a business as well as its ability to offer mobile content to the millions of
wireless subscribers is dependent on the equal and fair enforcement of the Commission's
call blocking prohibitions and net neutrality principles.

   Myxer's short code should be as open to any wireless subscriber as
Myxer's webpage is to any Internet user. Myxer should not be hampered by the wireless
provider's ability to influence aggregators to block short codes based on eliminating a
competitive product. Verizon could hypothetically no more block Myxer's webpage over
its FIOS Internet service, than it should be allowed to block Myxer's short code text
messages over its wireless service. Mobile phone users should not be prevented from
accessing mobile content over the mobile Internet through text message blocking. Text
messages are an increasingly common means to access the Internet and should be
unrestricted. Consumers benefit from open markets and open networks and the FCC

---

[30] *FCC Chairman Genachowski Outlines Actions to Preserve the Free and Open
Internet*, Sept. 21, 2009, *available at*
http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-293567A1.pdf.

should work towards the goal of opening wireless networks and text messages as much as possible.

## IV.     CONCLUSION

For all these reasons, the Commission should encourage wireless innovation through open access to wireless networks.  Wireless innovation and consumer choice will be severely stunted if wireless networks are closed and text messages can be blocked.

Dated: September 30, 2009                     Respectfully submitted,


                                              By: s/ Michael B. Hazzard
                                              Michael B. Hazzard
                                              Jason A. Koslofsky
                                              Arent Fox LLP
                                              1050 Connecticut Ave, N.W.
                                              Washington, DC  20036-5339
                                              Tel: (202) 857-6029
                                              Fax: (202) 261-0035
                                              hazzard.michael@arentfox.com
                                              koslofsky.jason@arentfox.com

                                              *Counsel to Myxer Inc.*

## CERTIFICATE OF SERVICE

      I, Michele Depasse, hereby certify that on this 30th day of September, 2009, the foregoing Comments of Myxer Inc. were served on the following persons via ECFS, First Class Mail *, or electronic mail **:

s/ Michele Depasse        
Michele Depasse

Peter Trachtenberg **
Wireless Telecommunications Bureau
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C. 20554
peter.trachtenberg@fcc.gov

Jamison Prime **
Office of Engineering and Technology
Federal Communications Commission
445 12th Street
Washington, D.C. 20554
jamison.prime@fcc.gov

Best Copy and Printing, Inc. (BCPI) **
Portals II
445 12th Street, S.W.
Room CY-B402
Washington, D.C. 20554
(202) 488-5300
fcc@bcpiweb.com

## DECLARATION OF BRIAN ASHBY

I, Brian Ashby, declare as follows:

1.       I am an Assistant General Counsel to Cellco Partnership d/b/a Verizon Wireless ("Verizon").  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.       Before March 2009, I became aware of allegations that Mxyer, Inc. ("Myxer") had violated copyright laws.  Accordingly, I became concerned that the copyright holders, or even Myxer itself, might later assert claims against Verizon in litigation.

3.       Based on the above, I asked Ed Ruth, a Verizon employee, to investigate certain aspects of Myxer's business and to report back to me.  I asked Mr. Ruth to conduct this investigation because he had the expertise necessary for this task.

4.       I am familiar with the unredacted versions of the emails attached to the declaration of Jeffrey Darnell as Exhibit A.  These documents are responsive to my request for an investigation to Mr. Ruth as described above.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed March 23, 2010, at Basking Ridge, New Jersey.



Brian Ashby