Erin R. Ranahan (SBN: 235286)
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Telephone:  213-615-1700
Facsimile:   213-615-1750
Email: eranahan@winston.com

Michael S. Elkin  (*admitted pro hac vice*)
Thomas P. Lane  (*admitted pro hac vice*)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York  10166
(212) 294-6700 (Telephone)
(212) 294-4700 (Facsimile)
Email: melkin@winston.com
Email: tlane@winston.com

Attorneys for Defendant
MYXER INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARISTA RECORDS LLC, a Delaware limited liability company; *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> MYXER INC., f/k/a mVISIBLE TECHNOLOGIES, INC., *et al.* <br><br> Defendants. | **Case No. CV 08-03935 GAF (JCx)** <br><br> **MYXER'S RESPONSE TO UMG's SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF UMG RECORDING INC.'S MOTION FOR SUMMARY ADJUDICATION ON LIABILITY OR, ALTERNATIVELY, A DETERMINATION OF MATERIAL FACTS NOT GENUINELY AT ISSUE** <br><br> Date:  August 23, 2010 <br> Time:  9:30 a.m. <br> Place:  Courtroom 740 <br> Judge:  The Hon. Gary A. Feess <br><br> Pretrial Conference: Sept. 20, 2010 <br> Trial Date: Oct. 5, 2010 |

## I. INTRODUCTION

Plaintiffs' ("UMG") discussion in its Supplemental Brief of *Columbia Pictures Indus. Inc. v. Fung*, No. 06 CV 5578, 2009 U.S. Dist. LEXIS 122661, at *63 (C.D. Cal. Dec. 21, 2009) fails to draw any meaningful analogies to this case. Not only was *Fung* dealing with a separate safe harbor, thus setting forth no analysis of the Section 512(c) safe harbor that UMG says is at issue here, but the defendants in *Fung* designed and promoted their system to facilitate infringement. *See Viacom International Inc. v. YouTube, Inc.,* 2010 WL 2532404, *11 (S.D.N.Y. 2010) (holding the defendant YouTube was entitled to DMCA safe harbor protection under § 512(c), and noting that *Fung* involved "an admitted copyright thief whose DMCA defense under § 512(d) was denied on undisputed evidence of 'purposeful, culpable expression and conduct' aimed at promoting infringing uses of the websites").

Myxer's system and comprehensive copyright compliant policies bear no resemblance to those in *Fung*. Myxer was not designed or ever promoted as a means to facilitate infringement; instead, it is a legitimate business conceived to simplify the delivery of personal computer content to mobile devices, with its core focus on independent bands and musicians. Moreover, unlike the defendants in *Fung,* Myxer offers significant amount of authorized partner content, including from major record labels other than UMG, and from third parties and UMG's own artists who have rights to the same songs alleged as infringing in this action. In stark contrast to the defendants in *Fung,* Myxer expeditiously removed any unauthorized material upon discovery, it implemented a strong and comprehensive repeat infringer policy, and it developed and implemented not only its own filtering system and its Protect Program, but also employed third party filtering to bolster it. Myxer did everything it could to keep unauthorized content off its site. As *Fung* is wholly distinguishable from the facts here, the Court should decline to adopt the principles applied in *Fung* to foreclose Myxer's rightful DMCA safe harbor protection.

## II. *FUNG* IS ENTIRELY DISTINGUISHABLE FROM THIS CASE

In *Fung,* the court found that the defendants had induced copyright infringement, and for the same reasons, they were not entitled to DMCA safe harbor protection. *Id.* at *18. The court in *Fung* relied on a catalog of acts in holding that the defendants were liable for inducement and not entitled to DMCA safe harbor protection, including: the defendants soliciting uploads of feature films; the defendants creating links for downloading unauthorized movies; statements by the defendant Fung that he was stealing from "lechers" not artists; the defendants' facilitation of infringement by moderators; spidering of suspicious websites, and admissions that the appearance of popular copyrighted works helped increase ad revenue. *Id.* at *11-*12. Myxer's alleged conduct comes nowhere near the defendants' misconduct in *Fung*. Thus, the DMCA-disqualifying inducement found present in the *Fung* action is simply not present here.

The defendants in *Fung* hosted a "peer-to-peer" file-sharing site that the court found was "an evolutionary modification" of Napster and Grokster systems. *Id.* at *19-*22; *see also, Viacom International Inc.* 2010 WL 2532404 at *11 (declining to rely on *Fung* given that it "involved peer-to-peer file-sharing networks which are not covered by the safe harbor provisions of DMCA § 512(c).") The *Fung* court relied on "almost wholly unrebutted" evidence that the defendants promoted their site to facilitate infringement, including through recommending software applications that frustrate copyright enforcement, assisting users with locating certain unlicensed copyrighted works, and contributing "technical assistance" designed to solicit infringing activity. *Id.* at *1, *11-*13. Myxer's system is *not* a "peer-to-peer" file-sharing site; Myxer retains the ability to delete files if it receives notice or otherwise discovers suspected infringements. The protection at issue here is afforded by § 512(c), as UMG states in its Supplemental Brief. (p. 1:26-27). Unlike the many examples relied on by the *Fung* court to conclude that the defendants induced

copyright infringement, there is **no** evidence that Myxer "promoted" infringing activity.

The court in *Fung* also noted that there was "overwhelming statistical evidence" that "90%-95%" of the content on the defendants' website was allegedly infringing. *Id.* at *17. The *Fung* court noted this was "a percentage that is nearly identical" to *Napster,* where 87% of the files were allegedly infringing. Even construing the evidence most favorably to UMG, UMG does not allege anywhere near 90% of Myxer's content is allegedly infringing. Indeed, of the millions and millions of files that have been uploaded to Myxer by its users, UMG has only alleged that 245 of its works have been infringed. (UMG's First Amended Compl. (Dkt. No. 202) pp. 44-47; Myxer's Statement of Genuine Issues (Dkt. No. 399) ("SGI") ¶ 158, p. 70).[1]

In *Fung,* the defendants failed to present evidence that they had a meaningful copyright policy. In fact, the *Fung* court noted that "Defendants have not introduced any evidence that they 'act[ed] expeditiously to remove, or disable access to, the [infringing] material' once they became aware that this infringing activity was apparent." *Id.* at *17. Conversely, far from being the lawless "pirate ringtone bazaar" in UMG's hyperbole, Myxer spent a great deal of time, effort and money complying with the DMCA and keeping unauthorized content off its site. Myxer's policies have always strictly prohibited users from uploading infringing content, and Myxer has always immediately removed suspected infringements upon notice, even where UMG failed to comply with the DMCA requirements in providing notice. [SGI ¶¶ 209-210]. Myxer's commitment to preventing infringement extends far beyond its legal obligations, including its "takedown-staydown" policy, where identical works subject to prior takedowns are blocked from future uploads, and its PROTECT program, where content owners can disable works directly without requiring notice to Myxer.

---

[1] *See also* SGI ¶¶ 10, 189-190 (UMG's expert's highly inflated percentage of items that are allegedly owned by UMG, combined with the now settled Warner and Sony plaintiffs, fails to exclude works not even at issue herein, but is still significantly lower than the percentages at issue in *Napster* and *Fung*.)

3

[*Id.* at ¶¶ 193-195; 201-202].

### III. MYXER HAS NOT BEEN WILLFULLY BLIND TO INFRINGEMENTS, AS THERE IS NO EVIDENCE THAT MYXER FAILED TO ACT UPON "RED FLAGS" OF INFRINGEMENT

While UMG attempts to liken Myxer to "pirate sites," the legislative history discussing red flag knowledge in this context actually notes that an online service provider ("OSP") "would not be required to make discriminating judgments" about copyright infringement (as would be required here) and has "no obligation to seek out copyright infringement;" but that red flags may exist where sites are "clearly" and "obviously" a "sophisticated 'pirate' director[y]—which refer[s] Internet users to other selected Internet sites...that are obviously infringing because they typically use words such as 'pirate,' 'bootleg.'" S. Rep. No. 105-190, at 48-49. UMG has not--and cannot--allege that Myxer comes close to the "pirates" that were intended to be excluded from DMCA safe harbor protection. UMG's Supplemental Brief fails to actually cite to any specific evidence of red flags, instead relying on unspecified evidence of "all of the facts and circumstances on which Plaintiff relies . . . ." (*Id.* at p.3:25-27, n. 1).

While UMG insists that the "standard advocated" by Myxer—which would require that UMG notify Myxer of "specific infringing files denoted by a URL"—is "fundamentally inconsistent" with the DMCA, UMG ignores its explicit requirement to identify the location where the material resided so that Myxer could locate it. 17 U.S.C. § 512(c)(3)(A)(iii). UMG argues that a "representative list" is sufficient to put Myxer on notice of all of its alleged infringements, an argument it made, and which the court rejected, in *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F.Supp.2d 1099, 1110 (C.D. Cal. 2009), where again UMG ignored the language of 17 U.S.C. § 512(c)(3)(A)(iii).[2]

---

[2] The *Veoh* court explained that "[r]equiring Veoh to perform such searches would also conflict with the principle articulated in CCBill that '[t]he DMCA notification procedures place the burden of policing copyright infringement--identifying the potentially infringing material and adequately documenting infringement--squarely on

4

Although UMG argues that Myxer seeks to impose "its own legal standard," Myxer is merely seeking that the Court adopt the proper standard, as already recognized by the courts in California (*Veoh*) and New York (*YouTube*). UMG also argues that Myxer's proposed standard would "upset the delicate balance" between the respective interests the DMCA was intended protect, which is "to preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements" and provide "greater certainty to service providers concerning their legal exposure for infringements." S. Rep. No. 105–190, at 20 (1998). UMG apparently believes this "balance" to be illusory, as it ignores its notification obligations under the DMCA and cites no specific examples of Myxer failing to remove a single known infringement, instead citing vaguely to unspecified "overwhelming evidence" and "all of the facts and circumstances on which Plaintiff relies." (UMG's Supp. Brief, p. 2:7-8; 3:25-26). Under UMG's interpretation, "general awareness" (*Id.* at 4:12) of copyright infringement would render OSPs liable notwithstanding safe harbor compliance.

### IV. A FINANCIAL BENEFIT IS NOT PRESENT AND WAS NOT NECESSARY TO DETERMINATION

Because financial benefit is only considered in a case where Myxer does have the requisite ability to control the infringing activity, there is no need for the Court to consider the financial benefit prong. 17 U.S.C. § 512(c)(1)(B). But even if this Court concludes that Myxer did somehow have the ability to control the infringing content, and thus considers the financial benefit inquiry proper, Myxer still qualifies for Section 512(c) safe harbor because Myxer did not receive a financial benefit "directly attributable" to the allegedly infringing content. *Id.* Courts that have analyzed the financial benefit prong for purposes of Section 512(c) as part of their holdings have

---

the owners of the copyright.'" *Id.* at 1110. Further, here Myxer *did* do artist and title searches of all works identified in the original and amended complaints in this action going beyond its legal obligations in seeking to prevent infringements, even where UMG failed to comply with the DMCA notification requirements. (SGI ¶¶ 210, 213).

5

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

required a more direct connection than required under the common law approach UMG advocates. *See CoStar*, 164 F. Supp. 2d at 695, 705; *see, e.g.*, 3 Melville B. Nimmer & David Nimmer, Nimmer On Copyright, 12B.04[A][2][b] at 12B 55–57 (2008). Given the relatively small percentage of allegedly infringing files on Myxer, and Myxer's prompt removal of all suspected infringements, there is no evidence that Myxer received a financial benefit directly attributable to allegedly infringing content.

Contrary to the approach UMG advocates from *Fung* and *Napster* (a non-DMCA case), courts have found that for an OSP to be found to have the requisite "ability to control" to expose it to liability, the service provider must exercise a "greater level of control than the threshold level that is required simply to qualify for the Section 512(c) safe harbor." *Veoh* at 1114. In *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1181 (C.D. Cal. 2002), the court noted that "closing the safe harbor based on the mere ability to exclude users from the system is inconsistent with the statutory scheme." Accordingly, the *Cybernet* court applied a separate standard for the "ability to control" in the context of Section 512(c) than it applied in evaluating the plaintiff's claim for common law vicarious infringement, because "Section 512 is meant to encourage some level of copyright enforcement activity by service providers, not to punish it." *Id*. at 1173–74, 1181.

UMG argues that "there is no dispute" that Myxer "could have used Audible Magic or other similar services to prevent infringing ringtones from ever reaching its servers and its users." (UMG's Supp. Br. p. 5:20-22). While UMG claims this "starkly differentiates" Myxer from "other online defendants that have successfully invoked the DMCA," it ignores the careful analysis in *Veoh* regarding filtering. As the *Veoh* court found, "UMG has not established that the DMCA imposes an obligation on a service provider to implement filtering technology at all, let alone technology from the copyrighted holder's preferred vendor or on the copyright holder's desired timeline." *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665

6

F.Supp.2d 1099, 1111 (C.D. Cal. 2009).  The *Veoh* court rejected UMG's argument that Veoh's "right and ability" to implement filtering software, either "standing alone or even along with Veoh's ability to control users' access" was sufficient to disqualify Veoh from Section 512(c) safe harbor given the language of Section 512(m).  Thus, the *Veoh* court found that the "applicability of the Section 512(c) safe harbor does not turn on when Veoh implemented the filtering system that UMG prefers." *Id.* at 1113.  Several other courts that have analyzed Section 512(c)(1)(B) have reached similar conclusions.  *Hendrickson v. eBay, Inc*., 165 F. Supp. 2d 1082 (C.D. Cal. 2001) (rejecting argument that eBay had "right and ability to control" because it removed infringing items in past)[3]; *Ellison v. Robertson* 189 F. Supp. 2d 1051, 1061 (C.D. Cal. 2001), *aff'd in part and rev'd in part on different grounds*, 357 F.3d 1072, 1079 n.10 (9th Cir. 2004) (noting that Congress would not create "a confusing, self-contradictory catch-22 situation that pits 512(c)(1)(B) and 512(c)(1)(C) directly at odds with one another" and that "the DMCA requires more than the mere ability to delete and block access to infringing material after that material has been posted in order for the [O]SP to be said to have 'the right and ability to control such activity.'"); *Veoh* at 1113-14.

## V.   CONCLUSION

The *Fung* case is wholly distinguishable from the case here, and accordingly presents no applicable analysis.  For the reasons discussed in Myxer's Opposition to UMG's Motion for Summary Adjudication, its Supplemental Brief, and herein, UMG's motion should be denied.

Dated:  August 2, 2010                    WINSTON & STRAWN LLP

By: /s/ Erin R. Ranahan
        Michael S. Elkin
        Thomas P. Lane

---

[3] The *eBay* court also held that eBay's limited monitoring of its website for apparent infringements did not constitute the "ability to control," because "the legislative history shows that Congress did not intend for companies such as eBay to be penalized when they engage in voluntary efforts to combat piracy over the Internet." *Id.* at 1094.

Erin R. Ranahan
Attorneys for Defendant,
MYXER INC.

**Winston & Strawn LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543

MYXER'S RESPONSE TO UMG'S SUPP. BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY ADJUDICATION; Case No. CV 08-03935 GAF (JCx)

LA:275969.2