# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ARISTA RECORDS LLC, et al. | ) | NO. CV 08-03935 GAF (JCx) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| | ) | |
| MYXER INC., f/k/a VISIBLE TECHNOLOGIES, INC., et al. | ) | [Docket No. 308] |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## I.

## INTRODUCTION

Like many cases filed over the past decade, this lawsuit pits the music industry against an internet service provider in a dispute over the use of copyrighted musical compositions.

Myxer Technologies, Inc., ("Myxer") operates a website that allows Myxer's customers to upload recorded music to the site and then, through the use of Myxer's software, download the music to cellular phones for use as a ring tone. UMG Records, Inc. ("UMG"), a competitor in the ring tone market and the sole remaining plaintiff in this case, contends that Myxer allows uploaded music to remain available on its site to the general public to be downloaded without

compensation to UMG.[1]  Because of that conduct, UMG contends that Myxer is operating a file-sharing site much like the peer-to-peer file sharing encouraged by the original Napster website. Myxer denies the allegations.

The case requires the Court to review Myxer's conduct under the Digital Millenium Copyright Act ("DMCA") to determine whether, over the relevant time period, Myxer took sufficient steps to qualify for the safe-harbor provisions of the DMCA.  UMG contends that the undisputed facts developed in the course of this litigation establish that Myxer has not met the requirements necessary to assert the safe harbor defense and that summary judgment should be entered in its favor.  Myxer opposes.

As the Court discusses in detail below, the Court concludes that Myxer has established the existence of genuine issues of material fact for trial with respect to its DMCA affirmative defense.  Accordingly, the motion for summary judgment as to claims of direct, contributory and vicarious infringement is **DENIED.**  However, because Myxer's use of Plaintiff's works does not qualify as fair use under 15 U.S.C. § 107, the motion for summary judgment as to the fair use affirmative defense is **GRANTED.**

//
//
//
//
//
//
//
//

---

[1]   The Court notes that although the instant Motion was originally filed on behalf of numerous named Plaintiffs, the parties have stipulated to dismiss all named Plaintiffs except UMG.  (*See infra* Note 3; *see generally* First Am. Compl. ("FAC"); Supplemental Brief in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Supp. Brief") 1; Supplemental Brief in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Supp. Brief") 1; *see* Stipulation of Dismissal of all Claims of EMI Music Pls. with Prejudice; *see* Order of Feb. 8, 2010; *see* Order of May 19, 2010.)

# II.

# BACKGROUND[2]

A.   <u>Procedural Background</u>

On June 16, 2008, a number of leading record companies, including Plaintiff (collectively, "Plaintiffs"),[3] filed this action against Myxer and three individual Defendants (collectively, "Defendants"): (1) Myxer Chief Executive Officer and Founder Michael "Myk" Willis ("Willis"); (2) Myxer Chairman and President Scott Kinnear ("Kinnear"); and (3) Myxer Corporate Director Ron Harris ("Harris") (collectively, "Individual Defendants").  (Compl. ¶ 29; Decl. of Kinnear in Supp. of Def.'s Opp'n to Pls.' Mot. for Summ. J. ("Kinnear Decl.") ¶ 1.)  With respect to the individuals, UMG contends:

> "Willis, Kinnear, and Harris are the moving forces behind the infringing activities
> alleged herein.  Willis, Kinnear, and Harris collectively possess majority

---

[2]  The facts set forth in this section are undisputed or without substantial controversy.  The Court will not address the numerous immaterial factual "disputes" and objections raised by the parties.  An example or two should provide sufficient explanation. Relying on the Deposition of Ron Harris ("Harris"), UMG asserts that "Myxer's business has been valued at over $60 million – a figure which Myxer board member Harris stated, was in his opinion, too low."  (Pl.'s Statement of Facts ["Pl.'s SOF"] ¶ 13.)  In response, Myxer asserts that this is "**DISPUTED** to the extent that what one Myxer board member believed about an August 1, 2008 valuation reflects Myxer's current, accurate, estimated value." (Def.'s Statement of Facts ["Def.'s SOF"] ¶ 13.)  The Court need not resolve this "dispute" to address the material issues in this case.  Myxer submits additional objections ("Myxer's Additional Objections") as to the: (1) Declaration of Silda Palerm; (2) Declaration of Joan Cho; and (3) Declaration of Wade Leak.  (*See generally* Def.'s Evidentiary Objections to Certain Alleged Proof Submitted in Supp. of Pl.'s Mot. for Summ. J. ["Myxer's Additional Objections"].)  However, the Court has unambiguously explained that there is no issue as to the Plaintiff's copyright ownership of the sound recordings at issue (*See* Mins. of Aug. 27, 2010 Hearing), and further, because Plaintiffs Warner and Sony are dismissed as Named Plaintiffs, the Court overrules Defendant's Additional Objections as to these Declarations.  Myxer's Additional Objections objects to the Declaration of Donald Miller ("Miller Declaration"), exhibits within the Miller Declaration, and the personal blog entries of Willis, all of which are either irrelevant or immaterial to the Court's determinations.  Not to be outdone, Plaintiff also objects to proof submitted by Myxer.  (*See generally* Pl.'s Evidentiary Objections in Supp. of Pl.'s Mot. for Summ. J. ["Pl.'s Objections"].)  The Court overrules Plaintiff's Objections because they are generally irrelevant and/or argumentative. In short, if the fact is set forth in this or any other section of the memorandum, the Court has concluded that it is either undisputed or without substantial controversy (unless the Court specifies to the contrary); if it is not included the Court has found it to be disputed or immaterial.

[3]  The following record companies, in addition to UMG, were originally named Plaintiffs: (1) Arista Records LLC; (2) Atlantic Recording Corporation; (3) BMG Music; (4) Capital Records, LLC; (5) Caroline Records, Inc.; (6) Elektra Entertainment Group Inc.; (7) EMI Christian Music Group, Inc.; (8) LaFace Records LLC; (9) Priority Records, LLC; (10) Sony BMG Music Entertainment; (11) Virgin Records America, Inc.; (12) Warner Bros. Records Inc.; and (13) Zomba Recordings, LLC.  (FAC ¶ 1.)

ownership and control of Myxer, operate Myxer, personally direct and participate in the infringing conduct of Myxer, manage Myxer, finance Myxer, and, with actual and constructive knowledge of Myxer's massively infringing conduct, and despite the ability to supervise, control, minimize, and prevent such infringing conduct, have made the conscious decision to engage in business practices and continue to engage in business practices, and fail to alter business practices that constitute direct, contributory, and vicarious copyright infringement."  (FAC ¶ 29.)

Myxer treated the Complaint as a DMCA notice.[4]  (Def.'s Statement of Genuine Facts ("SGI") ¶ 133; Decl. of Marsha Creely ("Creely") in Supp. of Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Creely Decl.") ¶ 28.)  On August 27, 2009, Plaintiffs filed a First Amended Complaint ("FAC") against Defendants, alleging claims for direct, contributory, and vicarious copyright infringement.  (FAC ¶ 1.)  Plaintiffs summarized the dispute in these terms:

Through the use of copyrighted material, to which they have made no effort to obtain the rights, including many of Plaintiffs' most valuable copyrighted works, Defendants are building their [I]nternet business, which is growing in size exponentially and on a daily basis, by seeking to usurp the important ringtone market for themselves, though it owns none of the creative [material] of Plaintiffs' sound recordings, and has incurred none of the costs required to create such [material].

(FAC ¶ 1.)  UMG, the only remaining Plaintiff, now moves for summary judgment.[5]

---

[4]  Myxer argues that because the original Complaint did not provide a Uniform Resource Locator ("URL"), it did not serve as a complaint DMCA notice.  Myxer nevertheless asserts that it treated the works at issue, and identified in Schedule A of the Complaint, as a DMCA notice and promptly removed all files it could locate.  (Decl. of Marsha Creely in Supp. of Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Creely Decl.") ¶ 28.)  However, Plaintiff alleges that many of the works at issue returned to the Myxer Website by March 2009.  (SGI ¶ 136; Pl.'s Reply in Supp. of Mot. for Summ. J. ("Pl.'s Reply") 1-3.)

[5]  The Court declines to address Myxer's additional arguments regarding the purported "substantial non-infringing uses" of its software, which the Court views essentially as a request for summary adjudication, that were raised for the first time in its Opposition and Supplemental Brief.  (Def.'s Opp'n to Pl.'s Mot. for Summ. Adjudication

B.   Factual Background

      1.   Plaintiff's Copyrighted Works

Plaintiff expends substantial time, effort, and money establishing business relationships with recording artists, and spends considerable resources working with these artists to produce copyrighted sound recordings.  (Decl. of David Ring in Supp. of Pl.'s Mot. for Summ. J ("Ring Decl.") ¶ 2; Pl.'s Mot. 6-7; FAC ¶ 2.)  Plaintiff exploits its copyrighted sound recordings in various ways: for example, by selling them on compact discs ("CDs") or in digital files over the Internet.  (FAC ¶ 3.)  The United States ("U.S.") Copyright Office issued Certificates of Copyright Registration for the 244 sound recordings at issue, which gives it the exclusive right to reproduce, distribute, or otherwise exploit those works.  (Pl.'s Mot. 6-7.)

Prior to 2005, ringtones — music that replaces the traditional ring signifying that a phone call is being received — began to serve as a significant revenue source for Plaintiff.[6]  (FAC ¶¶ 2, 3.)  The portion of the sound recordings used for ringtones is often the portion that Plaintiff anticipates customers will most identify with the song, such as the chorus.  (*Id.*)  Plaintiff's authorized resellers, and sometimes Plaintiff, directly, sell ringtones for a retail price of between $2.00 and $2.50.  (*Id.* ¶ 4.)  The revenue earned from these ringtones is typically shared between Plaintiff and the artists with whom Plaintiff maintains contractual relationships.  (*Id.*)  Plaintiff claims that because Myxer offers its copyrighted works for free, it is now more difficult for it and its authorized resellers to sell ringtones.  (*Id.* ¶ 5.)

      2.   The Myxer Website

---

on Liability or, Alternatively, a Determination of Material Facts Not Genuinely at Issue ("Def.'s Opp'n") 10 n. 15*; see generally* Def.'s Supp. Brief; *see* Order of Sept. 10, 2010.)

  [6]  "A ringtone is a digital file of a portion of a musical composition or other sound that is designed to be played by a customer's telephone in order to be played by a customer's telephone in order to signal an incoming call in the same manner as would a telephone ring." *In re Application of Cellco Partnership (In re Application of Cellco)*, 663 F. Supp. 2d 363, 367 (S.D.N.Y. 2009).

"Defendants operate [I]nternet websites located at the . . . URLs www.myxertones.com and www.Myxer.com." (FAC ¶ 31.)  Through these websites, Myxer provides customers with access to a technology that simplifies the process of managing and delivering material, including ringtones, to mobile devices.  (Def.'s Opp'n to Pl.'s Mot. for Summ. Adjudication on Liability or, Alternatively, a Determination of Material Facts Not Genuinely at Issue ("Def.'s Opp'n") 1; Decl. of Willis in Supp. of Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Willis Decl.") ¶ 2; Kinnear Decl. ¶ 2; Def.'s Statement of Additional Material Facts ("Def.'s SAF") ¶ 144.)  According to Willis, Myxer was founded to "address the unmet need of independent bands and musicians to have their voices heard in the mobile space by creating a technical vehicle for them to load their own [material] onto mobile devices in a fast and efficient way."[7]  (Willis Decl. ¶ 2; Decl. of William Madden in Supp. of Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Madden Decl.") ¶ 2; Def.'s Opp'n 1.)[8]  The website www.myxer.com (the "Myxer Website") enables registered users to upload material, which can then be transcoded into a format to create and download ringtones.[9]  (Madden Decl. ¶ 25; Decl. of Donald A. Miller in Supp. of Pl.'s Mot. for Summ. J. ("Miller Decl."), Ex. K [Harris Decl. ¶ 5]; Pl.'s Response to Def.'s Statement of Additional Facts ("Pl.'s Response") ¶ 148.)  Visitors to the Myxer Website may explore it without registering.  (Madden Decl. ¶ 26.)  However, to upload material, one must register by providing a cellular phone number and by agreeing to Myxer's Terms of Use.  (Willis Decl. ¶ 22; Creely Decl. ¶ 4, Ex. A

---

[7] Myxer, formerly named mVisible Technologies, Inc., was founded in May 2005, and became operational in September 2005.  (Madden Decl. ¶ 3; Willis Decl. ¶ 2; Def.'s SAF ¶ 153.)  The Myxer Website states: "Myxer began four years ago with one goal in mind – to be the champion for indie bands and musicians that want their voice heard in the mobile space." (SGI ¶ 154; Def.'s Opp'n 2; Def.'s SAF ¶ 154.)

[8] Willis and Kinear proclaim a noble purpose for their venture.  Willis claims: "Myxer's core focus has always been to provide independent artists a platform to create, promote, and share their mobile content."  (Willis Decl. ¶¶ 18-19; Kinnear Decl. ¶¶ 5-6; Def.'s SAF ¶ 147.)  Kinnear concurs: "Myxer's goal and focus in serving independent artists has not changed, and Myxer has never sought to exploit, build upon, use or feature major label material in violation of the law." (Kinnear Decl. ¶ 6.)  These "facts" are plainly meant to distance Myxer from the inflammatory attacks on traditional music distributors at times before this lawsuit was filed.

[9] "To download means to receive information, typically a file, from another computer to yours via your modem . . . .  The opposite term is upload, which means to send a file to another computer."  *A&M Records, Inc. v. Napster, Inc.* (*Napster*), 239 F.3d 1004, 1011 n. 1 (9th Cir. 2001) (internal citations omitted).

[Terms of Use]; Def.'s Opp'n 2.)  Myxer's Terms of Use requires users to agree that they have the rights to distribute the material submitted to Myxer.  (Creely Decl. ¶ 5; Def.'s Opp'n 3.)  Despite Myxer's policy and warnings, however, some users upload material to which they do not own the copyright and proceed to create and download ringtones.  (Miller Decl., Ex. K [Harris Decl. ¶ 8].)

Myxer estimates: "As of 2009, there were a total of 331,501 user accounts permitted to upload [material]."  (Def.'s Opp'n 2; Def.'s SAF ¶ 156.)  Myxer further states, "[a]s of October 2009, users have uploaded more than 2.4 million items to Myxer, which includes 2,204,844 ringtones, 167,182 wallpaper items, 33,365 videos, and 19,464 screensavers."  (Def.'s Opp'n 3.)  "The maximum preview and ringtone length available for download on Myxer is currently 40 seconds, though ringtones can be much shorter, averaging 25 seconds, with over 50,000 [that are] 22 seconds or less."[10]  (Def.'s Opp'n 3; Def.'s Statement of Genuine Issues of Material Fact ("Def.'s SOF") ¶ 47.)  Material may be placed on Myxer's Website: (1) by "Myxer Artists;" (2) by "MyxerIndies;" and (3) through licenses from content providers, artists, or corporations ("Partners") that upload material on the site to be downloaded at no cost.  (Creely Decl. ¶ 16 n.1; Decl. of William Madden in Supp. of Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Madden Decl.") ¶ 5; Decl. of Jeffrey Sass in Supp. of Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Sass Decl.") ¶ 10.)

a.    <u>Myxer Artists</u>

"Myxer Artists" may upload [material] to the Myxer Website and then download a ringtone from that [material] at no charge.  (Def.'s Opp'n 3; Madden Decl. ¶ 6.)  (*Id*.)  Myxer Artists may also choose a feature called "Allow Customizing," which allows "subsequent users [to] pick a different section of the song to preview and download as a ringtone."  (*Id*.)

b.    <u>MyxerIndies</u>

---

[10]   According to the Declaration of Ellis Horowitz ("Horowitz"), (*see infra*, Note 33) of the 1.4 million song files produced by Myxer, more than 94% are longer than thirty four seconds.  (Decl. of Ellis Horowitz ("Horowitz Decl.") ¶ 8.)  Of the 106,801 song files that have been identified as Plaintiffs' copyrighted works, approximately 98% are longer than thirty four seconds.  (*Id*.)

1    Certain "independent" music artists, referred to as "MyxerIndies," may also upload

2    material to the Myxer Website.  (Willis Decl. ¶¶ 20, 25; Def.'s Opp'n 3.)  MyxerIndies must go

3    through an application process, and, "if verified, are allowed to post [material] on the [Myxer

4    Website] to be downloaded at either no charge, or for a fee.  (*Id.* ¶ 25.)  When users apply to

5    become MyxerIndies, Myxer claims that a Myxer employee verifies whether the MyxerIndie

6    applicant has a website or MySpace page associated with the respective band or artist — to

7    ensure that the applicant is a genuine music artist.[11]  (*Id.*)  MyxerIndies who qualify under

8    Myxer's application procedures can, if they choose, charge a fee of $0.99 to $2.99 per ringtone,

9    and keep 30% of the retail price.  (*Id.* ¶ 30.)  "As of October 2009, there were 111,800 registered

10   MyxerIndies.  MyxerIndies include well known artists for whom Plaintiff . . . claims rights in

11   this action."  (Def.'s Opp'n 3.)

12                          c.      Partners

13          "In addition to obtaining [material] directly from [A]rtists (or MyxerIndies), Myxer

14   obtains licenses from content providers ("Partners") who upload [material] to [the Myxer

15   Website] to be downloaded at no charge."  (Def.'s Opp'n 3-4; Willis Decl. ¶ 33; Def.'s SAF

16   ¶¶ 171-173; Sass Decl. ¶¶ 10-17.)  Indeed, some of Myxer's Partners are authorized to distribute

17   the music of artists affiliated with Plaintiff's labels.  (Willis Decl. ¶ 33.)  For example,

18   INGrooves, a Myxer partner, has a relationship with Plaintiff to distribute mobile material,

19   including ringtones.  (Def.'s Opp'n 4; Decl. of Erin Ranahan in Supp. of Def.'s Opp'n to Pl.'s

20   Mot. for Summ. J. ("Ranahan Decl.") ¶ 2, Ex. A; Willis Decl. ¶ 36; Kinnear Decl. ¶ 8.)  Myxer

21   has provided the Court with a list of works licensed to it and uploaded by its Partners.  (Madden

22   Decl. ¶ 36; Sass Decl. ¶¶ 10-13.)

23

24          3.      Downloading Material from the Myxer Website

25

26   _____

27          [11]  Based on a July 2007 email between Kinnear, Madden, and Willis, it is purported that Myxer rejected 53%
     of MyxerIndie applications received in June 2007.  (Decl. of Rebecca Lawlor Calkins in Supp. of Def.'s Opp'n to Pl.'s
     Mot. for Summ. J. ("Calkins Decl."), Ex. 74; Willis Decl. ¶ 28.)

28

Myxer's unique "SMS functionality" allows users to download material from the Myxer Website to their cellular phones without requiring reformatting of the information for compatibility. (Madden Decl. ¶¶ 7-8.)  Users can download uploaded material to their cellular phones by clicking a "Send to Phone" button on the Myxer Website. (Miller Decl., Ex. B [Madden Depo. at 155-57]; Madden Decl. ¶ 7.)  A URL link is sent to the user's cell phone in a text message that prompts the user to click on his cellular phone to complete the download. (*Id.*) As this description indicates, it is the user, not Myxer, that downloads a ringtone to the user's mobile device. (*Id.* ¶ 29.)  Although users are not required to register before first downloading material, they must register for a Myxer account after three items are sent to their cellular phone. (*Id.* ¶ 39.)

### 4.  Myxer's Other Functions[12]

In addition to uploading and downloading ringtones, Myxer users may play portions of any of the sound recordings on Myxer's Website. (Miller Decl., Ex. B [Madden Depo. at 72-75]) Users may also select a sound recording on Myxer's Website and share it on certain third party websites (e.g., Facebook). (Miller Decl., Ex. B [Madden Depo. at 83-84]; Pl.'s Statement of Genuine Issues of Material Fact ("Pl.'s SOF") ¶ 36.)  Further, users may select a sound recording on Myxer's Website, often a full-length version, and "Customize It" (using editing tools provided by Myxer) by selecting a desired "start" and "stop" point for a ringtone. (Miller Decl., Ex. B [Madden Depo. at 77-81].)  As noted above, ringtones may not be more than 40 seconds in length. (Def.'s SOF ¶ 47.)

### 5.  Advertising on the Myxer Websites

---

[12]  In 2008, Myxer created a second website, MyxerSelect, which resembles the Myxer Website at issue, but contains "no user generated [material]," and only "100% certified [material]" — material that Myxer had licensed from copyright holders. (SGI ¶ 90.)  MyxerSelect contains material and Artists for which Myxer has license agreements (traditional or electronic) or who have otherwise validated to the best of their ability that they have full rights to distribute the material. (SGI ¶ 91.)

As an "on-line publisher," Myxer displays or otherwise distributes material to its viewers and/or users.  (Decl. of Benjamin Edelman in Supp. of Pl.'s Mot. for Summ. J. ("Edelman Decl.") ¶ 9.)  Myxer does not charge users to access the Myxer Website, and instead, generates revenue by selling web page space to advertisers.  (Miller Decl. ¶ 4, Ex. K [Harris Decl. ¶ 6]; Edelman Decl. ¶ 11.)  Advertisers pay Myxer on a cost per impression ("CPM") basis so that Myxer receives a fee for each one thousand "impressions" (advertising displays) it delivers.  (Miller Decl., Ex. B [Madden Depo. at 134, 136-37]; Edelman Decl. ¶ 13.)  CPM arrangements arguably provide publishers, like Myxer, with an incentive to display popular material, since popular material generates more impressions, which in turn generates more advertising revenue. (Edelman Decl. ¶ 14.)  Myxer also displays advertisements from Google and Amazon, which provide revenue in proportion to the number of clicks on a particular Google advertisement, or based on whether the user purchases an item from Amazon.  (Edelman Decl. ¶¶ 21-22.)

6.   Myxer's Policies and Copyright Compliance

In addition to the Terms of Use, Myxer's copyright compliance includes: (1) a DMCA Policy; (2) Audible Magic; (3) a "Take Down, Stay Down" policy; (4) a PROTECT Program; and (5) a Repeat Infringer Policy.  (Madden Decl. ¶ 4; Kinnear Decl. ¶ 3; Calkins Decl., Ex. N.) The scope and enforcement of these policies are at the center of this lawsuit and the present motion.

a.   Myxer's DMCA Policy

Creely, Myxer's Copyright Compliance Officer and designated DMCA agent, receives and responds to DMCA notices and manages improvements to Myxer's copyright compliance efforts.   (Creely Decl. ¶¶ 2, 11; Madden Decl. ¶ 12.)  Myxer has presented evidence regarding its DMCA compliance efforts, including the following:

(1) Testimony from Creely that she processes DMCA notices immediately and disables allegedly infringing material usually within one business day of receipt of the notice. (Creely Decl. ¶ 12.)

(2) Evidence that Myxer has responded to 16,492 purported DMCA notifications of infringement and has disabled access to 23,514 files, pursuant to this Policy.  (Creely Decl. ¶ 14; Madden Decl. ¶ 14; Def.'s Opp'n 5.)

(3) Evidence that Myxer,"upon notice that a particular URL is suspected to be infringing, [] conducts additional searches for the same artist/title combination to locate and disable other possible infringements."  (Def.'s Opp'n 5.)

(4) Evidence that Myxer "has disabled access to 5,709 files for suspected infringement after investigating informal reports (e.g., by employees or users) of suspected infringement."  (Def.'s Opp'n 5.)

(5) Evidence that Myxer investigates, and where appropriate, disables files located from informal notices of suspected infringement, such as instances reported by employees or users.  (Madden Decl. ¶ 13.)

> b.    <u>Audible Magic</u>

Myxer also presents evidence regarding its use of Audible Magic as an element of its DMCA compliance efforts.  Audible Magic is a vendor of "digital fingerprinting" software.[13] (SGI ¶ 46.)  By running a sound file through Audible Magic's Copysense software ("Copysense"), Myxer can obtain high-level descriptive information, "metadata," about the particular sound recording.  (Miller Decl., Ex. B [Madden Depo. at 101-05].)  This information includes whether the sound recording is owned by a particular record company, and whether the copyright owner seeks to have it blocked from Myxer's Website.  (Miller Decl., Ex. C [Ikezoye Depo. at 12-16, 18-24, 25-27].)  Copysense can be applied to millions of music files to remove infringing sound recordings.  (*Id.* [Ikezoye Depo. at 42-43].)  Audible Magic estimates that it would cost Myxer $15,598 to run 250,000 files through CopySense.  (Miller Decl., Ex. 97.)

---

[13]  "The Audible Magic filter creates a 'psychoacoustic' fingerprint of musical content, meaning that the Audible Magic fingerprint is a mathematical representation of the way the underlying audio content sounds to the human ear."  (Horowitz Decl. ¶ 6.)

The parties, however, dispute the length of fingerprint required for Audible Magic to function here.  Myxer contends that Audible Magic requires songs to be at least 34 seconds in length to function properly, which may prove problematic for Copysense because the average length of ringtones on Myxer's Websites is 25 seconds and over 50,000 ringtones are 22 seconds or less.  (Madden Decl. ¶ 33; Decl. of Rebecca Lawlor Calkins in Supp. of Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Calkins Decl."), Ex. 100; Def.'s SOF ¶¶ 47, 54.)  Myxer also questions whether Audible Magic returns reliable information.  (Madden Decl. ¶¶ 30, 33; Def.'s Opp'n 5.)  Although MP3 files may contain metadata, Myxer asserts that metadata does not always contain information regarding the publisher or copyright owner.[14]  (Madden Decl. ¶ 31.)  For that reason, Myxer argues that Audible Magic has caused it "operational problems in distributing Partner content when the Audible Magic information proved inaccurate."  (Def.'s Opp'n 5; Madden Decl. ¶ 34.)  Myxer concedes that works identified in the original Complaint may have reappeared on the Myxer Website, despite efforts to keep them on its "Stay Down" list (see below).  (Id. ¶ 35.)  However, Myxer's technology expert, Liudvikas Bukys, acknowledges that Audible Magic "is a relatively high quality service with low rates of false positives."  (Supplemental Decl. of Miller in Supp. of Pl.'s Mot. for Summ. J. ("Supp. Miller Decl."), Ex. AA [Bukys Depo. at 238]; Bukys Decl. ¶ 9.)

### c.     Take Down, Stay Down Policy

Myxer's Take Down, Stay Down policy "uses Audible Magic's leading filtering technology to block future uploads of works identified in DMCA notices from being uploaded to Myxer."  (Def.'s Opp'n 5; Madden Decl. ¶ 15; Transcript of Aug. 27, 2010, 24:13-22.)  As Madden explains: "Under [this] policy, metadata of any item that was disabled as a result of a DMCA notice is used to prevent all subsequent uploads of the item," and since Spring 2008,

---

[14]  MP3s are digital music files "created through a process colloquially called 'ripping.'  Ripping software allows a computer owner to copy an audio compact disk . . .  directly onto a computer's hard drive by compressing the audio information on the CD into the MP3 format.  The MP3's compressed format allows for rapid transmission of digital audio files from one computer to another by electronic mail or any other file transfer protocol."  *Napster*, 239 F.3d at 1011.

Myxer asserts that it has blocked 1,182,799 items using this procedure.  (Madden Decl. ¶¶ 15, 17.)  The "Stay Down" list includes more items than DMCA notices received because Myxer removes any existing items from the same artists/titles it can locate and adds these works to its "Stay Down" list when content from Partners is added to the Myxer Website.  (*Id.* ¶ 18.)

d.   <u>"PROTECT" Program</u>

Myxer's PROTECT Program allows content owners to disable content immediately, without having to first submit a request to Myxer.  (Creely Decl. ¶ 21; Madden Decl. ¶ 20.)  Fifteen content owners have PROTECT accounts and have removed hundreds and hundreds of files from the Myxer site.  (Def.'s Opp'n 6; Madden Decl. ¶ 23.)  Myxer believes that PROTECT is the "first program of its kind for a mobile provider" and is particularly effective because it permits those who claim to hold copyright interests in uploaded works to act immediately upon discovery of an alleged infringement.   (See Madden Decl. ¶ 22.)

e.   <u>Repeat Infringer Policy</u>

Finally, "Myxer . . . also ha[s] a repeat infringer policy, which requires termination of Artists' accounts that have been subject to two DMCA notifications."[15]  (Madden Decl. ¶ 24; Def.'s Opp'n 6; Creely Decl. ¶¶ 2, 16; Calkins Decl., Ex N.)  Myxer acknowledges Plaintiff's claim that it has never terminated any Artists pursuant to its repeat infringer policy, (Def.'s Opp'n 6.), but presents evidence that "[a]s of October 2009, Myxer has terminated the Artist accounts of 2,371 users, pursuant to [it's] repeat infringer policy so that they can no longer upload [material]."  (Def.'s Opp'n 6; Creely Decl. ¶ 17.)  Nevertheless, a Myxer user who has been suspended or terminated for uploading infringing material may still download ringtones because downloading does not require registration, and there is no analogous policy as to downloading.  (SGI ¶ 37.)

---

[15]  The Court overrules Plaintiff's objection to this statement to the extent that it is argumentative.  (Pl.'s Objections 9.)  In fact, Plaintiff's Statement of Facts states "Myxer's Website, www.myxer.com, enables and encourages users to upload music which is then used to create rintones."  (Pl.'s SOF ¶ 24.)

# III.

# DISCUSSION

A.    <u>Legal Standard for Summary Judgment</u>

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Thus, when addressing a motion for summary judgment, the Court must decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  *Id.* at 256.

In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all "justifiable inferences" are drawn in that party's favor.  *Anderson*, 477 U.S. at 255.  Where there is no evidence demonstrating the existence of a genuine issue of material fact, the moving party may prevail simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  As the Supreme Court emphasized: "Where the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

B.    <u>Copyright Infringement</u>

"Plaintiffs must satisfy two requirements to present a prima facie case of direct copyright infringement: (1) they must show ownership of the allegedly infringed material, and (2) they must demonstrate that the alleged infringers violated at least one exclusive right granted to copyright holders under 17 U.S.C. § 106 ["§ 106"]."  *A&M Records, Inc. v. Napster, Inc.*

14

1   (*Napster*), 239 F.3d 1004, 1013 (9th Cir. 2001); *see* 17 U.S.C. § 106; *see* 17 U.S.C. § 501(a)

2   (infringement occurs when alleged infringer engages in activity listed in § 106); *see also Baxter*

3   *v. MCA, Inc*., 812 F.2d 421, 423 (9th Cir. 1987); *see, e.g., S.O.S., Inc. v. Payday, Inc*., 886 F.2d

4   1081, 1085 n. 3 (9th Cir.1989) ("The word 'copying' is shorthand for the infringing of any of the

5   copyright owner's five exclusive rights . . . .").

6                1.      Ownership of a Valid Copyright

7        Under the Copyright Act, sound recordings are entitled to copyright protection.  *See* 17

8   U.S.C. § 102(a) ("Copyright protection subsists, in accordance with this title, in original works

9   of authorship fixed in any tangible medium of expression, now known or later developed, from

10  which they can be perceived, reproduced, or otherwise communicated, either directly or with the

11  aid of a machine or device.").  To that end, Plaintiff asserts that it owns Certificates of Copyright

12  Registration for the 244 sound recordings at issue, and identified in Schedule A of the Complaint

13  (and FAC).  (Pl.'s Mot. 22-23; *see generally* Compl.; *see generally* FAC.)  In the Ninth Circuit, a

14  copyright certificate registration constitutes prima facie evidence of the validity of the copyright

15  in a judicial proceeding commenced within five years of the copyright's first publication.  *Entm't*

16  *Research Group v. Genesis Creative Group* (*Entm't Research Group*), 122 F.3d 1211, 1217

17  (9th Cir. 1997) (citations omitted); *see* 17 U.S.C. § 410(c) ("In any judicial proceedings the

18  certificate of a registration made before or within five years after first publication of the work

19  shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the

20  certificate.  The evidentiary weight to be accorded the certificate of a registration made

21  thereafter shall be within the discretion of the court.").  "A certificate of copyright registration,

22  therefore, shifts to the defendant the burden to prove the invalidity of the plaintiff's copyrights."

23  *Entm't Research Group*, 122 F.3d at 1217 (citations omitted).  Accordingly, Plaintiff's evidence

24  establishes a presumption of ownership of the 244 sound recordings at issue.  (Decl. of Joan Cho

25  ("Cho") in Supp. of Pl.'s Mot. For Summ. J ("Cho Decl.") Decl., Ex. 2.)

26       On November 30, 2009, Plaintiff was ordered to produce all chain of title documents

27  bearing on its ownership of the sound recordings at issue.  (*See* Order of Nov. 30, 2009.)  Myxer

28

argues: "Based on a review of the ownership documents ultimately produced by [Plaintiff,] there are significant deficiencies in [Plaintiff's] ownership production."  (Supp. Brief in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Supp. Brief") 4.)  For the reasons discussed below, however, Myxer's claims regarding Plaintiff's ownership of the sound recordings at issue lack merit.

Myxer first argues that Plaintiff failed to produce any copyright registration for: (1) Guns 'N Roses: "Welcome to the Jungle"; (2) Sugarland: "We Run"; and (3) U.S.D.A: "White Girl."  (Ranahan Decl. ¶ 2.)  However, these copyright registrations were produced in Plaintiff's original Motion for Summary Judgment, and are attached to the Cho Declaration.  (Goldman Decl. ¶ 2 ("All three registrations were submitted to the Court as exhibits of the [Cho] Declaration . . . in this action, as Exhibit 2c [Docket No. 310-5] at p. 9268; Exhibit 2g [Docket No. 310-9] at p. 9531; and Exhibit 2g [Docket No. 310-9] at p. 9544."), Ex. A; Cho Decl., Ex. 2, at UNIV 000133, 012217, 012229.).)

Second, Myxer argues that certain registrations produced by Plaintiff are illegible or contain errors.  Myxer states: (1) the registration for 98 Degrees "Because of You" is unreadable and does not indicate whether the work was for hire; (2) the registration for Angels & Airwaves: "The Adventure" does not specify whether the work was for hire; and (3) the registration for Bloodhound Gang: "The Bad Touch" fails to specify whether the work was for hire.  (Ranahan Decl., Exs. B, C, D.)  In fact, the underlying agreements for the above-mentioned artists explicitly: (1) provide that all works created under the terms of the agreements are works for hire; and (2) transfer all rights in the works to the registration claimants.  (Goldman Decl. ¶ 3, Ex. B; *see Lamps Plus, Inc. v. Seattle Lighting Fixture Co.* (*Lamps Plus*), 345 F.3d 1140, 1145 (9th Cir. 2003) (citing *Urantia Found. v. Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997)); *see Craft v. Kobler*, 667 F. Supp. 120, 125 (S.D.N.Y. 1987) (citation omitted) (holding that "[d]efendants rely on the fact that [the plaintiff] did not claim 'work for hire' on the certificate of registration.  Nonetheless, if the facts sustain [the plaintiff's] position and if it appears that the misstatement was inadvertent, little turns on the error; the copyright is not thereby invalidated, nor is the certificate of registration rendered incapable of supporting the action."); *see also Jules*

16

*Jordan Video, Inc. v. 144942 Canada Inc*., 617 F.3d 1146, 1156 (9th Cir. 2010).  Further, even if

the agreements at issue failed to designate a particular sound recording as a "work for hire," the

copyright registrations would still not be invalidated.  The Ninth Circuit has explained:

"Inadvertent mistakes on registration certificates do not invalidate a copyright and thus do not

bar infringement actions, unless . . . the alleged infringer has relied to its detriment on the

mistake, or the claimant intended to defraud the Copyright Office by making the misstatement."

*See Lamps Plus*, 345 F.3d at 1145.  No such evidence is presented here.

Third, Myxer claims that the artist agreements at issue are undated or the effective date is

otherwise unclear, thereby rendering it impossible to know when the rights began and/or expired

as to the New Kids On The Block: "Summertime," and Sum 41: "Fat Lip" "Pieces," and "Still

Waiting."  (Ranahan Decl. ¶ 3, Ex. E.)  However, the New Kids On the Block recording

agreement was dated "May __, 2008," and is date stamped "05/08/08."  (*Id*.; Goldman Decl. ¶ 4.)

Similarly, the Sum 41 agreement is clearly dated December 6, 1999.  (Ranahan Decl., Ex. E;

Goldman Decl. ¶ 4.)  With respect to Fabulous: "Baby Don't Go," "Diamonds," and "Make Me

Better," a work for hire provision was not included and the agreement was not executed.

(Ranahan Decl. ¶ 3, Ex. F.)  However, the document cited and submitted by Myxer's counsel is

Appendix D to the recording agreement and is not the agreement itself, which was fully

executed.  (Goldman Decl. ¶ 5, Ex. C, at UNIV 15873.)  In addition, the agreement contains an

"assent and guaranty" signed by the artist.  (*Id*. at UNIV 15890.)  With respect to Prima J:

"Corazon" (You're Not Alone), "Rockstar," and Rich Boy: "Throw Some D's," and "Throw

Some D's (Remix)," the artist did not sign the agreement and there is no inducement letter.

(Ranahan Decl. ¶ 3, Ex. G.)  The artist, though, was not a party to the recording agreement

because his services were provided through his furnishing or "loan-out" company, BJH

Entertainment, Inc., which executed the agreement.  (*Id*. at UNIV 022295.)  Furthermore, there

is no legal authority suggesting that the absence of an inducement letter diminishes the legal

effect of Plaintiff's rights.  *See Great Entm't Merch., Inc. v. VN Merch., Inc*., 1996 WL 355377,

*1 (S.D.N.Y. June 27, 1996).

Myxer also includes a list of agreements for 45 songs that are either missing or illegible. (Ranahan Decl. ¶ 4, Ex. H.)  According to Myxer, 66 works also allegedly have chain of title deficiencies.  (Ranahan Decl. ¶ 5.)  However, to the extent any of these documents were inadvertently missing or illegible, Plaintiff produced them on July 30, 2010.  (Goldman Decl. ¶ 7.)

Finally, Myxer argues that 24 of the works at issue were first published after June 16, 2008, the date Plaintiffs filed the original Complaint.  (Ranahan Decl. ¶ 3, Ex. A.)  17 U.S.C. § 411(a) "mandates that a copyrighted work be registered before an infringement action can be brought."  *Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 614 (9th Cir. 2010); *see* 17 U.S.C. § 411(a) ("Except for an action brought for a violation of the rights of the author under [§] 106A(a), and subject to the provisions of subsection (b), no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."); *see also Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1241 (2010) ("Subject to certain exceptions, the Copyright Act . . . requires copyright holders to register their works before suing for copyright infringement.").  Although the works at issue have effective registration dates after the date on which the original Complaint was filed, they were all published and registered before the FAC was filed on August 27, 2009.  *Loux v. Rhay*, 375 F.2d 55, 57 (9th Cir. 1967) (citations omitted) ("The amended complaint supersedes the original, the latter being treated thereafter as non-existent.").

In short, Myxer has not presented sufficient evidence to dispute Plaintiff's ownership of the copyrights in the 244 works at issue. As the Court stated at the hearing on this motion, it has carefully reviewed the evidence regarding ownership and is persuaded that there is no genuine issue of fact on that question.  Accordingly, the Court is satisfied that Plaintiff owns valid copyrights for the 244 sound recordings at issue.  *See Entm't Research Group*, 122 F.3d at 1217-18.

2.      Copying of Protected Elements

"The Copyright Act confers upon the owner of a copyright 'a bundle of discrete exclusive
rights,' each of which may be transferred or retained separately by the copyright owner."  *U.S.
v. Am. Soc'y of Composers, Authors & Publishers* (*American Society of Composers*), 627
F.3d 64, 71 (2d Cir. 2010) (citing *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 495-96 (2001)); *see In
re Application of Cellco P'ship* (*In re Application of Cellco*), 663 F. Supp. 2d 363, 369
(S.D.N.Y. 2009).  A copyright owner may therefore, hold the following exclusive rights:

> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to
> the public by sale or transfer of ownership, or by rental, lease, or
> lending; (4) in the case of literary, musical, dramatic, and
> choreographic works, pantomimes, and motion pictures and other
> audiovisual works, to perform the copyrighted work publicly; (5) in
> the case of literary, musical, dramatic, and choreographic works,
> pantomimes, and pictorial, graphic, or sculptural works, including
> the individual images of a motion picture or other audiovisual work,
> to display the copyrighted work publicly; and (6) in the case of
> sound recordings, to perform the copyrighted work publicly by
> means of a digital audio transmission.

17. U.S.C. § 106.  "Each of these six rights may be owned and conveyed separately." *In re
Application of Cellco*, 663 F. Supp. 2d at 369.

Plaintiff alleges that Defendants have violated its exclusive reproduction, distribution and
digital public performance rights under §§ 106(1), (3), and (6).  (Pl.'s Mot. 8, 22; Pl.'s Reply 4-
6.)  Myxer does not dispute that copies of the sound recordings at issue are present on its servers
and on the Myxer Website, are distributed via downloading to cellular phones, and are
performed on the Myxer Website.  (Def.'s Opp'n 5.)  On the basis of those facts, Plaintiff argues
that Myxer directly infringes Plaintiff's reproduction rights.  Pl.'s Mot. 8; *see* 17 U.S.C. § 106(1);

1   *see Maverick Recording Co. v. Harper*, 598 F.3d 193, 197 (5th Cir. 2010) (finding that an

2   owner's exclusive right to reproduce copyrighted works was infringed upon by the defendant's

3   downloading of the owner's audio files to her computer without authorization).  Plaintiff also

4   alleges that by allowing users to download copies of the sound recordings at issue to users'

5   cell[ular] phones, Myxer infringes Plaintiff's distribution rights.  Pl.'s Mot. 8; *see* 17 U.S.C.

6   § 106(3).  Finally, Plaintiff alleges that by allowing users to preview the sound recordings at

7   issue on either the Myxer Website, or on users' cellular phones, Myxer infringes Plaintiff's

8   public performance rights.[16]  *See* 17 U.S.C. § 106(6).

9          The undisputed facts in the present record establish that Myxer has directly infringed at

10  least one of Plaintiff's exclusive rights, pursuant to § 106.  Thus, Plaintiff has met its burden of

11  production in establishing a claim of copyright infringement.  When "a moving party carries its

12  burden of production, the nonmoving party must produce evidence to support its claim or

13  defense."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*. (*Nissan Fire*), 210 F.3d 1099,

14  1103 (9th Cir. 2000) (citation omitted).  In this motion, Plaintiff contends that the present record

15  demonstrates that Myxer's affirmative defenses fail as a matter of law.  The Court therefore

16  turns its attention to Myxer's affirmative defenses.

17

18  C.    Affirmative Defenses

19

20          [16]  Myxer's Opposition correctly argues that downloading ringtones to one's personal cellular phone is not
21  a public performance.  (Def.'s Opp'n 21.)  The Court agrees with the analysis of *In re Application of Cellco*, in which
    the court found that a company's transmission of a ringtone to a customer's cellular phone did not constitute a "public"
    performance of a musical work because "when the downloading of a ringtone is considered as the first link in a chain
22  of transmissions, it does not qualify as a public performance."  *In re Application of Cellco*, 663 F. Supp. 2d at 371.
23  More recently, the Second Circuit concluded that downloads are not public performances of musical works, for which
    the copyright owners must be separately and additionally compensated.  *See Am. Soc'y of Composers*, 627 F.3d at 71.
24  The Second Circuit explained: "The downloads at issue in this appeal are not musical performances that are
    contemporaneously perceived by the listener.  They are simply transfers of electronic files containing digital copies
25  from an on-line server to a hard drive. . . .  Because the electronic download itself involves no recitation,
    rendering, or playing of the musical work encoded in the digital transmission, we hold that such a download is not
26  performance of work, as defined by [17 U.S.C.] § 101."  *Id*.   Accordingly, for the reasons articulated in *In re*
    *Application of Cellco*, as well as in *American Society of Composers*, it is clear that the act of downloading and then
27  transmitting ringtones (so as to alert the individual of an incoming call) to one's cellular phone does not violate
    Plaintiff's exclusive right of public performance because it is not a public performance.

28

1    Because Plaintiff has sufficiently established a prima facie case of copyright infringement

2    it is now Myxer's burden to establish the existence of a genuine issue of material fact as to each

3    element (or factor) of its affirmative defenses.  *See Nissan Fire*, 210 F.3d at 1103.  Myxer asserts

4    that the DMCA's safe harbor provision, 17 U.S.C. § 512(c) ("§ 512(c)"), and the doctrine of fair

5    use protect it from liability.[17]  *Id.* (citing *Celotex Corp.*, 477 U.S. at 322); *see Corbis Corp.*

6    *v. Amazon.com, Inc.* (*Corbis Corp.*), 351 F. Supp. 2d 1090, 1098-99 (W.D. Wash. 2004)

7    *overruled on other grounds by Cosmetics Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612

8    (9th Cir. 2010) (holding that "even if the plaintiff's copyright infringement claims can bare [sic]

9    fruit, [the defendant's] liability protection ensures that the claims will whither on the vine.").

10   However, if Myxer "fails to produce enough evidence to create a genuine issue of material fact,

11   [Plaintiff] wins the motion for summary judgment."  *Nissan Fire*, 210 F.3d at 1103.

12               1.    The Digital Millennium Copyright Act

13   "Congress enacted the DMCA in 1998 to conform [U.S.] copyright law to its obligations

14   under two World Intellectual Property Organization ("WIPO") treaties, which require

15   contracting parties to provide effective legal remedies against the circumvention of protective

16   technological measures used by copyright owners."[18]  *MDY Indus., LLC v. Blizzard Entm't, Inc.*

17   (*MDY Industries*), 629 F.3d 928, 942 (9th Cir. 2010); *see Universal City Studios, Inc. v. Corley*,

18   273 F.3d 429, 440 (2d Cir. 2001)*; see Io Group, Inc. v. Veoh Networks, Inc.* (*Io Group*), 586

19   F. Supp. 2d 1132, 1141-42 (N.D. Cal. 2008) (internal citations omitted) (explaining that "the

20   DMCA was designed to facilitate the robust development and world-wide expansion of

---

22   [17]   Plaintiff states: 17 U.S.C. "[§§] 512 (a), (b), and (d) are also plainly inapplicable.  Sections 512(a) and

23   512(b) only apply to 'intermediate and transient storage' of infringing material, among many other requirements."
     (Pl.'s Mot. n. 11; *see A&M Records, Inc. v. Napster*, 2000 WL 573136, *1 (N.D. Cal. May 12, 2000).) Plaintiff further

24   explains: "Section 512(d) applies to providers 'referring or linking users to an online location containing infringing
     material or infringing activity, by using information location tools, including a directory, index, reference, pointer,

25   or hypertext link . . . .'  Myxer does not refer its users to infringing material stored at some other online location; it
     copies and maintains the infringing material on its own servers."  (Pl.'s Mot. n. 11.)

26

27   [18]   "The DMCA introduced epochal amendments to U.S. copyright law when it implemented the World
     Intellectual Property Organization Copyright Treaty and the Performances and Phonograms Treaty."  *Realnetworks,*

28   *Inc. v. DVD Copy Control Ass'n (Realnetworks)*, 641 F. Supp. 2d 913, 931 (N.D. Cal. 2009).

electronic commerce, communications, research, development, and education in the digital age"); *see Realnetworks, Inc. v. DVD Copy Control Assoc.* (*Realnetworks*), 641 F. Supp. 2d 913, 940-41 (N.D. Cal. 2009) (citing *Chamberlain Group, Inc. v. Skylink Techs. Inc.*, 381 F.3d 1178, 1194 (Fed. Cir. 2004)) (stating that the DMCA's anti-circumvention and anti-trafficking provisions establish "new grounds for liability in the context of the unauthorized access of copyrighted material."); *see UMG Recordings, Inc. v. Veoh Networks, Inc.* (*UMG Recordings I*), 620 F. Supp. 2d 1081, 1090 (C.D. Cal. 2008) (citing H.R. REP. NO. 105-551(II), at 21 (1998)) (finding that the DMCA intends to "appropriately balance[ ] the interests of content owners, on-line and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet."*); see also Hendrickson v. eBay, Inc.* (*Hendrickson*), 165 F. Supp. 2d 1082, 1088 (C.D. Cal. 2001).

"In enacting the DMCA, Congress sought to mitigate the problems presented by copyright enforcement in the digital age." *MDY Industries*, 629 F.3d at 942. In *Io Group*, the court explained:

> Difficult and controversial questions of copyright liability in the online world prompted Congress to enact Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act ("OCILLA"). . . . In order to strike a balance between their respective interests, OCILLA seeks to preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment. . . . Congress hoped to provide greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.

*Io Group*, at 586 F. Supp. 2d at 1141-42 (internal citations omitted)*; see also Ellison v. Robertson* (*Ellison*), 357 F.3d 1072, 1076 (9th Cir. 2004)).

In particular, "OCILLA enables qualifying service providers to limit their liability for
claimed copyright infringement under four 'safe harbors.'" *Io Group*, 586 F. Supp. 2d at 1142;
*see* 17 U.S.C. § 512(a)-(d).  "These safe harbors provide protection from liability for:
(1) transitory digital network communications; (2) system caching; (3) information residing on
systems or networks at the direction of users; and (4) information location tools." *Ellison*, 357
F.3d at 1076-77; *see Perfect 10, Inc. v. CCBill LLC* (*CCBill*), 488 F.3d 1102, 1109 (9th
Cir. 2007); *see In re Aimster Copyright Litig.* (*In re Aimster*), 252 F. Supp. 2d 634, 657 (N.D.
Ill. 2002), aff'd, 334 F.3d 643 (7th Cir. 2003).

However, "nothing in the language of § 512 indicates that the limitation on liability
described therein is exclusive." *CCBill*, 488 F.3d at 1109 (quoting *CoStar Group, Inc.
v. LoopNet, Inc.* (*CoStar Group*), 373 F.3d 544, 552 (4th Cir. 2004)). "These safe harbors limit
liability but do not affect the question of ultimate liability under the various doctrines of direct,
vicarious, and contributory liability." *CCBill*, 488 F.3d at 1109 (quoting *Perfect 10, Inc. v.
Cybernet Ventures, Inc.* (*Cybernet Ventures*), 213 F. Supp. 2d 1146, 1174 (C.D. Cal. 2002)).
"That is, they protect qualifying service providers from liability for all monetary relief for direct,
vicarious and contributory infringement, leaving copyright owners with limited injunctive
relief." *Io Group*, 586 F. Supp. 2d at 1142 (holding that "the safe harbor provisions are not
exclusive of any other defense an accused infringer might have."); *see Corbis Corp.*, 351
F. Supp. 2d at 1098-99; *see Ellison*, 357 F.3d at 1077 (quoting S. REP. NO. 105-190, at 19
(1998)) ("Far short of adopting enhanced or wholly new standards to evaluate claims of
copyright infringement against online service providers, Congress provided that OCILLA's
'limitations of liability apply if the provider is found to be liable under existing principles of
law.'").  Here, Myxer seeks safe harbor under § 512(c), which in turn necessitates satisfaction of
several threshold requirements, and to which the Court now turns.

a.      Threshold Requirements of the DMCA

i.      Volition Requirement

It is well-established that copyright infringement is a strict liability tort: there is no need to prove the defendant's mental state to establish copyright infringement. *See Educ. Testing Serv. v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D. Cal. 1999) ("There is no need to prove anything about a defendant's mental state to establish copyright infringement; it is a strict liability tort."); *see UMG Recordings, Inc. v. Disco Azteca Distrib., Inc.*, 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006) ("A plaintiff need not demonstrate the defendant's intent to infringe the copyright in order to demonstrate copyright infringement."). Myxer though, asserts: "Although copyright is a strict liability statute, there should still be some element of volition or causation . . . ." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995); Def.'s Opp'n 8-9. For that proposition, Myxer cites to a number of cases that have found a volitional component to direct copyright infringement. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.* (*Cartoon Network*), 536 F.3d 121 (2d Cir. 2008); *see CoStar Group*, 373 F.3d 544; *see also In re Application of Cellco*, 663 F. Supp. 2d at 370.

In *Cartoon Network*, defendant Cablevision ("Cablevision") was sued for its "Remote Storage DVR System," which allowed customers to record cable programming and receive playback of those programs through their home television sets using only a remote control and a cable box equipped with the RS-DVR software. *See Cartoon Network*, 536 F.3d at 124. The Second Circuit found that Cablevision could not be held liable for direct infringement because it merely allowed customers to operate a system that "automatically obeys commands and engages in no volitional conduct." *Id*. at 131. The court reasoned that because Cablevision's system only produced copies on command, Cablevision "more closely resembled a store proprietor who charges customers to use a photocopier on his premises, and it seems incorrect to say, without more, that such a proprietor 'makes' any copies when his machines are actually operated by his customers." *Id*.

24

By contrast, in *Arista Records LLC v. Usenet.com, Inc*., the court found that this volitional conduct requirement was met because the defendants were aware that digital music files were among the most popular articles on their service, and consequently, sought to create servers dedicated to MP3 files and to increase the retention times of news groups containing digital music files. *See Arista Records LLC v. Usenet.com, Inc.* (*Arista Records*), 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009). In particular, the defendants took active steps, including both automated filtering and human review, to remove access to certain categories of material and to block certain users. *Id.* The defendants also admitted that they controlled which newsgroups their servers accepted and stored, and even which ones they rejected. *Id.* Thus, the court found that the defendants' actions transformed the defendants "from passive providers of a space in which infringing activities happened to occur to active participants in the process of copyright infringement." *Id.* (quoting *Playboy v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997)). The court concluded that the defendants were not merely "passive conduits" facilitating the exchange of material between users who upload and download, but instead, were actively engaged in infringement, thereby satisfying the volitional conduct requirement. *See Arista Records*, 633 F. Supp. 2d at 148-49.

However, no Ninth Circuit case has adopted this volitional conduct requirement. *See Kelly v. Arriba*, 336 F.3d 811 (9th Cir. 2003); *see Perfect 10, Inc. v. Amazon.com. Inc.* (*Amazon.com*.), 508 F.3d 1146 (9th Cir. 2007); *see Napster*, 239 F.3d 1004. Indeed, although the Ninth Circuit has dealt with the DMCA safe harbor provisions since *Cartoon Network* and *CoStar Group* were each decided, including in *Napster*, Myxer provides no evidence that the Ninth Circuit has actually adopted this so-called "volitional conduct" requirement, indicating instead, that the Ninth Circuit has consciously declined to adopt said requirement. *Id.*; Pl.'s Mot. 23; Pl.'s Reply 6. Moreover, as Plaintiff asserts, the DMCA safe harbor provisions address intent and/or volition elsewhere.[19] (Pl.'s Reply 6.) Accordingly, in light of the fact that

---

[19] "The Copyright Act accounts for issues of knowledge and intent in other ways, such as by limiting damages for 'innocent' infringers, 17 U.S.C. § 504(c)(2), and via the DMCA safe harbors." (Pl.'s Reply 6; *see* 17

1  copyright infringement is a strict liability offense, the Court is not inclined to adopt a volitional

2  conduct requirement without clear instruction from the Ninth Circuit, and so declines to apply

3  the so-called volitional conduct requirement advocated by Myxer.

ii.   "By Reason of the Storage at the Direction of a User"

17 U.S.C. § 512(d) provides in pertinent part:

> A service provider shall not be liable for monetary relief, or, except
> as provided in subsection (j), for injunctive or other equitable relief,
> for infringement of copyright *by reason of the storage at the*
> *direction of a user of material that resides on a system or network*
> controlled or operated by or for the service provider. . . .

17 U.S.C. § 512(d) (emphasis added).  Plaintiff argues that the conduct at issue is not the type

that occurs "by reason of the storage at the direction of a user of material" residing on a service

provider's system or network.  17 U.S.C. § 512(c); Pl.'s Mot. 26-27; Pl.'s Reply 8-9.  In

particular, Plaintiff asserts that Myxer fails to explain "how [the] sending of Plaintiff's sound

recordings to cell[ular] phones rationally occurs 'by reason of' [Myxer's] storage of Plaintiff's

works."  (Pl.'s Mot. 27; Pl.'s Reply 8.)  Myxer concedes that downloading and performing a

ringtone are acts separate and apart from storage.  (Def.'s Opp'n 11.)

As an initial matter, "[p]rotection from copyright liability under the DMCA is only

available to entities that meet the statute's definition of a 'service provider.'"  *Corbis Corp.*, 351

F. Supp. 2d at 1099-1100 ("For purposes of the § 512(c) safe harbor, a service provider is

defined as a provider of online services or network access, or the operator of facilities

therefor. . . . This definition encompasses a broad variety of Internet activities.").  Indeed,

Section 512(k)(1)(B) broadly defines "service provider" to be "a provider of online services or

network access, or the operator of facilities therefor," and includes "entit[ies] offering the

U.S.C. § 504(c)(2) ("In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000 . . . .").)

1  transmission, routing, or providing of connections for digital online communications."  17

2  U.S.C. § 512(k)(1)(B) ).  The parties do not dispute that Myxer is a service provider for purposes

3  of § 512(c) analysis.  (Def.'s Opp'n 11-12; *see generally* Pl.'s Reply.)

4      In *Io Group*, the court held that although the defendant service provider did not actively

5  participate or supervise in uploading files, "[i]nasmuch as [the automatic creation of these files]

6  is a means of facilitating user access to material on its website . . . [the defendant] d[id] not lose

7  safe harbor."  *Io Group*, 586 F. Supp. 2d at 1148.  The court explained: "One of the stated

8  purposes of [the DMCA] [i]s to facilitate the robust development and worldwide expansion of

9  electronic commerce, communications, research, development, and education in the digital age."

10  *Id*. (citing *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n* (*Visa*), 494 F.3d 788, 794 n. 2 (9th Cir. 2007)

11  (quoting S. REP. NO. 105-190, at 1-2 (1998))); *see also* S. REP. NO. 105-190, at 44 (identifying

12  § 512(c) as covering "the activity at an online site offering audio or video.")  By contrast:

13  "Excluded from [§] 512(c)'s safe harbor is material that resides on the system or network

14  operated by or for the service provider through its own acts or decisions and not at the direction

15  of a user."  *Io Group*, 586 F. Supp. 2d at 1146 (internal citations omitted).

16      In *UMG Recordings I*, the defendant service provider's software "allow[ed] users to

17  access uploaded videos by downloading whole video files."  *UMG Recordings I*, 620 F. Supp. 2d

18  at 1083.  The plaintiff contended that the defendant did not qualify for § 512(c) immunity

19  because the alleged conduct was not "storage," and therefore, not undertaken "at the direction of

20  a user."  The court, however, declined to adopt the argument that "§ 512(c) requires . . . that the

21  service provider's infringing conduct be storage and that the storage be at the direction of a user."

22  *Id*. at 1088 (internal citations omitted).  Instead, the court adopted a broader definition: "[T]he

23  § 512(c) limitation on liability applies to service providers whose software performs these

24  functions for the purpose of facilitating access to user-stored material" because "§ 512(c) does

25  not require that the infringing conduct constitute storage in its own right.  Rather, the infringing

26  conduct m[ay] occur *as a result of* the storage."  *Id*. (emphasis added).  The court explained:

27

28

27

1    It is very difficult to see how the DMCA could achieve [its] goals if

2    service providers otherwise eligible for limited liability under

3    § 512(c) were exposed to liability for providing access to works

4    stored at the direction of users.  Such liability would surely undercut

5    the robust development and world-wide expansion of electronic

6    commerce, communications, research, development, and education

7    in the digital age. . . . [T]his cooperative process would be pointless

8    if service providers who provide access to material stored on their

9    systems at the direction of users were precluded from limiting their

10   potential liability merely because their services enabled users to

11   access such works.  The threat of such liability would create an

12   enormous disincentive to provide access, thereby limiting the variety

13   and quality of services on the Internet.  Moreover, absent such access

14   copyright owners would find it difficult to located infringing

15   material in order to provide notice in the first place.

16   *Id.* at 1090-91 (internal citations omitted); *see Youtube*, 718 F. Supp. 2d at 527 (internal citations

17   omitted) ("Although [the defendant] correctly observes that the language of § 512(c) is 'broad,' it

18   does not venture to define its outermost limits.  It is unnecessary for this [c]ourt to do so either,

19   because the critical statutory language really is pretty clear.  Common sense and widespread

20   usage establish that 'by reason of' means 'as a result of' or 'something that can be attributed

21   to. . . .'  So understood, when copyrighted [material] is displayed or distributed on [the

22   defendant's website] it is 'as a result of' or 'attributable to' the fact that users uploaded the

23   [material] to [the defendant's] servers to be accessed by other means.  If providing access could

24   trigger liability without the possibility of DMCA immunity, service providers would be greatly

25   deterred from performing their basic, vital and salutary function-namely, providing access to

26   information and material for the public.").  The *UMG Recordings I* court concluded that a

27   narrow interpretation of the statute was not the intent of Congress: "Instead, as the language

28

makes clear, the statute extends to functions other than mere storage; it applies to infringement of copyright by reason of the storage at the direction of a user . . . ." *UMG Recordings I*, 620 F. Supp. 2d at 1089 (citing 17 U.S.C. § 512(c)).

Pursuant to both *UMG Recordings I* and *Youtube*, the downloading at issue is covered by § 512(c) because it occurs as a result of the uploaded material, which both parties agree is clearly covered by § 512(c).[20]  *See UMG Recordings I*, 620 F.Supp.2d at 1088.  Moreover, § 512(c)'s broadly defined purpose makes clear that the downloading at issue is covered by the DMCA, lest "service providers would be greatly deterred from performing their basic, vital and salutary function-namely, providing access to information and material for the public." *Youtube*, 718 F. Supp. 2d at 527.  Accordingly, the Court concludes that the downloading at issue fits within the scope of § 512(c)'s "by reason of the storage at the direction of a user of material" because it occurs "as a result of" users' uploaded material.

b.    Section 512(i)(1)(A) Threshold Requirements

To avail itself of the § 512 safe harbors, a service provider "must adopt, reasonably implement and inform subscribers of a policy providing that it may, in appropriate circumstances, terminate the accounts of repeat infringers," pursuant to 17 U.S.C. § 512(i)(1)(A) ("§ 512(i)(1)(A)"). *Io Group,* 586 F. Supp. 2d at 1142; *see Ellison*, 357 F.3d at 1080; *see* 17 U.S.C. § 512(i)(1)(A); *see CCBill*, 488 F.3d at 1109.  As the *Corbis Corp*. court explained: "A service provider that does not meet these threshold conditions may not invoke the DMCA's safe harbor limitations on liability." *Corbis Corp*., 351 F. Supp. 2d at 1099.

i.    Adoption of a Policy

"The language of § 512(i)(1)(A), as well as the overall structure of the DMCA, indicate" that although a user must adopt a policy that terminates the accounts of repeat infringers, "the policy need not be . . . specific." *Corbis Corp*., 351 F. Supp. 2d at 1100.  To that end:

---

[20]    The Court finds unconvincing Plaintiff's claim that because downloading and uploading are separate functions, downloading is necessarily not "by reason of the storage." (Pl.'s Reply 8.)  It is not only inconsistent with *UMG Recordings* and *Youtube*, it also does not comport with the broadly defined purposes of the DMCA.

1   This does not mean that the first prong of the *Ellison* test is a paper
2   tiger.  To the contrary, it is clear that a properly adopted
3   infringement policy must convey to users that "those who repeatedly
4   or flagrantly abuse their access to the [I]nternet through disrespect
5   for the intellectual property rights of others . . . know that there is a
6   realistic threat of losing that access."

7   *Id*. at 1101 (citing H.R. REP. NO. 105-551, pt. 2, at 44.)

8   Here, Myxer provides evidence of the existence of a repeat infringer policy.  (Calkins
9   Decl., Ex. N (explaining that it has "always been our policy").)  Creely states:

10   Myxer's policies have always strictly prohibited the use of its
11   [W]ebsite or software in connection with infringing [material] and
12   that Myxer reserves the right to terminate a user's account for
13   violating our Terms of Use.  Our Abuse page
14   (http://www.myxer.com/abuse.) has always stated that Myxer will
15   terminate access for repeat infringers.

16   (Creely Decl. ¶¶ 2, 16; SGI ¶ 157; Def.'s Opp'n 4-5.)  Creely further explains:

17   By agreeing to these Terms of Use, users state that they will not use
18   Myxer to upload, post, email, transmit, or post links to any [material]
19   that infringes any patent, trademark, service mark, trade secret,
20   copyright or other proprietary rights of any party, or contributing or
21   inducing or facilitating such inducement.  In addition to agreeing to
22   the Terms of Use, when they register, artists must also agree to the
23   following statement each time they upload a new item for sharing: "I
24   understand that uploading [material] that violates Myxer's Terms of
25   Use will result in the canceling of my account."

26   (Creely Decl. ¶ 4, Ex. A.)  "Under Myxer's Terms of Use, users also agree that they have the
27   master rights to distribute, for free or for payment, the material [that they] submit[ ] to Myxer.
28

30

1  Myxer's Terms of Use also warn users of potential account termination for failing to comply."

2  (Creely Decl. ¶ 5.)

3       Plaintiff acknowledges that Myxer has a repeat infringer policy as to users who upload,

4  but argues that Myxer has no policy as to users who download infringing material.  (Pl.'s

5  Mot. 28-29; Pl.'s Reply 10-11.)  Creely concedes: "downloading . . . is a separate function from

6  [sharing/uploading], and not really related."  *Id*.  Thus, even though Myxer requires that users

7  register and agree to its Terms of Use before uploading material, Myxer has no similar

8  registration or repeat infringer policy as to users who download infringing material.  (Pl.'s

9  Mot. 28.)  Plaintiff states:

10            The absence of such a policy necessarily disqualifies Myxer from

11            safe harbor for such downloads.  Either downloading is within the

12            meaning of [§] 512(c), in which case Myxer must have a repeat

13            infringer policy for downloading, or is it [sic] not, in which case no

14            safe harbor applies.  Myxer cannot have it both ways.

15  (Pl.'s Reply 10.)

16       In response, Myxer asserts that § 512(i)(1)(A) does not require termination of individuals

17  who access the Myxer Website without registering for an account because § 512(c) only requires

18  the termination of "subscribers and account holders," not users or user access.  Def.'s Opp'n 13-

19  14.  Myxer additionally contends that the DMCA does not require that it have a system in place

20  to prevent users from accessing and/or downloading from the Myxer Website because requiring

21  registration for uploading should sufficiently prevent and stop infringing.  (Def.'s Opp'n 13.)  To

22  that end, Myxer asserts that "it can and does stop alleged repeat infringers from uploading, but it

23  cannot prevent individuals from accessing and downloading from its website."  (Def.'s

24  Opp'n 14.)

25       To the extent that Myxer contends that it qualifies for the safe harbor because, as a matter

26  of law, it has no obligation to establish a repeat infringer policy for users who download

27  copyrighted material goes too far.  That argument is based on the proposition that users do not

28

have to register to access the site and implies that Myxer can avoid liability simply by declining to register users.  But if internet service providers can so easily avoid liability for infringement, the constraints imposed by § 512(i)(1)(A)'s requirements cease to have any meaning.  Myxer may be correct that its policy provides copyright owners with protection that meets the requirements of the DMCA, but that is a question of fact, not of law.  Myxer contends that it does provide such protection; Arista contends that the evidence of user downloads disqualifies Myxer from the safe harbor shelter offered by the DMCA.

To address the parties' competing positions, the Court focuses on the fundamental proposition that the DMCA seeks to "appropriately balance[ ] the interests of content owners, on-line and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet." *UMG Recordings I*, 620 F. Supp. 2d at 1090.  To facilitate this objective, the DMCA intends "to provide greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities." *Ellison*, 357 F.3d at 1076.  Indeed, "[t]he component of [the] safe harbors is that the service provider must do what it can reasonably be asked to do to prevent the use of its service by 'repeat infringers.'" *In re Aimster*, 334 F.3d at 655.  Therefore, because § 512(i)'s language emphasizes that a service provider's repeat infringer policy must be implemented in a reasonable manner in appropriate circumstances, it is incorrect that Myxer must have an exhaustive and perfectly-crafted policy.  *See Io Group*, 586 F. Supp. 2d at 1142, 1144 ("A service provider reasonably implements its repeat infringer policy if it terminates users 'when appropriate.'  Section 512(i)(1)(A) itself does not clarify when it is 'appropriate' for service providers to act.  It only requires that a service provider terminate users who are 'repeat infringers.'").

Thus, to the extent that Myxer's repeat infringer policy as to uploading meaningfully prevents users from accessing infringing material and can be reasonably adopted and implemented, Myxer's repeat infringer policy complies with the purposes of the DMCA and § 512(i).  Indeed, it appears that uploading is "of greatest concern," and "principal" to Myxer's

1   functioning, and which the Court expressed when the parties appeared for oral argument on

2   August 27, 2010.[21]  (*See* Transcript of Aug. 27, 2010, 8:21-22, 10:21.)  Consequently, because

3   users are necessarily limited to downloading already uploaded material and Myxer's repeat

4   infringer policy as to users who upload infringing material is appropriate and reasonable, a

5   strong argument can be made that a repeat infringer policy as to users who download would be

6   redundant.  (Def.'s Opp'n 14.)  Stated another way, to the extent that adopting a repeat infringer

7   policy as to users who download is not feasible, the Court is compelled to construe any such

8   policy beyond the realm of appropriate and reasonable.  *See Io Group*, 586 F. Supp. 2d at 1144.

9   Indeed, the DMCA aims to "foster the continued development of electronic commerce and the

10  growth of the Internet" by providing "greater certainty to service providers concerning their legal

11  exposure for infringements that may occur in the course of their activities," not to create unduly

12  stringent standards or second-guess service providers legitimate attempts at compliance.  *See*

13  *UMG Recordings I*, 620 F. Supp. 2d at 1090; *see Ellison*, 357 F.3d at 1076.  Accordingly, the

14  Court concludes that Myxer has sufficiently demonstrated the existence of a repeat infringement

15  policy, pursuant to § 512(i)(1)(A).  Whether that policy was adequate to meet the requirements

16  of the DMCA is an issue that must be resolved at trial.

17                          ii.      Communication of the Policy to Users

18          Section 512(i)(1)(A) requires that a service provider "inform users that in appropriate

19  circumstances, it may terminate the user's accounts for repeated copyright infringement."  *Corbis*

20  *Corp*., 351 F. Supp. 2d at 1101; *see Ellison*, 357 F.3d at 1080.  However, "[§] 512(i)(1)(A) does

21  not require service providers to track users in a particular way . . . or affirmatively police users

22  for evidence of repeat infringement."  *Io Group*, 586 F. Supp. 2d at 1145 (citing *CCBill*, 488

23  F.3d at 1109-10); *see Corbis Corp*., 351 F. Supp. 2d at 1101 ("The statute does not suggest what

24  criteria should be considered by a service provider, much less require the service provider to

25

26          ───────────────────

27          [21]  "You can't download it until it is uploaded.  That's why I'm suggesting that uploading and placing
      copyrighted content on the site where it becomes available would seem to me to be the principal concern because at
      that point then all sorts of things could happen."  (*See* Transcript of Aug. 27, 2010, 10:21.)

28

                                                    33

1   reveal its decision-making criteria to the user."); *see CCBill,* 488 F.3d at 1113 (holding that the

2   court must undertake an assessment of the service provider's "policy," not how the service

3   provider treats a particular copyright holder).

4          "[A] properly adopted infringement policy must convey to users that those who

5   repeatedly or flagrantly abuse their access to the [I]nternet through disrespect for the intellectual

6   property rights of others . . . know that there is a realistic threat of losing that access." *Corbis*

7   *Corp.*, 351 F. Supp. 2d at 1101 (internal citations omitted).  The DMCA does not mandate how

8   notice must be given.  Service providers "need only put users on notice that they face exclusion

9   from the service if they repeatedly violate copyright laws." *Corbis Corp.*, 351 F. Supp. 2d at

10  1102; *see CCBill*, 488 F.3d at 1102.  In *Ellison*, the Ninth Circuit concluded that defendant AOL

11  ("AOL") "did not have an effective notification procedure in place at the time the alleged

12  infringing activities were taking place." *Ellison*, 357 F.3d at 1080.  The court noted:

13              Although AOL [notified] the Copyright Office of its correct email

14              address before [the plaintiff's] attorney attempted to contact AOL

15              and [posted] its correct email address on the AOL website with a

16              brief summary of its policy as to repeat infringers, AOL also: (1)

17              changed the email address to which infringement notifications were

18              supposed to have been sent; and (2) failed to provide for forwarding

19              of messages sent to the old address or notification that the email

20              address was inactive. . . . AOL should have closed the old email

21              account or forwarded the emails sent to the old account to the new

22              one.

23  *Id.*  Thus, because "AOL allowed notices of potential copyright infringement to fall into a

24  vacuum and to go unheeded; that fact is sufficient for a reasonable jury to conclude that AOL

25  had not reasonably implemented its policy against repeat infringers." *Id.*  Similarly, in *In re*

26  *Aimster*, the district court held that "adopting a repeat infringer policy and then purposely

27  eviscerating any hope that such a policy could ever be carried out is not an 'implementation' as

28

34

1    required by § 512(i)." *CCBill*, 488 F.3d at 1110 (citing *In re Aimster*, 252 F. Supp. 2d 634).  The

2    Seventh Circuit affirmed, finding that the defendant Aimster ("Aimster") did not satisfy the

3    requirements of § 512(i)(1)(A).  *In re Aimster*, 334 F.3d at 655.  The Seventh Circuit explained:

4    "[B]y teaching its users how to encrypt their unlawful distribution of copyrighted materials

5    [Aimster] disabled itself from doing anything to prevent infringement." *Id.*

6         Myxer presents evidence that it does not permit copyright infringement and that before

7    uploading material, users must agree to its Terms of Use, which sets forth Myxer's repeat

8    infringement policy.  The Terms of Use indicates that Myxer reserves the right to terminate

9    repeat infringers' ability to upload so that users are put on notice of Myxer's policy as to repeat

10   infringers.  (Creely Decl. ¶¶ 2-3.)  Because § 512(i)(1)(A) requires that Myxer put users on

11   notice that they face expulsion for repeated infringement, and which Myxer's Terms of Use

12   arguably does, Myxer provides sufficient evidence that its repeat infringement policy is

13   reasonably communicated.  *See Ellison*, 357 F.3d at 1080.

14        Accordingly, the Court concludes that Myxer has raised a genuine issue of material fact

15   as to whether it reasonably communicates a repeat infringement policy, pursuant to

16   § 512(i)(1)(A).

17              iii.    Implementation of the Infringement Policy

18        "The final *Ellison* prong requires [a service provider] to reasonably implement its

19   infringement policy." *Corbis Corp.*, 351 F. Supp. 2d at 1102; *see Ellison*, 357 F.3d at 1080; *see*

20   *CCBill*, 488 F.3d at 1111.  The *Corbis Corp.* court explained:

21              Cases that have addressed this issue generally raise two questions.

22              The first is whether the service provider adopted a procedure for

23              receiving complaints and conveying those complaints to users. . . . If

24              such a procedure has been adopted, then the second question is

25              whether the service provider nonetheless still tolerates flagrant or

26              blatant copyright infringement by its users.

27

28

1  *Corbis Corp.*, 351 F. Supp. 2d at 1102; *see Cybernet Ventures*, 213 F. Supp. 2d at 1177-78.

2  "The statute permits service providers to implement a variety of procedures, but an

3  implementation is reasonable if, under 'appropriate circumstances,' the service provider

4  terminates users who repeatedly or blatantly infringe copyright." *Io Group*, 586 F. Supp. 2d at

5  1143 (citing *CCBill*, 488 F.3d at 1109).  In *Io Group*, the court explained:

6      The DMCA does not say what "reasonably implemented" means.

7      Nonetheless, the Ninth Circuit has held that a service provider

8      "implements" a policy if it has a working notification system, a

9      procedure for dealing with DMCA-compliant notifications, and if it

10     does not actively prevent copyright owners from collecting

11     information needed to issue such notifications. . . .  Instead, [a]

12     policy is unreasonable only if the service provider failed to respond

13     when it had knowledge of the infringement.

14  *Id.* at 1143 (citing *CCBill*, 488 F.3d at 1109).  Although the statute does not define the

15  "appropriate circumstances" that require termination, "[i]t . . . requires that a service provider

16  terminate users who are 'repeat infringers.'" *Id.*  However, "[t]o identify and terminate repeat

17  infringers, a service provider need not affirmatively police its users for evidence of repeat

18  infringement." *Id.* at 1144.  This is consistent with the service provider's statutory obligation

19  under § 512(c) to take action when it has actual knowledge of infringement, is aware of facts

20  indicating that infringing activity is taking place, or has received proper notice of infringement

21  under § 512(c)(3). *Id.*

22      Myxer asserts that pursuant to § 512(c), its repeat infringer policy sufficiently removes

23  users who have violated its terms.  (Creely Decl. ¶ 4; Def.'s Opp'n 6.)  Myxer's Copyright

24  compliance officer and designated DMCA agent, Creely, states that she processes DMCA

25  notices immediately and disables infringing material usually within one business day of the

26  notice.  (Creely Decl. ¶ 12; Def.'s Opp'n 14.)  Moreover, Myxer argues that it disables access to

27  material and terminates users in response to compliant DMCA notices, as well as in response to

28

1  informal notices, or if Myxer otherwise becomes aware of potentially infringing material.  (SGI

2  ¶¶ 191-92.)  Creely states: "As of October 2009, Myxer has terminated the Artist accounts of

3  2,371 users, pursuant to Myxer's repeat infringer policy so that they can no longer upload

4  [material]."  (Creely Decl. ¶ 17; Def.'s Opp'n 6.)

5      Nevertheless, Plaintiff argues that Myxer's repeat infringer policy is insufficient: "Even if

6  Myxer terminated a user, that user could immediately re-register with a different user name and

7  resume infringing."  (SGI ¶ 128.)  However, Plaintiff cites no controlling authority indicating

8  that such a set of circumstances would render a policy insufficient under the DMCA, and the

9  proposition appears unsupported by the plain language of § 512(i)(1)(A).  Moreover, simply

10  because "a rogue user might reappear under a different user name and identity does not raise a

11  genuine fact issue as to the implementation of [a] policy." *Io Group*, 586 F. Supp. 2d at 1144.

12  Plaintiff offers no evidence of specific infringers who have re-registered, and even if Plaintiff

13  provided evidence of users re-registering with Myxer after their accounts had been terminated,

14  that would not necessarily evidence a failed implementation of the policy.  *See Io Group*, 586 F.

15  Supp. 2d at 1144-45 ("Here, [the plaintiff] has presented no evidence that a repeat infringer has,

16  in fact, established a new account under false pretenses, much less that [the defendant] has

17  intentionally allowed that to happen.  Its supposition about the hypothetical possibility that a

18  repeat infringer may have done so is not evidence.  There is not indication that Mr. Ruoff is a

19  repeat infringer who should have been blocked; and, the fact that he was able to open a second

20  account does not give rise to a genuine issue of material fact as to the reasonableness of [the

21  defendant's] implementation."); *see Corbis Corp.*, 351 F. Supp. 2d at 1102.

22      Accordingly, because a repeat infringer policy needs to be reasonable, not perfect, and

23  because Myxer has presented evidence of an arguably adequate policy, the Court concludes that

24  Myxer has raised a genuine issue of material fact as to whether it has reasonably implemented its

25  repeat infringement policy, pursuant to § 512(i)(1)(A).  Since genuine issues of material fact

26  remain as to whether Myxer meets the threshold requirements of § 512(i)(1)(A), the Court

27  **DENIES** Plaintiff's Motion for Summary Judgment to the extent it seeks to find Myxer has not

28

1  satisfied the threshold requirements of 512(i).  The Court now turns to the requirements of

2  § 512(c).

3  c.  Requirements of Section 512(c)

4  "Having satisfied the threshold conditions, [the service provider] must still meet the three

5  conditions for liability protection set forth in § 512(c)(1)(A)-(C)."  *Corbis Corp*., 351 F. Supp.

6  2d at 1107.  "First, [the service provider] must show that it does not have actual or apparent

7  knowledge that material on its network is infringing."  *Id.* at 1102; *see* 17 U.S.C.

8  § 512(c)(1)(A)(i); *see* 17 U.S.C. § 512(c)(1)(A)(ii); *see UMG Recordings II*, 665 F. Supp. 2d at

9  1107.  Second, if the service provider has actual or apparent knowledge that material on its

10  network is infringing, it must show that it acted "expeditiously to remove, or disable access to,

11  the [infringing] material."  17 U.S.C. § 512(c)(1)(A)(iii); 17 U.S.C. § 512(c)(1)(C); *see Corbis*

12  *Corp*., 351 F. Supp. 2d at 1102.  Finally, "[the service provider] must show that it does not

13  receive a financial benefit directly attributable to any infringing activity that it maintains the

14  right and ability to control."[22]  *Id.*; *see ALS Scan, Inc. v. RemarQ Cmtys., Inc.* (*ALS*), 239 F.3d

15  619, 623 (4th Cir. 2001) (holding that the "service provider must demonstrate that it has met all

16  three of the safe harbor requirements, and a showing under the first prong-the lack of actual or

17  constructive knowledge – is prior to and separate from the showings that must be made under the

18  second and third prongs.").

19  i.  Knowledge Requirement

20  "The DMCA was enacted both to preserve copyright enforcement on the Internet and to

21  provide immunity to service providers from copyright infringement liability for 'passive,'

22  'automatic' actions in which a service provider's system engages through a technological process

23  initiated by another without the knowledge of the service provider."  *ALS*, 239 F.3d at 625.  In

24

25  _____

26  [22]  As Judge Howard A. Matz noted in *UMG Recordings II:* "There is no dispositive decision on the burden
of proof, but. . . . David Nimmer's authoritative treatise charts the following paths on the burdens of proof and
persuasion. . . .the copyright owner bears the burden of demonstrating knowledge independently of the failed
27  notification.  To the extent that no other proof exists, the proprietor's attempt to defeat the defense fails."  *UMG
Recordings II*, 665 F. Supp. 2d at 1107 n. 11.

28

*ALS,* the Fourth Circuit held that DMCA immunity "is not presumptive, but granted only to 'innocent' service providers who can prove they do not have actual or constructive knowledge of the infringement." *Id*. (internal citations omitted). The applicable knowledge standard is met by "actual knowledge of infringement or in the absence of such knowledge by awareness of facts or circumstances from which infringing activity is apparent." *Youtube*, 718 F. Supp. 2d at 520.

Actual knowledge applies to proper notice of alleged infringement. *See CCBill*, 488 F.3d at 1114. 17 U.S.C. § 512(c)(3)(A) provides: "To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider." 17 U.S.C. § 512(c)(3)(A). Notification of claimed infringement is effective if it includes: "Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, *a representative list of such works at that site*." 17 U.S.C. § 512(c)(3)(A)(ii) (emphasis added); *see ALS*, 239 F.3d at 625 (holding that "[i]n addition to substantial compliance, the notification requirements are relaxed to the extent that, with respect to multiple works, not all must be identified – only a 'representative' list. . . . Thus, when a letter provides notice equivalent to a list of representative works that can be easily identified by the service provider, the notice substantially complies with the notification requirements.").

However, "[n]otice that fails to substantially comply with § 512(c)(3)(B), . . . cannot be deemed to impart such awareness." *CCBill*, 488 F.3d at 1114. "In the spirit of achieving a balance between the responsibilities of the service provider and the copyright owner, the DMCA requires that a copyright owner put the service provider on notice by means that comport with the prescribed format only 'substantially,' rather than perfectly." *ALS*, 239 F.3d at 625. Nonetheless, the burden is born by the copyright owner, and that burden requires the owner to provide sufficiently detailed information to the service provider to identify the infringed work. In *UMG Recordings II*, the court emphasized:

> The DMCA notification procedures place the burden of policing
> copyright infringement-identifying the potentially infringing material

1      and adequately documenting infringement – squarely on the owners

2      of the copyright.  We decline to shift a substantial burden from the

3      copyright owner to the provider.

4  *UMG Recordings II*, 665 F. Supp. 2d at 1107-08.  The *UMG Recordings II* court further

5  explained:

6      even though the notices identified allegedly infringing pictures and

7      even contained links to the materials, they were inadequate for

8      several reasons, including that they required [the defendant] to

9      cobble together adequate notice by searching a spreadsheet for

10      ownership information and then combing through thousands of pages

11      of images to find [I]nternet links.

12  *UMG Recordings II*, 665 F. Supp. 2d at 1107-08. *see also CCBill*, 488 F.3d at 1112

13  ("compliance is not 'substantial' if the notice provided complies with only some of the

14  requirements [of the statute].").

15      Actual knowledge may be shown by evidence that the service provider was in possession

16  of information from which infringing activity was apparent.  17 U.S.C. § 512(c)(1)(A)(ii).

17  "Subsection (c)(1)(A)(ii) can best be described as a 'red flag' test." *UMG Recordings II*, 665

18  F. Supp. 2d at 1113 n. 17.  In *Youtube*, the court explained:

19      As stated in subsection (l), a service provider need not monitor its

20      service or affirmatively seek facts indicating infringing activity

21      (except to the extent consistent with a standard technical measure

22      complying with subsection (h)), in order to claim this limitation on

23      liability (or, indeed any other limitation provided by the legislation).

24      However, if the service provider becomes aware of a "red flag" from

25      which infringing activity is apparent, it will lose the limitation of

26      liability if it takes no action.  The "red flag" test has both a subjective

27      and an objective element.  In determining whether the service

28

1  provider was aware of a "red flag," the subjective awareness of the

2  service provider of the facts or circumstances in question must be

3  determined.  However, in deciding whether those facts or

4  circumstances constitute a "red flag" – in other words, whether

5  infringing activity would have been apparent to a reasonable person

6  operating under the same or similar circumstances – an objective

7  standard should be used.

8  *Youtube*, 718 F. Supp. 2d at 520-21 (citing H.R. REP. NO. 105-551(II), at 53, 57); *UMG*

9  *Recordings II*, 665 F. Supp. 2d at 1110-11; S. REP. NO. 105-190, at 1-2, 8 (1998); H.R. REP. NO.

10  105-551(II), at 21; *see also Visa,* 494 F.3d at 794 n. 2.

11      By way of example, the plaintiff in *CCBill* alleged that the defendant was "aware of facts

12  or circumstances from which infringing activity [was] apparent," including that it provided

13  services to websites with such "come hither" names as "illegal.net" and

14  "stolencelebritypictures.com."  *CCBill*, 488 F.3d at 1114.  The Ninth Circuit, however, found

15  that the sites' names alone did not signal awareness of infringement.  *Id*.  As the court stated in

16  *UMG Recordings II*: "*CCBill* teaches that if investigation of 'facts and circumstances' is required

17  to identify material as infringing, then those facts and circumstances are not 'red flags.'"  *UMG*

18  *Recordings II*, 665 F. Supp. 2d at 1108; *see Corbis Corp*., 351 F. Supp. 2d at 1108 (holding that

19  "[t]he question is not 'what a reasonable person would have deduced given all the

20  circumstances. . . .'  Instead, the question is 'whether the service provider deliberately proceeded

21  in the face of blatant factors of which it was aware.'") [citing 3 Nimmer on Copyright,

22  § 12B.04[A][1], at 12B-49]); *see Io Group*, 586 F. Supp. 2d at 1149 ("Nor is this court

23  convinced that the professionally created nature of submitted [material] constitutes a per se 'red

24  flag' of infringement sufficient to impute the requisite level of knowledge or awareness to [the

25  defendant].  Indeed, with the video equipment available to the general public today, there may be

26  little, if any, distinction between 'professional' and 'amateur' productions.").

27

28

41

### 1.    Myxer's Knowledge

Myxer argues that the first notice of infringement it received was through the Complaint, which named approximately 733 works, including the 244 sound recordings still at issue.  (*See generally* Compl.; Def.'s Opp'n 15.)  Myxer claims that this was insufficient notice because it was not provided the URLs of the works at issue, and so it was unable to reasonably locate the allegedly infringing material.  (SGI ¶¶ 210, 213.)  Myxer also contends that the only other notices it received were letters from the RIAA and GrayZone, and a small number from Plaintiff, which Myxer "promptly" processed.  (SGI ¶¶ 206-07, 210-13.)  In response, Plaintiff argues that a "representative list" it sent to Myxer of the copyrighted works on Myxer's Website was sufficient to put Myxer on notice.  *ALS*, 239 F.3d at 625.  In light of 17 U.S.C. § 512(c)(3)(A)(ii), the Complaint and other notices arguably constitute DMCA "complaint" notices, and so constitute evidence that Myxer knew of the alleged infringements.

Plaintiff also contends that Myxer had actual knowledge of infringement, as "Myxer's management not only knew its system was filled with Plaintiff's copyrighted material, but specifically intended that result."[23]  (Pl.'s Mot. 13, 37.)  Plaintiff's argument here, however, is based on the existence of "general knowledge:"

> Myxer pretends that it does not know that pirate copies of Plaintiff's
> well-known copyrighted sound recordings account for over 100,000

---

[23]  Plaintiff relies on *Columbia Pictures Industries, Inc. v. Fung* (*Columbia Pictures*), 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009).  However the facts before this Court are very different from the facts in *Columbia Pictures*.  The defendants in *Columbia Pictures* designed and promoted their system to facilitate infringement.  This is unquestionable: Fung's intent to induce infringement via his websites was overwhelmingly clear.  In fact, the "evidence show[ed] that 90%-95% of the material was likely to be copyright infringing, a percentage that is nearly identical to the facts in *Napster*, in which 'eighty-seven percent of the files available on [the] Napster [server] may be copyrighted.'"  *Columbia Pictures,* 2009 WL 6355911, at *17 (internal citations omitted).  The *Columbia Pictures* court explained: "In any event, for the purposes of this case, the precise percentage of infringement is irrelevant: the evidence clearly shows that Defendants' users infringed on a significant scale."  *Id*. at *11.  A much smaller percentage of files on Myxer's Website, less than 25%, is arguably owned by Plaintiff.  This number may be even smaller, in light of Myxer's various licensing agreements, Partners' material, and the fact that nearly all the named Plaintiffs have been dismissed, other than UMG.  Finally, the *Columbia Records* court found that the defendants implemented technical features intended to promote copyright infringement and never removed lists of the most popular material, which "almost exclusively contained copyrighted works."  *Id*.  The Court therefore finds *Columbia Pictures* distinguishable.

1       MP3 files on Myxer's website – despite all of the internal documents

2       acknowledging such knowledge, and even though Myxer carefully

3       monitors and tracks every aspect of its users' behavior, the better to

4       'monetize' it.

5   (Pl.'s Mot. 5.)  This evidence is less persuasive.  As the court explained in *UMG Recordings II*,

6   "if merely hosting user-contributed material capable of copyright protection were enough to

7   impute actual knowledge to a service provider, the [§] 512(c) safe harbor would be a dead letter

8   because vast portions of [material] on the [I]nternet are eligible for copyright protection." *UMG*

9   *Recordings II*, 665 F. Supp. 2d at 1108.  Indeed, there is no caselaw suggesting that "a provider's

10  general awareness of infringement, without more, is enough to preclude application of

11  [§] 512(c)." *UMG Recordings II*, 665 F. Supp. 2d at 1111; *see Corbis Corp.*, 351 F. Supp. 2d at

12  1108 ("The issue is not whether [defendant] Amazon ["Amazon"] had a general awareness that a

13  particular type of item may be easily infringed.  The issue is whether Amazon actually knew that

14  specific zShops vendors were selling items that infringed [plaintiff] Corbis' ["Corbis"]

15  copyrights.  Corbis provides no evidence from which such actual knowledge could be

16  gleaned.").   As in this case, Amazon provided the court with evidence that "[a]mong the types

17  of videos subject to copyright protection but lawfully available on [its] system were videos and

18  music created by users and videos that it provided, pursuant to arrangements it reached with

19  major copyright holders." *Corbis Corp.*, 351 F. Supp. 2d at 1109.  Indeed, the existence of

20  licenses between Myxer and third parties and MyxerIndies diminishes Plaintiff's argument that

21  Myxer had actual knowledge of infringement because any awareness of copyrighted material

22  may have related to licensed material, only.[24]  Further, Plaintiff is incorrect that Myxer should

23  have actively sought out actual knowledge of infringing material by searching its system:

24  _____

25      [24] Plaintiff contests Myxer's claim that it has obtained licenses from various third parties.  (Pl.'s Reply 4.)
    "Myxer asserts only that it supposedly obtained 'licenses' from third parties for its use of just 14 of the 733 works at

26  issue.  This argument has no effect on the other 719 works, lacks sufficient foundation even as to the 14 works
    identified, and only reinforces that Myxer is able to distinguish licenses and unlicensed [material] on its site." (Pl.'s

27  Reply 4.)  ) Whether Myxer has obtained licenses from third parties is one factor, but not dispositive to any
    determination made by the Court.  (*Id.*)

28

1       Requiring [a service provider] to perform such searches would . . .

2       conflict with the principal articulated in *CCBill,* that the DMCA

3       notification procedures place the burden of policing copyright

4       infringement – identifying the potentially infringing and adequately

5       documenting infringement – squarely on the owners of the copyright.

6 *UMG Recordings II*, 665 F. Supp. 2d at 1110 (internal citations omitted); Pl.'s Mot. 10-12.

7       Accordingly, because the burden is on the copyright holder to give notice of allegedly

8 infringing material and Myxer provides evidence that notice was insufficient and that it did not

9 have actual knowledge of the alleged infringement, the Court **DENIES** Plaintiff's Motion for

10 Summary Judgment to the extent it seeks to find that Myxer had actual knowledge, pursuant to

11 § 512(c)(1)(A)(i).  In any event, even if the Court imputes knowledge of infringement onto

12 Myxer, Myxer remains eligible for safe harbor protection under § 512(c) if it can show that it

13 expeditiously removed or blocked the infringing material, and to which the Court later turns.

14                 2.      Myxer's Awareness of Facts or Circumstances from

15                          Which Infringing Activities Was Apparent

16       Plaintiff argues that Individual Defendants were aware of "red flags" indicating that

17 infringement was occurring on Myxer's Website.  (Pl.'s Mot. 37.)  For example, Plaintiff claims

18 that material listed on Myxer's Website as "Most Popular," "Recent Downloads," or "Just

19 Shared" must undoubtedly be copyrighted, and thus, sufficient to raise a red flag.  (Pl.'s

20 Mot. 14).  In support, Plaintiff cites the Supreme Court's *Grokster* opinion for the proposition

21 that Top 40 songs are "inevitably copyrighted," and asserting that a similar inference should be

22 drawn from the above-listed categories.  *Metro-Goldwyn-Mayer Studios Inc. v. Gokster, Ltd.*

23 (*Gokster*), 545 U.S. 913, 926 (2005).  However, this is not precisely what the Supreme Court

24 said,[25] and, in any event, such a conclusion in that case would not control on the facts of this

25 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26    [25] Plaintiff characterizes the Supreme Court's opinion in *Grokster* as suggesting that Top 40 songs are "inevitably copyrighted." *Grokster,* 545 U.S. at 926.  However, the Supreme Court stated in *Grokster* that the volume

27 of users is a function of free access to copyrighted work. *Id.* ("Users seeking Top 40 songs, for example, or the latest release by Modest Mouse, are certain to be far more numerous than those seeking a free Decameron, and Grokster

28

case.  As noted in other cases, "Not all popular music is copyrighted.  Apart from music on

which the copyright has expired . . . start-up bands and performers may waive copyright in the

hope that it will encourage the playing of their music and create a following that they can

convert to customers of their subsequent works."  *In re Aimster*, 334 F.3d at 652.  Unlike the

defendants in *Grokster* and *In re Aimster*, Myxer asserts that many of the works on the Myxer

Website are from "lesser-known" independent artists and that it has acquired various licenses so

that the existence of copyrighted works on the Website is not necessarily evidence of

infringement.  Def.'s Opp'n 2; Sass Decl. ¶¶ 10-17; SGI ¶ 176*; see UMG Recordings II*, 665 F.

Supp. 2d at 1110; *see In re Aimster*, 334 F.3d at 653. In short, Myxer's awareness of popular

downloads, recently downloaded music, and just shared files does not, as a matter of law,

establish knowledge of a "red flag."

Second, Plaintiff contends that Myxer should have implemented the Audible Magic

fingerprinting system and that the failure to do so indicates the existence of willful blindness to

widespread infringement because implementation would have confirmed that infringement was

occurring.  However, as explained in *UMG Recordings II*: "[Plaintiff] has not established that

the DMCA imposes an obligation on a service provider to implement filtering technology at all,

let alone technology from the copyright holder's preferred vendor or on the copyright holder's

desired timeline."  *UMG Recordings II*, 665 F. Supp. 2d at 1114.  The *UMG Recordings II* court

reasoned:

> If courts were to find that the availability of superior filtering
> systems or the ability to search for potentially infringing files
> establishes — without more — that a service provider has 'the right
> and ability to control' infringement, that would effectively require
> service providers to adopt specific filtering technology and perform
> regular searches.  That, in turn, would impermissibly condition the

___

and StreamCast translated that demand into dollars.").  Thus, in *Grokster*, the Supreme Court did not propose that all
"Top 40" songs are necessarily copyrighted.

1  applicability of [§] 512(c) on a "service provider monitoring its

2  service or affirmatively seeking facts indicating infringing activity."

3  *Id*. at 1113.

4  This is not to say that the use or non-use of filtering tools is irrelevant.  In *Columbia*

5  *Records*, "the [c]ourt found it probative that defendants did not attempt to develop filtering tools

6  or other means of diminishing the use of its product for infringement."  *Columbia Pictures,* 2009

7  WL 6355911, at *11.  Even so , the court acknowledged that "[t]aken alone, the failure to

8  develop a filter would be insufficient to support liability" and that it must be considered in

9  context with other evidence to determine the existence of an unlawful objective on the part of the

10  service provider.  *Id*.  As mentioned above, the facts before the court in *Columbia Records* are

11  distinguishable from the facts before this Court.  (*See supra,* Note 23.)

12  Myxer also asserts that "Audible Magic data about ownership is entirely unworkable

13  considering that many of the same works are authorized [material] uploaded by Myxer's

14  Partners, and Plaintiff's own [A]rtists and representatives upload [material] to Myxer."  (Def.'s

15  Opp'n 4; Bukys Decl. ¶ 9 ("Audible Magic cannot be aware of licencing agreements in effect

16  between Myxer and its [P]artners.  Altogether, an Audible Magic match cannot be given the

17  same weight as a well-formed DMCA notice.  Other technologies suggested by Horowitz in his

18  Expert Report, such as metadata filtering, have intrinsic performance characteristics that make

19  reliance upon them problematic, introducing issues of classification errors and cost/benefit

20  tradeoffs.").)  Thus, to the extent that Plaintiff suggests that Myxer should have taken additional

21  steps to filter infringing material on the Myxer Website, "the DMCA does not place the burden

22  of ferreting out infringement on the service provider."  *UMG Recordings II*, 665 F. Supp. 2d at

23  1112.

24  Accordingly, because Myxer provides evidence that it was not aware of "red flags,"

25  notwithstanding its knowledge of the general proposition that infringing material is often

26  uploaded to websites, the Court **DENIES** Plaintiff's Motion for Summary Judgment to the extent

27  it seeks a determination, as a matter of law, that Myxer was aware of facts or circumstances from

28

1   which infringing activities was apparent, pursuant to § 512(c)(1)(A)(ii).  The Court now

2   proceeds to 17 U.S.C. § 512(c)(1)(A)(iii) ("§ 512(c)(1)(A)(iii)") because (as previously

3   mentioned) even if Myxer is found to have had actual knowledge or awareness of "red flags," it

4   may still escape liability if it expeditiously removed the infringing material at issue.

5                                    ii.       Expeditious Removal, Upon Obtaining Knowledge or

6                                    Awareness

7          A service provider does not lose the limitation of liability "upon notification of claimed

8   infringement as described in paragraph (3), [if it] responds expeditiously to remove, or disable

9   access to, the material that is claimed to be infringing or to be the subject of infringing activity."

10  17 U.S.C. § 512(c)(1)(C); *see Youtube*, 718 F. Supp. 2d at 517; *see Io Group,* 586 F. Supp. 2d

11  at 1149-50; *see UMG Recordings II*, 665 F. Supp. 2d at 1107 (finding expeditious removal

12  where the defendants "designated an agent, and when they received specific notice that a

13  particular item infringed a copyright, they swiftly removed it.") Whether removal is

14  "expeditious" necessarily implicates the circumstances presented in the particular case.

15                  Because the factual circumstances and technical parameters may

16                  vary from case to case, it is not possible to identify a uniform time

17                  limit for expeditious action. . . . Under § 512(c)(1)(C), upon

18                  notification of claimed infringement, the defendant must respond

19                  expeditiously to remove, or disable access to, the material that is

20                  claimed to be infringing or to be the subject of infringing activity.

21  *Youtube*, 718 F. Supp. 2d at 517; *see* 17 U.S.C. § 512(c)(1)(A)(iii).

22          Here, Plaintiff focuses on Myxer's response to its initial Complaint and other DMCA

23  notices.  When the Complaint was filed in June 2008, thereby identifying the allegedly

24  infringing works at issue, Myxer deemed the Complaint a DMCA notice and removed these

25  works from the Myxer Website.  (SGI ¶ 133.)  Pursuant to its policy of emailing users who have

26  uploaded infringing material, Myxer produced three emails for 288 of the works named in the

27  Complaint.  (SGI ¶ 135.)  Plaintiff alleges that sending only three emails is insufficient to

28

1  constitute expeditious removal. (Pl.'s Reply 22.) Plaintiff also asserts that many of the works at

2  issue returned to the Myxer Website by March 2009. (SGI ¶ 136; Pl.'s Reply 21-22: Def.'s SOF

3  ¶ 136.) Finally, Plaintiff contends that Myxer "has never terminated any user under its supposed

4  policy; and that even if it did so, that user could immediately re-register with a different user

5  name and resume infringing." (Pl.'s Mot. 29.)

6       In response, Myxer has presented evidence that it responds to DMCA notices, removes

7  infringing material (supposedly within one business day of receiving notice), and also responds

8  to informal notices of infringement. (SGI ¶¶ 189, 192.) On the basis of such evidence, Myxer

9  claims that it has disabled more than 23,000 items in response to DMCA notices or for suspected

10  infringement, and has terminated at least 2,371 individual Artist accounts. (Def.'s Opp'n 6.)

11  Further, although the parties do not contest whether Myxer produced emails, they disagree over

12  whether the number of emails Myxer produced is sufficient to constitute expeditious removal.

13  These disputes establish the existence of factual disputes for trial.

14       Accordingly, because genuine issues of material fact remain as to whether Myxer

15  expeditiously removed and/or disabled access to infringing material, the Court **DENIES**

16  Plaintiff's Motion for Summary Judgment to the extent it seeks to find that Myxer has failed to

17  satisfy the requirements of § 512(c)(1)(A)(iii).

18                  iii.    Financial Benefit and the Right and Ability to Control

19       A service provider remains liable for copyright infringement, and thereby loses protection

20  under § 512(c), if it receives a financial benefit directly attributable to the infringing activity in a

21  case in which the service provider has the right and ability to control such activity. *See* 17

22  U.S.C. § 512(c)(1)(B). "Both elements must be met for the safe harbor to be denied." *Io Group*,

23  586 F. Supp. 2d at 1150 (citation omitted). "These requirements grew out of the common law

24  standard for vicarious liability, and the Ninth Circuit has indicated that these elements under the

25  DMCA are to be interpreted consistently with common law." *Id.*; Def.'s Opp'n 24; Pl.'s Reply

26  16-17; *see CCBill*, 488 F.3d at 1117 (holding that "'direct financial benefit' should be interpreted

27  consistent with the similarly-worded common law standard for vicarious copyright liability.").

28

1

2        1.   Financial Benefit

3   "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal

4 relationship between the infringing activity and any financial benefit a defendant reaps,

5 regardless of how substantial the benefit is in proportion to a defendant's overall profits."

6 *Ellison*, 357 F.3d at 1079; *see* 17 U.S.C. § 512(c)(1)(B).  The relevant inquiry is "whether the

7 infringing activity constitutes a draw for subscribers, not just an added benefit."  *CCBill*, 488

8 F.3d at 1117 (quoting *Ellison*, 357 F.3d at 1079).  "The law is clear that to constitute a direct

9 financial benefit, the 'draw' of infringement need not be the primary, or even a significant,

10 draw-rather, it need only be 'a' draw."  *Arista Records*, 633 F. Supp. 2d at 156; *see Ellison*, 357

11 F.3d 1079.  In *Napster*, the Ninth Circuit stated:

12     Ample evidence supports the district court's finding that [defendant

13     Napster's] future revenue is directly dependent upon "increases in

14     userbase."  More users register with the Napster system as the

15     quality and quantity of available music increases . . . . [T]he district

16     court did not err in determining that [the defendant] financially

17     benefits from the availability of protected works on its system.

18 *Napster*, 239 F.3d at 1023.  In *Youtube*, the court explained:

19     In determining whether the financial benefit criterion is satisfied,

20     courts should take a common-sense, fact-based approach, not a

21     formalistic one.  In general, a service provider conducting a

22     legitimate business would not be considered to receive a "financial

23     benefit directly attributable to the infringing activity" where the

24     infringer makes the same kind of payment as non-infringing users of

25     the provider's service.  Thus, receiving a one-time set-up fee and flat

26     periodic payments for service from a person engaging in infringing

27     activities would not constitute receiving a "financial benefit directly

28

1     attributable to the infringing activity."  Nor is subparagraph (B)

2     intended to cover fees based on the length of the message (per

3     number of bytes, for example) or by connect time.  It would

4     however, include any such fees where the value of the service lies in

5     providing access to infringing material.

6 *Youtube*, 718 F. Supp. 2d at 521.

7     Plaintiff alleges that Myxer's business model is substantially similar to the one in *Napster*,

8 and additionally, "Myxer earns revenue each time these ad[vertisement]s are displayed, and even

9 more revenue if the user clicks on them."  (Pl.'s Mot. 7, 31.)  Plaintiff claims:

10     Myxer's financial expert has now admitted that Myxer receives

11     revenue from sales of Plaintiff's Schedule A works[26]. . . . Myxer also

12     does not present any evidence to meet its burden to show that it does

13     not receive advertising revenue resulting from users infringing

14     Plaintiffs' copyrights, as well as more broadly from the "draw" of

15     Plaintiffs' works.  To the contrary, [Myxer's] financial expert and

16     head of technology both admit Plaintiffs' works are a "draw."

17 (Pl.'s Mot. 31; Pl.'s Reply 2, 12; Supp. Miller Decl., Ex. BB [Tregillis Depo. at 7].)

18     In response, Myxer argues that because the Myxer Website has substantial non-infringing

19 uses and does not promote infringing material to draw users, it is "a service provider conducting

20 a legitimate business," and so should not lose protection under § 512(c).  *Youtube*, 718 F. Supp.

21 2d at 521. Def.'s Opp'n 20.  Myxer asserts that the Myxer Website was created with the "lesser-

22 known" independent artist in mind and is devoted to Partners and MyxerIndies, as well as to

23 Artists who provide their own copyrighted material.  (Def.'s Opp'n 2.)  Moreover, Tregillis

24 asserts that "a challenge that Internet-based companies such as Myxer face is that as page views

25

26    [26] The financial expert Plaintiff refers to is Christian Tregillis ("Tregillis").  Tregillis has "been retained by
counsel for defendants to analyze damages and related financial, accounting and economic issues pertaining to the
27 claims of plaintiffs against defendant for copyright infringement."  (Decl. of Tregillis in Supp. of Def.'s Opp'n to Pl.'s
Mot. for Summ. J. (Tregillis Decl") ¶ 1.)

28

1    and ad impressions increase due to increased traffic, so too does the inventory a website has to

2    sell.  In addition, it is common that the quality of ads will decrease as this occurs." (Tregillis

3    Decl. ¶ 7.)  Finally, compared to *Napster*, where the Ninth Circuit found that 87% of defendant

4    Napster's files were infringing, or in *Columbia Records* where infringement represented 90-95%

5    of the defendant's business, Myxer claims that "all suspected infringement to date (not just

6    Plaintiff's) represents less than 1% of total uploaded [material]."[27]  (Def.'s Opp'n 20; Def.'s SAF

7    ¶ 190; *see supra,* Note 23.)

8          The central question here is whether the infringing activity constitutes a "draw" for users,

9    not just an added benefit.  *See Ellison*, 357 F.3d at 1079.  Tregillis admits that Plaintiff's works

10   draw users to the Myxer Website, in part.  (*Id.* [Tregillis Depo. at 13] ("I believe they are able to

11   draw a user to the Myxer Website, but there's more that draws a user to the Myxer Website than

12   just popular ringtones. . . . I can see how they could be a draw.  However, they are not nearly the

13   draw that they also could be if they were advertised and were prominently featured as part of the

14   Myxer Website and Myxer's strategy.").  Indeed, because "the relevant inquiry is whether there

15   is a causal relationship between the infringing activity and any financial benefit" Myxer

16   receives, the record supports the conclusion that Myxer undoubtedly receives some financial

17   benefit from the infringing activity.  (Supp. Miller Decl., Ex. BB [Tregillis Depo. at 7].)

18   However, to the extent that infringing material represents only 1% of total uploaded material on

19   Myxer's Website and users may also upload their own content, it remains unclear to what degree

20   Plaintiff's works serve as a "draw."  (Def.'s SAF ¶ 190.)  Without more, the Court cannot, on a

21   motion for summary judgment, resolve this issue in favor of Plaintiff and against Myxer.

22         Because it is unclear whether the allegedly infringing conduct is more than an "added

23   benefit," the Court cannot reasonably find at this stage that Myxer derives a financial benefit

24   from the allegedly infringing activity.  Accordingly, Plaintiff's Motion for Summary Judgment is

25

26          [27]  At oral argument, the Court expressed: "No, my point was that UMG seeks to characterize Myxer and conduct on the part of Myxer similar to that [which] was in the *Napster* case, but there's no question that it's on the

27   extreme end of the spectrum with *Veoh* and *Youtube*, I think, on the other end." (*See* Transcript of Aug. 27, 2010, 25:12-16.)

28

1    **DENIED** to the extent it seeks to find that Myxer derives a financial benefit from the allegedly

2    infringing activity, pursuant to 17 U.S.C. § 512(c)(1)(B).

3                              2.      Right and Ability to Control

4           "Turning first to the text of the statute, numerous provisions in the DMCA make clear that

5    the section 512(c) safe harbor applies *only* to service providers that have substantial control over

6    users' access to material on their systems." *UMG Recordings II*, 665 F. Supp. 2d at 1112

7    (emphasis in original).  However, the "'right and ability to control' the infringing activity, as the

8    concept is used in the DMCA, cannot simply mean the ability of a service provider to remove or

9    block access to materials posted on its website or stored in its system." *Hendrickson*, 165 F.

10   Supp. 2d at 1093-94; *see Corbis Corp.*, 351 F. Supp. 2d at 1110; *see Costar Group*, 164

11   F.Supp.2d at 704.  A contrary holding would render the DMCA internally inconsistent:

12                  The DMCA specifically requires a service provider to remove or

13                  block access to materials posted on its system when it receives notice

14                  of claimed infringement.  The DMCA also provides that the

15                  limitations on liability only apply to a service provider that has

16                  adopted and reasonably implemented . . . a policy that provides for

17                  the termination in appropriate circumstances of [users] of the service

18                  provider's system or network who are repeat infringers.  Congress

19                  could not have intended for courts to hold that a service provider

20                  loses immunity under the safe harbor provision of the DMCA

21                  because it engages in [these] acts that are specifically required by the

22                  DMCA.

23   *Hendrickson*, 165 F. Supp. 2d at 1093-94 (internal quotes and citations omitted); *see Ellison*

24   *v. Robertson,* 189 F. Supp. 2d 1051, 1061 (C.D. Cal. 2002), *aff'd in part and rev'd in part on*

25   *different grounds*, 357 F.3d 1072, 1079 n. 10 (9th Cir. 2004) ("The [c]ourt does not accept that

26   Congress would express its desire to do so by creating a confusing, self-contradictory catch-22

27   situation that pits 512(c)(1)(B) and 512(c)(1)(C) directly at odds with one another, particularly

28

                                              52

1  when there is a much simpler explanation: the DMCA requires more than the mere ability to

2  delete and block access to infringing material after that material has been posted in order for the

3  ISP to be said to have 'the right and ability to control such activity.'"); *see UMG Recordings* II,

4  665 F. Supp. 2d at 1115 (emphasis added) ("If the [c]ourt adopted principle (1) from *Napster* it

5  would render the statutory phrase 'right and ability to control' redundant, because the 'ability to

6  block infringers' access for any reason whatsoever' is already a prerequisite to satisfying the

7  requirements of § 512(i)(1)(A).  If the [c]ourt adopted principle (2), it would run afoul of

8  § 512(m), which states explicitly that nothing in [§] 512 shall be construed to condition the safe

9  harbors on 'a service provider monitoring its service or affirmatively seeking facts indicating

10  infringing activity.'").  Borrowing from patent infringement cases involving the intent

11  requirement for contributory liability of trademark licensors, one court has concluded that,

12  instead, '*something more' is required*."  *Io Group*, 586 F. Supp. 2d at 1151.

13       Defining the "something more" has proved troublesome.  Although "the provider need

14  not monitor or seek out facts indicating such activity. . . . [p]recisely what constitutes the

15  requisite right and ability to control in the present context is somewhat hard to define . . . ."

16  *Youtube*, 718 F. Supp. 2d at 527; *Io Group*, 586 F. Supp. 2d at 1152.  Consistent with the

17  discussion above, "[c]ourts that have found that a service provider's 'right and ability to control'

18  exposes it to liability have identified a greater level of control than the threshold level that is

19  required simply to qualify for the section 512(c) safe harbor."  *UMG Recordings II*, 665 F.

20  Supp. 2d at 1114.  Indeed, "the pertinent inquiry is not whether [the defendant] has the right and

21  ability to control its system, but rather, whether it has the right and ability to control the

22  infringing activity."  *Io Group*, 586 F. Supp. 2d at 1150.  "The right and ability to control the

23  activity requires knowledge of it, which *must be item-specific*."  *Youtube*, 718 F. Supp. 2d at 527

24  (internal citations omitted) (emphasis added).  *see Tur v. YouTube, Inc.*, 2007 WL 1893635, at

25  *3 (C.D. Cal. June 20, 2007) (holding that the requisite right and ability to control "presupposes

26  some antecedent ability to limit or filter copyrighted material.");  *see Youtube*, 718 F. Supp. 2d at

27  527 (holding that "[t]here may be arguments whether revenues from advertising, applied equally

28

to space regardless of whether its [materials] are or are not infringing are 'directly attributable to' infringements, but in any event the provider must know the particular case before he can control it.").

In *Fonovisa, Inc. v. Cherry Auction, Inc.*, the plaintiff owned copyrights and trademarks in certain music recordings and claimed that the defendant, a swap meet proprietor, was liable for third-party vendors' sales of infringing counterfeit recordings of its music recordings. *See Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259 (9th Cir. 1996). The Ninth Circuit found that there were sufficient elements of control where the defendant could terminate vendors for any reason, promoted the swap meet, and controlled customers' access to the swap meet area. *Id*. at 262. "[T]he defendant evidently agreed to provide the Sheriff with information about each vendor, but did not do so." *Io Group*, 586 F. Supp. 2d at 1152; *see Fonovisa,* 76 F.3d at 264. "In essence, the swap meet proprietor and the infringing vendors engaged in a mutual enterprise of infringement." *Io Group*, 586 F. Supp. 2d at 1152; *see Visa*, 494 F.3d at 798.

*Napster* applied the *Fonovisa* concept in the online context. *See Napster*, 239 F.3d 1004. In *Napster,* the Ninth Circuit concluded: "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Napster*, 239 F.3d at 1023 (citing *Fonovisa*, 76 F.3d at 262). "To escape imposition of vicarious liability, the reserved right to police must be exercised to its fullest extent.  Turning a blind eye to detectable acts of infringement for the sake of profit gives rise to liability." *Id*.  Further:

> [The] plaintiffs successfully established a likelihood of success on
> the merits where [defendant] Napster controlled access to its system,
> reserved the right to terminate user accounts for any reason and had
> the ability to locate infringing material listed on its search indices,
> but nonetheless failed to police its system to prevent the exchange of
> copyrighted material.

*Io Group*, 586 F. Supp. 2d at 1152; *see Napster*, 239 F.3d at 1023-24.

"More recently in the electronic commerce context, other businesses have been found to not have the requisite right and ability to control infringing activity." *Io Group*, 586 F. Supp. 2d at 1152.  In *Io Group*, the court found that the defendant Google "did not have the right and ability to control the infringing activity of third-party websites because it did not have contractual relationships with the third-party websites, and because it lacked the practical ability to police their activities."  *Id.*  Similarly, although the plaintiff in *Visa* alleged that defendant Visa ("Visa") was secondarily liable for copyright infringement because its credit card payment services facilitated the purchase of infringing material online, the Ninth Circuit concluded that Visa had no role in the alleged infringing activity.  *See Visa*, 494 F.3d at 802-05.  The *Io Group* court explained: "Although . . . Visa could exert financial pressure by blocking access to its payment systems . . . for vicarious liability to attach, [Visa] must have the right and ability to supervise and control the infringement, not just affect it." *Io Group*, 586 F. Supp. 2d at 1152; *see Visa*, 494 F.3d at 805; *see Cybernet Ventures,* 213 F. Supp. 2d at 1181-82.

*Io Group* distinguished *Napster* from the facts before it: "Unlike *Napster*, there is no suggestion that [the defendant] aims to encourage copyright infringement on its system." *Io Group*, 586 F. Supp. 2d at 1153.  Second, "there is no evidence that [the defendant] can control what content users choose to upload before it is uploaded."  *Id.*  Further, although the plaintiff requested the defendant to "pre-screen every submission before it is published," the *Io Group* court declined to require such a policy because "[the defendant] . . . submitted evidence that it ha[d] received hundreds of thousands of video files from users.  The court explained:

> Even if such a review were feasible, there is no assurance that [the
> defendant] could have accurately identified the infringing [material]
> in question.  True, [the defendant] maintains a central index of
> videos on its servers.  However, unlike Napster (whose index was
> comprised entirely of pirated material), [the defendant's] ability to
> control its index does not equate to an ability to identify and

1    terminate infringing videos.  For the most part, the files in question

2    did not bear titles resembling [the] plaintiff's works; and, [the

3    plaintiff] did not provide [the defendant] with its titles to search.

4  *Id*. at 1153.  Ultimately, the *Io Group* court found that defendant adequately policed its system,

5  as the record showed that it had responded promptly to infringement notices, terminated

6  infringing material on its system and on users' hard drives, and terminated repeat infringers'

7  accounts.  *See Io Group*, 586 F. Supp. 2d at 1153.  The court stated: "All of this indicates that

8  [the defendant] has taken steps to reduce, not foster, the incidence of copyright infringement on

9  its website."  *Id*. at 1154.

10        Similarly, in *Hendrickson*, the owner of a copyright in a motion picture sued the Internet

11  website Amazon.com ("Amazon"), for copyright infringement. *Hendrickson*, 298 F. Supp. 2d at

12  918.  The court found "no evidence to suggest that Amazon had the ability to know that an

13  infringing sale by a third party seller would occur" because "[it] merely provided the forum for

14  an independent third party seller to list and sell his merchandise.  Amazon was not actively

15  involved in the listing, bidding, sale or delivery of the DVD." *Id*.  Moreover, the court

16  emphasized that just because "Amazon generated automatic email responses when the DVD was

17  listed and again when it was sold, does not mean that Amazon was actively involved in the sale."

18   *Id*.  The court noted:

19                  Once a third party seller decides to list an item, the responsibility is

20                  on the seller to consummate the sale.  While Amazon does provide

21                  transaction processing for credit card purchases, that additional

22                  service does not give Amazon control over the sale.  In sum,

23                  Amazon's evidence shows that it did not have control of the sale of

24                  DVD.

25  *Id*.

26        Here, Plaintiff contends that Myxer has the "right and ability to control" because Myxer

27  "knows it possesses many other methods of limiting the infringement on its website," but

28

declines to implement them.  (Pl.'s Mot. 16.)  Plaintiff states: "For one thing, virtually all of the MP3 files uploaded to Myxer's website by users are embedded with metadata that contain the name of the song and the recording artists, and sometimes, the copyright owner," which Myxer "could . . . use . . . to filter out works for which it possesses no rights, but chooses not to do so." (Pl.'s Mot. 16, 31-33; Pl.'s Reply 12.)  However,"[d]eclining to change business operations is not the same as declining to exercise a right and ability to control infringing activity." *Io Group*, 586 F. Supp. 2d at 1154.  Further, as already explained, "the DMCA does not require service providers to deal with infringers in a particular way."  *Id*.; *see CCBill*, 488 F.3d at 1109.

Although Myxer has the right and ability to remove users who upload infringing material, "[t]he process of uploads into downloadable format is entirely automated."[28]  (Willis Decl. ¶ 25.) Moreover, "[i]t is the user that downloads ringtone[s] to the user's cell[ular] phone.  Myxer does not download any ringtones." (Madden Decl. ¶ 29.)  Evidence presented by Myxer shows that Myxer possesses neither "the right [nor] ability to control the works at issue.  As set forth above, the allegedly infringing works were not uploaded by Myxer and Myxer did not select or preview them." (Madden Decl. ¶ 10.)

Accordingly, because the evidence is in conflict regarding whether and to what extent Myxer has the right and ability to control infringing activity, pursuant to 17 U.S.C. § 512(c)(1)(B), Plaintiff's Motion for Summary Judgment is **DENIED**.

iv.     Conclusion

Because genuine issues of material fact exist as to whether Myxer is eligible for protection under § 512(c), summary judgment is inappropriate as to Myxer's safe harbor affirmative defense and Plaintiff's Motion for Summary Judgment is **DENIED** to the extent it seeks to find Myxer ineligible for safe harbor protection under § 512(c).

---

[28]  Plaintiff objects to this evidence on the grounds that it lacks foundation, but it is clear that Myxer does not actually or literally assist users in the uploading of material into a downloadable format, so that this objection is overruled.  (Pl.'s Objections 36.)

2.    Fair Use

"The Copyright Act was intended to promote creativity, thereby benefitting the artist and the public alike.  To preserve the potential future use of artistic works for purposes of teaching, research, criticism, and news reporting, Congress created the fair use exception."[29]  *Arriba*, 336 F.3d at 820.  "A claim of copyright infringement is subject to certain statutory exceptions, including the fair use exception.  This exception permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."  *Arriba*, 336 F.3d at 817 (citing *Campbell v. Acuff-Rose Music, Inc.* (*Campbell*), 510 U.S. 569, 577 (1994)); *see Realnetworks*, 641 F. Supp. 2d at 941 ("The DMCA itself is, of course, rooted in the Copyright Act.  The DMCA's [§] 1201(c) merely preserves the general fair use defense to copyright infringement.  It does not create new exemptions, nor does it exempt from liability circumvention tools otherwise deemed unlawful under §§ 1201(a)(2) or (b)(1)."); *see* 17 U.S.C. § 1201(c)(3).  17 U.S.C. § 107 ("§ 107") provides:

> [T]he fair use of a copyrighted work . . . for purposes such as criticism [and] comment . . . is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include – (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

---

[29]  17 U.S.C. § 107 ("§ 107") provides in pertinent part: "The fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship or research is not an infringement of copyright."

17 U.S.C. § 107; *see Napster*, 239 F.3d at 1014.  "A court is not restricted to these factors in a fair use analysis; rather, the analysis is a flexible one that is performed on a case-by-case basis." *Leadsinger, Inc. v. BMG Music Pub.* (*Leadsinger*), 512 F.3d 522, 529 (9th Cir. 2008); *see Savage v. Council on Am.-Islamic Relations, Inc.*, 2008 WL 2951281, *4 (N.D. Cal. July 25, 2008) (holding that "[a]ll fair use factors must be explored and weighed together, not in isolation, while considering the purposes of the Copyright Act."); *see Harper & Row Publishers, Inc. v. Nation Enters.* (*Harper & Row*), 471 U.S. 539, 560 (1985) (internal citations omitted) ("The factors enumerated in the section are not meant to be exclusive: '[S]ince the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts.'").

The fair use doctrine is evaluated as a "mixed question of law and fact." *Harper & Row*, 471 U.S. at 560.  Nonetheless, it is well-established that a court can resolve the issue of fair use on a motion for summary judgment when no material facts are in dispute. *See Leadsinger*, 512 F.3d at 530; *see Hustler Magazine, Inc. v. Moral Majority Inc.* (*Hustler Magazine*), 796 F.2d 1148, 1151 (9th Cir. 1986) ("If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as fair use of the copyrighted work."); *see Fisher v. Dees*, 794 F.2d 432, 435-36 (9th Cir. 1986) (finding fair use where the operative facts were undisputed or assumed; the court is to make fair use judgments, which "are legal in nature").

a.      Purpose and Character of the Use

"Analysis of the first of the four statutory factors comprises at least three separate considerations: the general purpose or character of the use, whether the use is commercial in nature, and whether the use is 'transformative.'" *Sofa Entm't, Inc. v. Dodger Prods., Inc.* (*Sofa Entm't*), 2010 WL 4228343, *4 (C.D. Cal. July 12, 2010).

i.      Purpose of the Use

The Court first considers whether Myxer's copying of Plaintiff's works is the type of conduct that is likely to be considered fair use.  "This aspect of the first of the four statutory factors speaks to the question of whether the character of the secondary-user's work is created to serve purposes of the type cited by the statute as legitimate goals of fair use."  *Sofa Entm't,* 2010 WL 4228343, at *4.  The list set out in § 107's preamble is not exhaustive, but identifies "purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research," as examples of the types of uses for which fair use may provide an affirmative defense.  *Harper & Row*, 471 U.S. at 561 (internal citations omitted).  Further, "whether a use referred to in the first sentence of [§] 107 is a fair use in a particular case will depend upon the application of the determinative factors, including those mentioned in the second sentence."  *Id*.  Because the copying of Plaintiff's works serves a purely entertainment purpose, which is not of the type cited by § 107 as a legitimate goal of fair use, Myxer's copying of Plaintiff's works falls outside the scope of uses generally considered "fair" under the doctrine.  Def.'s Opp'n 22; Ring Decl. ¶ 2-3; *see Sofa Entm't,* 2010 WL 4228343, at *3.

ii.      Commercial or Nonprofit Use

"This 'purpose and character' element . . . requires the district court to determine whether the allegedly infringing use is commercial or noncommercial."  *Napster*, 239 F.3d at 1015; *see Campbell*, 510 U.S. at 584-85.  "A commercial use weighs against a finding of fair use but is not conclusive on the issue."  *Napster*, 239 F.3d at 1015.  "Direct economic benefit is not required to demonstrate a commercial use.  Rather, repeated and exploitative copying of copyrighted works, even if the copies are not offered for sale, may constitute a commercial use."  *Id*.; *see Worldwide Church of God*, 227 F.3d at 1118 (finding that a church that copied religious text for its members "unquestionably profit[ed]" from the unauthorized "distribution and use of [the text] without having to account to the copyright holder"); *see Campbell*, 510 U.S. at 584-85 (holding that "the mere fact that a use is educational and not-for-profit does not insulate from a finding of infringement any more than the commercial character of a use bars a finding of fairness"); *see*

*Am. Geophysical Union v. Texaco, Inc.* (*Texaco*), 60 F.3d 913, 922 (2d Cir. 1994) (finding that researchers at for-profit laboratory gained indirect economic advantage by photocopying copyrighted scholarly articles); *see also Sega Enters. Ltd. v. MAPHIA*, 857 F. Supp. 679, 687 (N.D. Cal. 1994) (finding commercial use when individuals downloaded copies of video games "to avoid having to buy video game cartridges").

Here, as in *Napster*, "commercial use is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies." *Napster*, 239 F.3d at 1015; Ring Decl. ¶¶ 2-5 ("Obviously, it is much more difficult for [Plaintiff] to sell ringtones when unauthorized companies such as Myxer offer [Plaintiff's] copyrighted ringtones for free.").  Indeed, Myxer runs a for-profit endeavor and concedes that Plaintiff's works appear on the Myxer Website.  To the extent that Myxer's use of Plaintiff's works is commercial, this weighs against fair use.

iii. Transformative Use

The final part of the inquiry "as to this [purpose and character] factor involves the transformative nature of the use." *Arriba*, 336 F.3d at 818.  "This . . . focuses on whether the new work merely replaces the object of the original creation or instead adds a further purpose or different character." *Napster*, 239 F.3d at 1015 (internal citations omitted); *see Campbell,* 510 U.S. at 579.  In *Arriba*, the Ninth Circuit explained:

> The central purpose of this investigation is to see . . . whether the new work merely supercedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative.

*Arriba*, 336 F.3d at 818.

"The more 'transformative' the use of a copyrighted work, the more likely it is that the use will come within the protection of the fair use defense." *Sofa Entm't,* 2010 WL 4228343, at *5.

However, courts have rejected the argument that retransmission in a different medium is "transformative" within the meaning of the fair use doctrine. *Napster*, 239 F.3d at 1015 (citing *Arriba*, 336 F.3d at 818); *see Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998); *see UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000).

In *Arriba*, the Ninth Circuit was tasked with determining whether the display and transmission of "thumbnail" pictures in a different medium constituted fair use. *Arriba*, 336 F.3d at 818-19. The court concluded that defendant Arriba's ("Arriba") "use of the images serve[d] a different function than [plaintiff Kelly's ("Kelly")] use – improving access to information on the [I]nternet versus artistic expression." *Id.* The court was guided by the fact that Kelly's pictures served an aesthetic purpose, whereas Arriba's thumbnails were contained on search engine results pages, and of significantly poorer quality. The Ninth Circuit explained:

> [Arriba's] use of [Kelly's] images promotes the goals of the Copyright Act and the fair use exception. The thumbnails do not stifle artistic creativity because they are not used for illustrative or artistic purposes and therefore do not supplant the need for the originals. In addition, they benefit the public by enhancing information-gathering techniques on the [I]nternet.

*Id.* at 820. Thus, "it would be unlikely that anyone would use [Arriba's] thumbnails for illustrative or aesthetic purposes because enlarging them sacrifices their clarity. Because [Arriba's] use is not superseding [Kelly's] use, but, has created a different purpose for the images, [Arriba's] use is transformative." *Id.* at 819. In *Arriba*, the Ninth Circuit distinguished the facts before it from *Worldwide Church of God v. Philadelphia Church of God, Inc.*, in which the Ninth Circuit held:

> copying a religious book to create a new book for use by a different church was not transformative. The second church's use of the book was merely to make use of the same book for another church

1             audience. . . . where the use is for the same instinctive purposes as

2             the copyright holder's . . . such use seriously weakens a claim of fair

3             use.

4 *Id.*; *see Worldwide Church of God v. Phila. Church of God, Inc.* (*Worldwide Church of God*),

5 227 F.3d 1110 (9th Cir. 2000).

6        Here, Myxer argues that its users transform copies of sound recordings they already own

7 into ringtones, thereby engaging in "space-shifting."[30]  (Def.'s Opp'n 22.)  In *Napster,* the

8 Ninth Circuit explained that a user engages in "space-shifting" when he transforms sound

9 recordings he already owns for his own personal use on his own cellular phone.  *See Napster*,

10 239 F.3d at 1019 (reaffirming that space-shifting of musical compositions and sound recordings

11 may constitute fair use); *see Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*,

12 180 F.3d 1072, 1079 (9th Cir. 1999) ("Rio [a portable MP3 player] merely makes copies in order

13 to render portable, or 'space-shift,' those files that already reside on a user's hard drive. . . . Such

14 copying is a paradigmatic noncommercial personal use."); *see Sony Corp. of Am. v. Universal*

15 *City Studios, Inc.* (*Universal City Studios*), 464 U.S. 417, 423 (1984) (finding that

16 "time-shifting," is fair use where a video tape recorder owner records a television show for later

17 viewing); *see Realnetworks*, 641 F. Supp. 2d at 942 (holding "that a consumer has a right to

18 make a backup copy of a DVD for their own personal use").

19        Downloading of Plaintiff's works may involve the following: (1) a user uploads music he

20 already owns and merely transforms that copy into a ringtone for personal use; or (2) a user

21 uploads a sound recordings he already owns and allows users in the general public to transform

22 it into a ringtone, also.  Users who transform sound recordings they already own for personal

23 use, "make personal, non-commercial use of the ringtones, which is presumptively fair."  (Def.'s

24

25        [30]  "Space-shifting occurs when a Napster user downloads MP3 music files in order to listen to music he

26 already owns on audio CD."  *Napster*, 239 F.3d at 1014, 1019; *see Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999); *see also Sony BMG Music Entm't v. Tenebaum*, 672 F.

27 Supp. 2d 217, 221 (D. Mass. 2009) (holding that "file sharing for the purposes of sampling music prior to purchase or space-shifting to store purchased music more efficiently might offer a compelling case for fair use.").

28

1    Opp'n 22.)  However, when users upload sound recordings to become available to the general

2    public, the users no longer engage in "space-shifting."  *See MP3.com,* 92 F. Supp. 2d at 351-52

3    (finding that space-shifting of MP3 files is not fair use even when previous ownership is

4    demonstrated before a download is allowed); cf. *Religious Tech. Ctr. v. Lerma,* 1996 WL

5    633131, at *6 (E.D. Va. Oct. 4, 1996) (suggesting that storing copyrighted material on computer

6    disk for later review is not a fair use).  As the court in *Realnetworks* explained:

7              while it may well be fair use for an individual consumer to store a

8              backup copy of a personally-owned DVD on that individual's

9              computer, a federal law has nonetheless made it illegal to

10             manufacture or traffic in a device or tool that permits a consumer to

11             make such copies.

12   *Realnetworks*, 641 F. Supp. 2d at 942.  To the extent that users' uploaded material becomes

13   available to the general public, and which appears to be the case here since users may share

14   uploaded material via "'Share It' on numerous third-party websites; or 'Embed It' on [their] own

15   website[s];" or access uploaded material on "Most Popular," "Recent Downloads," and "Just

16   Shared," users no longer engage in space-shifting.[31]  (Pl.'s Mot. 8.)

17         Myxer also argues: "the ringtones serve a different function (notification and promotion),

18   than the original song (aesthetic pleasure).  A use that transforms the work, imbuing it with a

19   'further purpose,' is fair."  (Def.'s Opp'n 22.)  However, to the extent that retransmitting Plaintiff's

20   works into a different medium is analogous to the conduct described in *Worldwide Church of*

21   *God*, the Court is not inclined to find a different purpose, and therefore, unpersuaded by the

22

23

24         [31]   Further, although the burden lies with Myxer to establish this affirmative defense, Myxer provides no
25   evidence to support the contention that users engage in any substantial space-shifting.  *See Texaco*, 60 F.3d at 922.
     Therefore, in light of the other evidence presented, namely that a majority of the uploaded material is not purchased
26   and becomes available to the general public, the Court cannot find that the downloading of purchased material for
     strictly personal use, and thus, space-shifting, exists on the Myxer Website in any meaningful way.  *See Universal*
27   *City Studios*, 464 U.S. at 454-56.

28

1  argument that the ringtones serve a different function.  *See Napster*, 239 F.3d at 1015; *see*

2  *Arriba*, 336 F.3d at 818.

3        Accordingly, because Myxer's users do not engage in space-shifting and instead, merely

4  retransmit Plaintiff's works into a different medium, the Court cannot find that Myxer's use of

5  Plaintiff's works is transformative.

6  iv.    Conclusion

7        Because Myxer's use of Plaintiff's copyrighted works serves none of the purposes cited by

8  § 107 as legitimate goals of fair use, and is not transformative, but rather, commercial, the Court

9  weighs this factor against finding fair use.  *See Arriba*, 336 F.3d at 819; *see Napster*, 239 F.3d at

10  1015.

11  b.    <u>Nature of the Work</u>

12        The second of the four statutory factors considers the nature of Plaintiff's works.  "Works

13  that are creative in nature are closer to the core of intended copyright protection than are more

14  fact-based works."  *Arriba*, 336 F.3d at 820; *see Napster*, 239 F.3d at 1016 (internal citations

15  omitted) (finding that the "plaintiffs' copyrighted musical compositions and sound recordings are

16  creative in nature . . . which cuts against a finding of fair use under the second factor.").  Indeed,

17  "[t]he scope of fair use is greater when informational as opposed to more 'creative' works are

18  involved."  *Hustler Magazine*, 796 F.2d at 1154-55; *see Marcus v. Rowley*, 695 F.2d 1171, 1176

19  (9th Cir. 1983); *see Harper & Row*, 471 U.S. 539, 563 (1985) ("The law generally recognizes a

20  greater need to disseminate factual works than works of fiction or fantasy."); *see also Universal*

21  *City Studios*, 464 U.S. at 455 n. 40 ("Copying a news broadcast may have a stronger claim to fair

22  use than copying a motion picture.").  Here, it is not disputed that Plaintiff's original sound

23  recordings are creative in nature.  (Def.'s Opp'n 22-23.)

24        "The fact that a work is published or unpublished is also a critical element of its nature.

25  Published works are more likely to qualify as fair use because the first appearance of the artist's

26  expression has already occurred."  *Arriba*, 336 F.3d at 820; *see Sofa Entm't*, 2010 WL 4228343,

27  at *8; *see Harper & Row*, 471 U.S. at 550 (noting that "the fair use doctrine was predicated on

28

65

1   the author's implied consent to 'reasonable and customary' use when he released his work for

2   public consumption").  But again, that factor does not trump the creative nature of the works or

3   allow for the appropriation of copyrighted material for commercial exploitation.

4          Accordingly, although Plaintiff's registered works are published, because they are

5   creative in nature, this factor weighs slightly against finding fair use.

6                              c.      The Portion Used

7          The third of the four statutory factors considers the "amount and substantiality" of the

8   portion of the original copyrighted work used "in relation to the copyrighted work as a whole."

9   17 U.S.C. § 107(3).  "While wholesale copying does not preclude fair use per se, copying an

10  entire work militates against a finding of fair use."  *Arriba*, 336 F.3d at 820 (citing *Worldwide*

11  *Church of God*, 227 F.3d at 1118); *see Napster*, 239 F.3d at 1016.  "[T]he extent of permissible

12  copying varies with the purpose and character of the use.  If the secondary user only copies as

13  much as is necessary for his or her intended use, then this factor will not weigh against him or

14  her."  *Arriba*, 336 F.3d at 820-21.  In *Arriba*, the Ninth Circuit held that although Arriba copied

15  Kelly's images as a whole: "[the copying] was reasonable to do so in light of Arriba's use of the

16  images.  It was necessary for Arriba to copy the entire image to allow users to recognize the

17  image and decide whether to pursue more about the image or the originating web site."  *Id.* at

18  821.  Had Arriba copied only parts of the images, "it would [have been] more difficult to

19  identify, thereby reducing the usefulness of the visual search engine."  *Id*.  Thus, "[e]ven

20  substantial quotations may constitute fair use in commenting on a published work."  *Savage*,

21  2008 WL 2951281, at *7.  For example, "an individual in rebutting a copyrighted work

22  containing derogatory information about himself may copy such parts of the work as are

23  necessary to permit understandable comment."  *Id.* at *7 (citing *Hustler Magazine*, 796 F.2d at

24  1153) (finding fair use where the defendant copied an entire parody to rebut the parody's

25  derogatory message about the defendant because said use was "comment"); *see also Lennon v.*

26  *Premise Media Corp.*, 556 F. Supp. 2d 310, 325-26 (S.D.N.Y. 2008) (holding that a fifteen-

27

28

1  second excerpt of the three-minute song "Imagine" favored fair use).  As the Ninth Circuit

2  explained:

3  　　　　Regarding the qualitative nature of the work used, *we look to see*

4  　　　　*whether "the heart" of the copyrighted work is taken* – in other

5  　　　　words, whether the portion taken is the most likely to be newsworthy

6  　　　　and important in licensing serialization.  Finally, if the new user only

7  　　　　copies as much as necessary for his or her intended use, this factor

8  　　　　will not weigh against the new user.

9  *Presley Enters.,* 349 F.3d at 630 (emphasis added).

10  　　　　Here, although Myxer's users upload entire versions of Plaintiff's works, thereby

11  constituting wholesale copying, users can only download portions of Plaintiff's works.  (Def.'s

12  Opp'n 23.)  Thus, users can arguably copy only as much as is necessary for their intended use,

13  around 25 seconds.  (Calkins Decl. ¶ 22, Ex. R [Madden Depo. at 81]; Madden Decl. ¶ 33; Def.'s

14  Opp'n 23; Def.'s SOF ¶ 47.)  Nevertheless, even though users' downloading represents only

15  portions of Plaintiff's works, it still does not serve any of the intended purposes of § 107.  *See*

16  *Hustler Magazine*, 796 F.2d at 1153.  Further, although the downloaded portions of Plaintiff's

17  works do not represent full versions of Plaintiff's works, they often include the chorus, which is

18  often a central part, i.e. "the heart," of each work.[32]  *Presley Enters.,* 349 F.3d at 630.  In

19  response, Myxer asserts:

20  　　　　In practice, when a phone rings, the user will answer the phone in

21  　　　　less time.  Quantitatively, this is a small portion of songs that

22  　　　　typically last several minutes.  Qualitatively, the excerpts are small,

23

24

25  _____

26  　　[32]  David Ring, an employee of UMG, explains: "In recent years (beginning prior to 2005), a significant source of digital revenue earned by UMG has been the use of portions of these sound recordings – most often the option that we anticipate our customers will most identify with the song, such as the 'hook' or chorus – in the form of cell[ular] phone ringtones, i.e., music that replaces the traditional ring signifying an incoming phone call."  (Ring Decl. ¶ 3.)

27

28

because a ringtone (with its poor quality playing through a

cell[ular] phone speaker) hardly captures the heart of the work.

(Def.'s Opp'n 23.)  Although it may be correct that downloaded versions of Plaintiff's works

represent only portions of each work, it is also arguably true that each downloaded version

constitutes the "heart" of each work because it captures the chorus or other central part, and

therefore, weighs against finding fair use.  *See Presley Enters.,* 349 F.3d at 630.

Accordingly, because the downloaded versions of Plaintiff's works arguably capture the

"heart" of each work, but serve none of the purposes of § 107, this factor weighs slightly against

finding fair use.

> d.   Effect of the Use Upon the Potential Market for or Value of the
>      Copyrighted Work

The "last and undoubtedly the single most important of all the factors, is the effect the use

will have on the potential market for and the value of the copyrighted works."  *Presley Enters.,*

349 F.3d at 631 (internal citations omitted); *see Hustler Magazine,* 796 F.2d at 1155; *see* 17

U.S.C. § 107(4).  "[T]he importance of this [fourth] factor will vary, not only with the amount of

harm, but also with the relative strength of the showing on the other factors."  *Campbell*, 510

U.S. at 591 n. 21.  As the Supreme Court explained in *Universal City Studios,* this fourth factor

seeks to protect the original copyright holder's "incentive to create:"

> The purpose of copyright is to create incentives for creative effort.
> Even copying for noncommercial purposes may impair the copyright
> holder's ability to obtain the rewards that Congress intended him to
> have.  But a use that has no demonstrable effect upon the potential
> market for, or the value of, the copyrighted work need not be
> prohibited in order to protect the author's incentive to create.

*Universal City Studios*, 464 U.S. at 450-51.

"Generally, the fourth factor is concerned with whether the unauthorized use competes for a share of the market for the original work." *Sofa Entm't,* 2010 WL 4228343, at *10; *see Harper & Row*, 471 U.S. at 568.  In *Hustler Magazine*, the Ninth Circuit explained:

> In determining whether the use has harmed the work's value or market, the courts have focused on whether the infringing use:
>
> (1) tends to diminish or prejudice the potential sale of the work; or
>
> (2) tends to interfere with the marketability of the work; or
>
> (3) fulfills the demand for the original work.

*Hustler Magazine*, 796 F.2d at 1155-56 (internal citations and quotations omitted); *see Campbell*, 510 U.S. at 590 (citing *Harper & Row*, 471 U.S. at 568) ("Evaluation of this factor considers both the extent of the market harm caused by the alleged infringer's conduct and the adverse impact on the potential market for the original if this conduct were unrestricted."). "Finally, if the purpose of the new work is commercial in nature, *the likelihood of market harm may be presumed.*" *Presley Enters.,* 349 F.3d at 631 (internal citations omitted) (emphasis added).  By contrast, critique or commentary of the original work, such as a parody that kills demand for the original by force of its criticism, rather than by supplying the demands of the market, does not create a cognizable harm under the Copyright Act.  *See Campbell*, 510 U.S. at 591-92.  Indeed, "[a] use that has no effect upon the market for, and value of the work, need not be prohibited in order to protect the author's incentive to create." *Hustler Magazine,* 796 F.2d at 1155 (internal quotation marks omitted).

"[T]he role of the courts is to distinguish between criticism that decreases demand and copyright infringement that essentially eliminates it by market substitution." *Savage*, 2008 WL 2951281, at *8 (citing *Campbell*, 510 U.S. at 592).  Therefore, the scope of fair use includes "copying by others which does not materially impair the marketability of the work which is copied." *Id.*; *see Texaco*, 60 F.3d at 929-30 (internal quotations and citations omitted) ("[N]ot every effect on potential licensing revenues enters the analysis under the fourth factor. Specifically, courts have recognized limits on the concept of potential licensing revenues by

considering only traditional, reasonable, or likely to be developed markets when examining and assessing a secondary use's effect upon the potential market for or value of the copyrighted work."); *see Arriba,* 336 F.3d 811, 821 ("A transformative work is less likely to have an adverse impact on the market of the original than a work that merely supersedes the copyrighted work.").

Plaintiff argues that Myxer's use of its works harms the existing market for the sale of ringtones of its sound recordings.  (Pl.'s Mot. 39.)  As an initial matter, that Myxer's use of Plaintiff's works serves an entertainment purpose and is commercial, but not tranformative, contributes to this factor weighing against finding fair use.  *See Campbell*, 510 U.S. at 591 n. 21. In response, Myxer argues: "Plaintiffs [sic] have offered no evidence of market harm.  On the other hand, when Myxer users' cell[ular] phones play short excerpts of songs while ringing, Plaintiffs derive benefit from the exposure.  Ringtones are no substitutes for the whole song, and therefore cannot harm the market for those songs."  (Def.'s Opp'n 23.)  However, "it is undisputed that there is an existing market for the sale of the very products – ringtones of Plaintiff's popular sound recordings – that Myxer gives away for free (and sometimes sells)." (Pl.'s Mot. 39.)  Moreover, since Myxer's use of Plaintiff's works is commercial, "the likelihood of market harm may be presumed."  *Napster*, 239 F.3d at 1016; *see Sofa Entm't,* 2010 WL 4228343, at *10.  To rebut this presumption, Myxer must "bring forward favorable evidence about relevant markets," but which it has failed to do.  *Dr. Seuss Enter., L.P. v. Penguin Books, USA, Inc*., 109 F.3d 1394, 1403 (9th Cir. 1997); Def.'s Opp'n 23.

Accordingly, because Myxer's use of Plaintiff's works serves an entertainment purpose and is commercial, and because it arguably harms an existing market for the sale of ringtones, which Plaintiff has entered, this final factor weighs against finding fair use.

### e.   Conclusion

"No single factor or combination of factors controls the fair use analysis; rather, the Court must weigh all the facts 'in light of the purposes of copyright.'"  *Sofa Entm't,* 2010 WL 4228343, at *11; *see Campbell*, 510 U.S. at 577-78 ("The task is not to be simplified with bright-line rules. . . . Nor may the four statutory factors be treated in isolation, one from another.  All are to

70

be explored, and the results weighed together, in light of the purposes of copyright."); *see also*
*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("Creative work is to be
encouraged and rewarded, but private motivation must ultimately serve the cause of promoting
broad public availability of literature, music, and the other arts.").

The Court finds that the purpose of the use component of the first factor weighs against
finding that Myxer's use of Plaintiff's works constitutes fair use; as the uploading and
downloading of copyrighted sound recordings does not fall clearly within any of the purposes
specifically identified in the statute's preamble, e.g., criticism, comment, news reporting,
teaching, scholarship. *See* 17 U.S.C. § 107(4).  "Nevertheless, the Court is mindful that its
inquiry does not end there."  *Sofa Entm't,* 2010 WL 4228343, at *11; *see Pac. & S. Co., Inc.
v. Duncan*, 744 F.2d 1490, 1495 (11th Cir. 1984) (finding that district court erred in failing to
consider the four statutory factors because the court determined that the use in question did not
fall within statute's preamble).

With respect to the remaining issues relevant to the first factor, although Myxer's use is
not transformative, the weight accorded the "commercial" nature of Myxer's use is diminished
by the fact that the downloaded copies represent only portions of the entertainment value of the
original works.  The second factor, which relates to the nature of the copyrighted work, weighs
slightly against fair use because even though Plaintiff's copyrighted works are published, they
are clearly creative in nature.  Additionally, the amount and substantiality of the copyrighted
excerpt supports a determination that the third factor weighs against a finding of fair use; the 25-
40 second ringtones arguably constitute the "heart" of each of Plaintiff's works.  Finally, Plaintiff
provides sufficient basis for a reasonable jury to find that an existing or potential market that
Plaintiff can exploit is adversely affected by Myxer's use of its works and Myxer has wholly
failed to bring forward favorable evidence about relevant markets. *See Dr. Seuss Enter.*, 109
F.3d at 1403.

Accordingly, the Court concludes that as a matter of law, Myxer's use of Plaintiff's works
does not qualify as fair use, pursuant to § 107.  Plaintiff's Motion for Summary Judgment is

1   **GRANTED** to the extent it seeks to preclude Myxer from pursuing the affirmative defense of

2   fair use.

3        D.    <u>Secondary Liability</u>

4        "Although the Copyright Act does not contain any provision imposing secondary liability

5   for copyright infringement, courts have long recognized that in certain circumstances, vicarious

6   or contributory liability will be imposed."  *UMG Recordings, Inc. v. Sinnott* (*Sinnott*), 300

7   F. Supp. 2d 993, 997 (E.D. Cal. 2004) (citing *Fonovisa*, 76 F.3d at 261).  As noted in *Universal*

8   *City Studios*,

9           "The Copyright Act does not expressly render anyone liable for infringement

10           committed by another. . . . The absence of such express language in the copyright

11           statute does not preclude the imposition of liability for copyright infringements on

12           certain parties who have not themselves engaged in the infringing activity.  For

13           vicarious liability is imposed in virtually all areas of the law, and the concept of

14           contributory infringement is merely a species of the broader problem of identifying

15           the circumstances in which it is just to hold one individual accountable for the

16           actions of another.").

17   464 U.S. at 434-35.

18        1.    <u>Contributory Copyright Infringement</u>

19        "Traditionally, one who, with knowledge of the infringing activity, induces, causes or

20   materially contributes to the infringing conduct of another, may be held liable as a 'contributory'

21   infringer."  *Napster*, 239 F.3d at 1019 (internal citations omitted); *see Grokster*, 545 U.S. at 930;

22   *see Ellison*, 357 F.3d at 1076.  "Put different, liability exists if the defendant engages in personal

23   conduct that encourages or assists the infringement."  *Cybernet Ventures*, 213 F. Supp. 2d

24   at 1169.  Indeed: "Establishing direct copyright infringement . . . is a prerequisite to both the

25   contributory and vicarious infringement claims."  *Napster*, 239 at 1013 n. 2.  "The standard for

26   the knowledge requirement is objective, and is satisfied where the defendant knows or has

27   reason to know of the infringing activity."  *Id.*; *see MDY Industries,* 629 F.3d at 937 (citing

28

1  *Napster*, 239 F.3d at 1019) (holding that "[t]o establish secondary infringement, a [plaintiff]

2  must first demonstrate direct infringement," and "[t]o establish direct infringement, [a plaintiff]

3  must first demonstrate copyright ownership and violation of its exclusive rights by [the

4  defendant's] users"); *see also Ellison*, 357 F.3d at 1077; *see Miller v. Facebook, Inc*., 2010

5  WL 2198204, *4 (N.D. Cal. May 28, 2010).  "In *Napster*, [w]e interpreted the knowledge

6  requirement for contributory copyright infringement to include both those with actual knowledge

7  and those who have reason to know of direct infringement."  *Ellison*, 357 F.3d at 1076.

8         Here, Plaintiff asserts that there is "overwhelming evidence of actual and constructive

9  knowledge of infringement on [Myxer's] premises . . . ."  (Pl.'s Mot. 39.)  In response, Myxer

10  presents evidence that, because its Website is capable of substantial non-infringing uses, Plaintiff

11  cannot show that it knew or had reason to know of direct infringement.  (SGI ¶¶ 173-176, 190.)

12  Myxer's evidence establishes that it not only features Partner content, but that many of the

13  ringtones available are directly authorized by their copyright holder or that users have certified

14  that they control the rights.  (Sass Decl. ¶ 10-17.)  Material uploaded by MyxerIndies, Myxer's

15  Partners, and MyxerArtists demonstrates that Myxer's Website is capable of non-infringing uses.

16  (*Id*.)  Indeed, many of the ringtones on Myxer's Website do not even belong to Plaintiff.  (*Id*.)

17  Horowitz testified that at most, 25% of the files uploaded on Myxer's Website were owned by

18  Plaintiff, Warner, or Sony.[33]  (Horowitz Decl. ¶ 7.)  Evidence of non-infringing uses weighs

19  against finding that Myxer materially contributes to the infringing conduct of another.  (Sass

20  Decl. ¶ 10.)  Even so, summary judgment is inappropriate here because contributory copyright

21  infringement requires a showing of direct copyright infringement, which has not yet been

22  established.  *See MDY Industries*, — F.3d —, 2010 WL 5141269, at *4.

23  ───────────────

24         [33] Horowitz states: "I have served as a Professor of Computer Science and Electrical Engineering since 1983,
and I served as the Chairman of the Computer Science Department at the University of Southern California from 1990

25  to 1999. . . . I have extensive experience in the field of software engineering, a field in which I have focused my
research work for the past two decades." (Horowitz Decl. ¶ 1.) Horowitz further explains: "based on my experiment,

26  of the 423,798 human-named files among the 1.4 million music files provided by Myxer on the hard drives,
Audible Magic determined that 106,801 of the files, or 25.2% were owned by current Plaintiffs in this action."

27  (Horowitz Decl. ¶ 7.)  The Court notes that all named Plaintiffs, except UMG, have been dismissed, such that the
percentage of files owned by Plaintiffs is necessarily less.

28

Accordingly, because Myxer provides examples of non-infringing uses and direct copyright infringement has not been established, the Court **DENIES** Plaintiff's Motion for Summary Judgment to the extent that it seeks to find Myxer liable for contributory copyright infringement.

### 2. Vicarious Copyright Infringement

One "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930. Thus, "a plaintiff must allege: (1) direct copyright infringement by a third party; (2) an obvious and direct financial interest in the exploitation of the copyrighted materials; and (3) the right and ability to supervise the infringing activity." *Live Face on Web, LLC v. Howard Stern Prods., Inc.*, 481, *3 (E.D. Pa. Mar. 17, 2009) (citing *Ellison*, 357 F.3d at 1078); *see Sinnott*, 300 F. Supp. 2d at 1002; *see Amazon.com*, 508 F.3d at 1173-75 (holding that "[to] succeed in imposing vicarious liability, a plaintiff must establish that the defendant . . . derives a direct financial benefit from the direct infringement," and "exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so.").[34]

To the extent that Myxer uses Audible Magic filtering technology (as well as other means to stop or limit the alleged copyright infringement) there remain genuine issues of material fact as to whether Myxer sufficiently exercises a right to stop or limit the alleged copyright infringement. *See Grokster*, 545 U.S. at 930. Further, as with contributory copyright infringement, vicarious copyright infringement requires a showing of direct infringement, but which has not been established because it remains unclear at this stage whether there is an underlying claim of direct copyright infringement. *Grokster*, 545 U.S. at 930; *see Napster*, 239 at 1013 n 2*; see also Amazon.com*, 508 F.3d at 1173-75.

---

[34] In *In re Aimster*, the Seventh Circuit explained: "Vicarious liability generally refers to the liability of a principal, such as an employer, for the torts committed by his agent, an employee for example, in the course of the agent's employment." *In re Aimster*, 334 F.3d at 654. The court reasoned, however, that vicarious liability "has been extended in the copyright area to cases in which the only effective relief is obtainable from someone who bears a relation to the direct infringers that is analogous to the relation of a principal to an agent." *Id.*

1    Accordingly, because Myxer shows that it exercises a right to stop or limit the alleged

2  copyright infringement and direct copyright infringement has not been established, the Court

3  **DENIES** Plaintiff's Motion for Summary Judgment to the extent that it seeks to find Myxer

4  liable for vicarious copyright infringement.

5  **III.   RULING**

6    For the reasons stated above, because Myxer has established a genuine issue of material

7  fact as to its affirmative defense under § 512(c), the Court declines to grant summary judgment

8  as to Plaintiff's claims of direct, contributory, and vicarious infringement.  However, because

9  Myxer's use of Plaintiff's works does not qualify as fair use pursuant to § 107, Myxer is

10  precluded from pursuing this fair use affirmative defense.  Accordingly, the Court **DENIES IN**

11  **PART AND GRANTS IN PART** Plaintiff's Motion for Summary Judgment.

12

13  **IT IS SO ORDERED.**

14

15  Dated this 1st day of April, 2011.

16

17  _____
                         GARY ALLEN FEESS
18                  UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28